UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

STATE OF CONNECTICUT    :    ss: New Haven, Connecticut
:
:
COUNTY OF NEW HAVEN    :

**AFFIDAVIT**

I, Scott Verillo, a Task Force Officer with the Drug Enforcement Administration, having been duly sworn, state as follows:

### I.    INTRODUCTION AND AGENT BACKGROUND

1.    I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7) and am empowered by law to conduct investigations of and to make arrests for offenses as set forth in 18 U.S.C. § 2516.00

2.    I am a Detective with the Bristol (CT) Police Department, whom I have been employed by since 2012.  From November 2019 to the present, I have been assigned as a deputized Task Force Officer ("TFO") to the Drug Enforcement Administration ("DEA") New Haven District Office ("NHDO") Tactical Diversion Squad ("TDS"), which is comprised of personnel from the DEA, Seymour (CT) Police Department, Bristol (CT) Police Department, West Haven (CT) Police Department, Hamden (CT) Police Department, Fairfield (CT) Police Department, Glastonbury (CT) Police Department, and the Connecticut State Police (CSP.) During my tenure as a Police Officer and a DEA Task Force Officer, I have participated in numerous criminal investigations, including investigation into suspected drug trafficking, money laundering, and related offenses.

3.    I have received instruction in conducting such investigations while attending the Connecticut Police Academy (POSTC) in Meriden, Connecticut, the DEA Basic Narcotics

School in New Britain, Connecticut, and the DEA Tactical Diversion Squad School in Stafford, Virginia, as well as various other schools, seminars, and periodic in-service training.

4.     Over the past fourteen years in law enforcement, I have participated in numerous investigations involving individuals suspected of distributing illegal drugs and have coordinated controlled purchases of illegal drugs using cooperating witnesses, confidential sources and undercover agents/officers.  I have assisted state and federal prosecutors in preparing affidavits in support of applications for search warrants and arrest warrants and have obtained and coordinated the execution of such warrants. These investigations have resulted in the seizure of illegal drugs, illegally possessed firearms, United States currency, assets acquired with drug proceeds, and assets used to facilitate drug activities, digital data and information that constituted evidence of drug trafficking and related offenses, as well as led to the arrest and/or conviction of many of those involved.  I have testified in court proceedings, conducted electronic as well as physical surveillance of individuals involved in illegal drug distribution, including participation in Title III investigations, analyzed records documenting the purchase and sale of illegal drugs, and spoken with informants and subjects, as well as other local, state and federal law enforcement officers, regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs.  As a result of my training and experience, I am familiar with behaviors, methods and common practices of persons and organizations that illegally import and distribute controlled substances, as well as the devices commonly used by them.

5.     Some of these practices include the use of multiple cellular devices to stay in contact with both the customer base and other DTO members, the use of drug runners to transport or deliver quantities of narcotics while mitigating risk to the principle DTO members,

and the use of counter-surveillance methods such as deceptive driving behavior and frequently changing meet spots.

6.     The information set forth in this affidavit comes from my personal observations and my own investigative efforts, my training and experience, and information obtained from other law enforcement officers acting in their official capacity, who have reported their findings to me. I have personally participated in this investigation and am familiar with the facts and circumstances of the offenses.  Law enforcement has developed information related to this investigation through physical and electronic surveillance, telephone toll records, seizures of illegal drugs, Court authorized searches of electronic devices, and information provided by confidential sources. The statements contained in this affidavit are based, in part, on my personal knowledge.  Where the contents of documents, or communications with others are reported in this affidavit, they are set forth in substance and part, unless otherwise indicated.  This affidavit does not purport to set forth all of the facts gathered during the course of the investigation of this matter, but rather includes only those facts which are necessary to establish probable cause to support the issuance of the requested search and arrest warrants.

## II.     <u>PURPOSE OF AFFIDAVIT</u>

7.     The subject case is a joint investigation being conducted by DEA NHDO TDS and the Bristol Police Department (BPD), with considerable assistance provided by a number local law enforcement agencies.  The collective of law enforcement agencies investigating this case will generally be referred to as "law enforcement," or "investigators."  As part of my duties, I am currently participating in an investigation into violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute, and distribution of, controlled substances) and 21 U.S.C. §§ 846 (conspiracy to traffic controlled substances) (hereinafter the "TARGET OFFENSES") by

Joshua OCASIO and other members of the OCASIO DTO.  The investigation has revealed that

the individuals described below are co-conspirators involved in the OCASIO DTO, who work in

concert as poly-drug sellers in the greater central Connecticut region.  Members sell quantities of

fentanyl, cocaine, crack-cocaine, diverted pharmaceuticals including oxycodone, Adderall, and

Xanax, counterfeit pills pressed with fentanyl, and other controlled substances for profit.

OCASIO employs multiple "drug runners" who carry quantities of narcotics and conduct drug

deals on behalf of the principles; these drug runners are dispatched to complete sales through

cellular telephones, most often utilizing text messaging, in what amounts to a "home delivery"

style of illegal drug sales.  Prior to a "shift," drug runners generally meet with OCASIO or

another member of the DTO to "Stock Up" with illegal drugs to sell - this terminology is used by

DTO members to describe the frequent drug resupplies that occur with the drug runners.  At the

conclusion of a "shift," drug runners turn over drug proceeds to OCASIO or other principles of

the DTO.

       8.     As outlined below, this affidavit is submitted in support of applications seeking

criminal complaints and arrest warrants for multiple individuals, who together are coconspirators

within the OCASIO DTO:

       a.   **Joshua OCASIO** – Joshua OCASIO is the de facto leader of the OCASIO DTO

           and is instrumental in the procurement of controlled substances for OCASIO

           DTO members to later resell. OCASIO is the primary individual contacted by

           OCASIO DTO customers to place orders, and handles the organization,

           coordination and dispatching of drug deliveries to OCASIO DTO customers.

           OCASIO further organizes, prepares and coordinates the restocking of illegal

           drugs for OCASIO DTO runners and the collection of drug proceeds from the

same. This affidavit is submitted in support of a request for the issuance of a criminal complaint charging Joshua OCASIO with a violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(vi) and 846.

b. **Jose ROSADO-ORTIZ** – Jose ROSADO-ORTIZ is a member of the OCASIO DTO and a close counterpart of Joshua OCASIO, holding a position of rank in the OCASIO DTO as OCASIO's second in command. ROSADO-ORTIZ assists in the delivery of illegal drugs to OCASIO DTO customers, and also controls the premises of TARGET LOCATION 2, where drugs and drug proceeds are thought to be stashed. This affidavit is submitted in support of a request for the issuance of a criminal complaint charging Jose ROSADO-ORTIZ with a violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 846.

c. **Ryan JASSOR** - Ryan JASSOR is a member of the OCASIO DTO. JASSOR is known to have previously held an OCASIO DTO phone linked to OCASIO and to be involved in the delivery of illegal drugs to OCASIO DTO customers. During the course of JASSOR's participation in the scheme, he is believed to have held a position of rank within the OCASIO DTO; however, after his January 2025 arrest, JASSOR appeared to have left the state and has lessened involvement. This affidavit is submitted in support of a request for the issuance of a criminal complaint charging Ryan JASSOR with a violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 846.

d. **Debra JANKOWSKI-** Debra JANKOWSKI is a runner for the OCASIO DTO, actively participating in the delivery of illegal drugs to OCASIO DTO customers and collecting drug proceeds and debts as directed. This affidavit is submitted in

support of a request for the issuance of a criminal complaint charging Debra

JANKOWSKI with a violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and

846.

e. **Toni RISUCCI -** Toni RISUCCI is a runner for the OCASIO DTO, actively

participating in the delivery of illegal drugs to OCASIO DTO customers and

collecting drug proceeds and debts as directed.  This affidavit is submitted in

support of a request for the issuance of a criminal complaint charging Toni

RISUCCI with a violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 846.

f. **James WARKOSKI-** James WARKOSKI is a runner for the OCASIO DTO,

actively participating in the delivery of illegal drugs to OCASIO DTO customers

and collecting drug proceeds and debts as directed.  WARKOSKI is further

believed to be involved the acquisition of drugs related to the overdose deaths that

occurred at 35 Jasmine St.  This affidavit is submitted in support of a request for

the issuance of a criminal complaint charging James WARKOSKI with a

violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 846.

g. **Ryan RIBACK –** Ryan RIBACK is a runner for the OCASIO DTO, actively

participating in the delivery of illegal drugs to OCASIO DTO customers and

collecting drug proceeds and debts as directed.  This affidavit is submitted in

support of a request for the issuance of a criminal complaint charging Ryan

RIBACK with a violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 846.

h. **Kyle MASTROIANNI-** Kyle MASTROIANNI is a runner for the OCASIO

DTO, actively participating in the delivery of illegal drugs to OCASIO DTO

customers and collecting drug proceeds and debts as directed.  MASTROIANNI

also operates as a redistributor to a separate customer base parallel to the OCASIO DTO, sourcing drugs from the OCASIO DTO to resell. MASTROIANNI is further believed to be involved in the sale of drugs related to three overdoses, including two which were fatal. This affidavit is submitted in support of a request for the issuance of a criminal complaint charging Kyle MASTROIANNI with a violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 846.

i.  **Robert PINETTE-** Robert PINETTE is a runner for the OCASIO DTO, actively participating in the delivery of illegal drugs to OCASIO DTO customers and collecting drug proceeds and debts as directed. This affidavit is submitted in support of a request for the issuance of a criminal complaint charging Robert PINETTE with a violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 846.

j.  **Griffin DEPREY-** Griffin DEPREY is a runner for the OCASIO DTO, actively participating in the delivery of illegal drugs to OCASIO DTO customers and collecting drug proceeds and debts as directed. This affidavit is submitted in support of a request for the issuance of a criminal complaint charging Griffin DEPREY with a violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 846.

k.  **Quran MUHAMMAD-** Quran MUHAMMAD is a facilitator for the OCASIO DTO, actively participating in the acquisition, transportation, and redistribution of drugs for the OCASIO DTO. MUHAMMAD also operates as a redistributor to a separate customer base parallel to the OCASIO DTO, sourcing drugs from the OCASIO DTO to resell. This affidavit is submitted in support of a request for the

issuance of a criminal complaint charging Quran MUHAMMAD with a violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 846.

9.      Additional members of the OCASIO DTO for whom investigators are not currently seeking charges include the following individuals, and others unnamed:

a.  **Lionel PACHECO-** Lionel PACHECO is a member of the OCASIO DTO. PACHECO previously operated as a high-ranking member within the OCASIO DTO, operating on a level equal to or just below OCASIO. PACHECO assisted in the receiving and dispatching of OCASIO DTO customer orders and the facilitation of drug deliveries. PACHECO appeared to have a significantly diminished role in OCASIO DTO activity during much of this investigation, but in the last several months appears to be participating in OCASIO DTO activities again.

b.  **Melissa OUELLETTE-** Melissa OUELLETTE was previously a runner for the OCASIO DTO, who actively participated in the delivery of illegal drugs to OCASIO DTO customers and collected drug proceeds and debts as directed.

c.  **Adam WITKEWICZ-** Adam WITKEWICZ was previously a runner for the OCASIO DTO, who actively participated in the delivery of illegal drugs to OCASIO DTO customers and collected drug proceeds and debts as directed.

d.  **Renhdell DELONE –** Rendhell DELONE is a facilitator for the OCASIO DTO, who is involved in the acquisition and registration of vehicles used by DTO members.  DELONE is also believed to reside at a premises used as a stash house for the OCASIO DTO.

10.     I also submit this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search multiple premises utilized by members of the OCASIO DTO in furtherance of drug trafficking, including:

a.  **TARGET LOCATION 1**: TARGET LOCATION 1, further described in Attachment A-1, is a single-family home with attached garage, with green siding and light trim, located at 2 Yellow-Orange Circle, Middletown, CT.  The home was purchased by DIAMOND EXPRESS LOGISTICS LLC, a company owned by OCASIO, in approximately August 2022.  Investigators are aware that TARGET LOCATION 1 is OCASIO's primary residence, and he stays overnight there on most occasions.  Investigators believe that the OCASIO DTO stores the items described in Attachment B there.

b.  **TARGET LOCATION 2**: TARGET LOCATION 2, further described in Attachment A-2 is multi-family duplex style structure, with tan siding, white trim, and black shutters.  TARGET LOCATION 2 is located at 37 Pioneer Circle, Manchester, CT.  The structure also holds the physical address of 35 Pioneer Circle, which investigators are not currently requesting to search.  The home was purchased by Jose ROSADO-ORTIZ in approximately June of 2022.  Investigators are aware that TARGET LOCATION 2 is ROSADO-ORTIZ's primary residence, and he stays overnight there on most occasions.  Investigators believe that the OCASIO DTO the items described in Attachment B at TARGET LOCATION 2, using it frequently to resupply OCASIO DTO members with drugs.

### III.     <u>BACKGROUND</u>

*Identification of Particular Devices Referenced in this Affidavit*

11.     During the course of this investigation, multiple Affidavits have been submitted to the Court in which reference to certain cellular devices have been made.  In some cases, generic terms such as "TARGET TELEPHONE" have been used to refer to different devices across different Affidavits.  In an effort to provide clarity, the following nomenclature will be utilized herein to refer to specific devices:

    a.  The "TARGET TELEPHONE" is assigned call number 860-807-5874.  It is utilized by Joshua OCASIO and was the primary "drug phone" for the OCASIO DTO until approximately February 2025.

    b.  The "TARGET TELEPHONE 2" is assigned call number 802-552-6658.  It is utilized by Joshua OCASIO, and is believed by investigators to be a direct replacement for the TARGET TELEPHONE, beginning in approximately February 2025

    c.  The "TARGET TELEPHONE 3" is assigned call number 860-549-2988.  It is believed to be utilized by Joshua OCASIO, and is a direct replacement for TARGET TELEPHONE 2

    d.  The "OCASIO TELEPHONE" is assigned call number 860-560-6931.  It is utilized by Joshua OCASIO to communicate with co-conspirators such as JASSOR and MUHAMMAD, but is not generally used to communicate with drug customers of the OCASIO DTO.

    e.  The "ROSADO-ORTIZ TELEPHONE" is assigned call number 959-759-3054.  It is utilized by Jose ROSADO-ORTIZ, and used to contact OCASIO and others.

f.  The "DELAROSA TELEPHONE" is assigned call number 860-754-4657.  It is believed to utilized by Tiffany DELAROSA, a drug customer of the OCASIO DTO.

g.  The "DELONE TELEPHONE" is assigned call number 860-904-8143.  It is utilized by Rendhell DELONE, a facilitator within the OCASIO DTO, who is the registered owner of the Acura JASSOR was driving at the time of his arrest

h.  The "DEPREY TELEPHONE" is assigned call number 860-919-5521.  It is believed to utilized by Griffin DEPREY, a drug runner for the OCASIO DTO.

i.  The "JANKOWSKI TELEPHONE" is assigned call number 860-770-0845.  It was, during the time frames discussed in this Affidavit, believed to utilized by Debra JANKOWSKI, a drug runner for the OCASIO DTO.

j.  The "JANKOWSKI TELEPHONE 2" is assigned call number 860-426-4574.  It was utilized by Debra JANKOWSKI, a drug runner for the OCASIO DTO, after the seizure of the JANKOWSKI TELEPHONE.

k.  The "JASSOR TELEPHONE" is assigned call number 860-538-8837.  It was a secondary "drug phone" for the OCASIO DTO up until its seizure by investigators on January 17, 2025.

l.  The "LENTINI TELEPHONE" is assigned call number 860-964-0623.  It is believed to utilized by RONALD LENTINI, a drug customer of the OCASIO DTO.

m.  The "D.L. TELEPHONE" is assigned call number 959-226-8393.  It was utilized by D.L. up until his death on May 12, 2025.

n.  The "MASTROIANNI TELEPHONE" is assigned call number 860-414-6746.  It is utilized by Kyle MASTROIANNI, a drug runner for the OCASIO DTO

o.  The "MUHAMMAD TELEPHONE 1" is assigned call number 860-934-9682.  It was utilized by Quran MUHAMMAD until at least April, 2025, and was used to contact OCASIO

p.  The "PINETTE TELEPHONE" is assigned call number 860-877-7888.  It is believed to utilized by Robert PINETTE, a drug runner for the OCASIO DTO.

q.  The "RIBACK TELEPHONE" is assigned call number 860-490-4934.  It is utilized by Ryan RIBACK, a drug runner for the OCASIO DTO

r.  The "RISUCCI TELEPHONE" is assigned call number 203-518-3196.  It is believed to be utilized by Toni RISUCCI, a drug runner for the OCASIO DTO.

s.  The "WARKOSKI TELEPHONE" is assigned call number 860-398-2393.  It is believed to be utilized by James WARKOSKI, a drug runner for the OCASIO DTO.

t.  The "WOFFORD TELEPHONE" is assigned call number 860-414-2495.  It is believed to be utilized by James WOFFORD, a drug customer of the OCASIO DTO who resides at 276 Louisiana Ave., Bristol CT.

u.  The "WITKEWICZ TELEPHONE" is assigned call number 860-372-6542.  It is believed to be utilized by Adam WITKEWICZ, a drug runner for the OCASIO DTO.

v.  The "BINGHAM TELEPHONE" is assigned call number 860-461-8622.  It was utilized by Michael BINGHAM, a frequent OCASIO DTO drug customer and redistributor of OCASIO DTO drugs.

w. The "C.M. TELEPHONE" is assigned call number 475-439-2821. It is utilized by C.M., a non-fatal overdose victim, including its use during the time frame of the overdose

x. The "J.K. TELEPHONE" is assigned call number 860-371-9708. It was utilized by J.K. up until the time of her overdose death.

y. The "NARDELLI TELEPHONE" is assigned call number 860-982-7724. It is utilized by OCASIO DTO drug customer Brian NARDELLI, a friend of overdose victim J.K.

*Case Initiation*

12. Dating back as far as March 2023, investigators developed information from multiple sources about a drug dealing operation conducted by "G and J" in Bristol, CT area. From multiple interviews, it was determined that "G and J," together with a network of drug runners delivered diverted pharmaceuticals including oxycodone, Xanax, and Adderall, counterfeit pills pressed with fentanyl, fentanyl powder, and cocaine to various cities. The two used two primary phone lines, which received incoming orders for illegal drugs, which were in turn dispatched out to the drug runners via text message from the main phone lines. Customers described the operation as "shift work" in which "G," "J," or various runners would show up to serve them. They stated that they communicated exclusively with the "G and J" phones and were in turn served by "G" or "J," or by runners with whom they had no direct telephone contact. "G and J" were said to provide rental cars, cellular phones, and caches of illegal drugs to runners to operate on behalf of the DTO. Investigators were provided with the license plates of certain vehicles said to be driven at the time by "G" and "J" and found them to be rental vehicles registered to Middletown Toyota Rental.

13.     Through subsequent interviews and Administrative Subpoenas served on various cell phone providers, investigators later determined that the two main phone lines are as follows:

    a.   860-538-8837, with service provided by T-Mobile, and no known subscriber information.  The -8837 phone was later identified by investigators as the "JASSOR TELEPHONE."

    b.   860-807-5874, with service provided by AT&T, and no known subscriber information.  The -5874 phone was later identified by investigators as the "TARGET TELEPHONE."

14.     In late 2023, continuing into 2024, BPD began to field complaints related to narcotics related activity occurring at certain residences within Bristol; among them were 30 Jeannette St., Bristol, CT and 52 Plank Hill Rd., Bristol, CT.

15.     On or around December 18, 2023, in the area of 30 Jeannette St., investigators observed a dark colored Dodge Ram pickup bearing Rhode Island registration 1LX254, which appeared to be making a delivery to residents at the house, consistent with complaints received on the BPD Tip Line.  An inquiry with a law enforcement database revealed the Ram to be a rental car owned by EAN Holdings (Enterprise Rent-A-Car.)  An Administrative Subpoena served on EAN Holdings showed that the renter of this Ram was Joshua OCASIO.

## IV.   INVESTIGATION CHRONOLOGY AND DRUG SEIZURES FROM OCASIO DTO

*Arrest of Adam WITKEWICZ in Plainville, CT on September 19, 2023*

16.     Investigators began to conduct research into the drug trafficking activities of the OCASIO DTO and learned after the fact of significant drug seizures related to the OCASIO DTO that had occurred during the prior months.  One such seizure occurred on or about

September 19, 2023, in Plainville, CT.  The Plainville Police Department (PPD), after fielding complaints of narcotics related activity occurring in the vicinity of 20 Stillwell Dr., Plainville, CT, were conducting surveillance in that area when they observed a dark colored Chevy Malibu bearing Florida registration 1008AS departing the same vicinity they had previously observed the occupants of another SUV walk to and from.  PPD effected a motor vehicle stop for an observed motor vehicle violation.  They contacted Adam WITKEWICZ, who, after an initial denial, admitting to possessing contraband.  A PPD narcotics K-9 was utilized for an open-air sniff and alerted to the presence of the odor of narcotics within the vehicle.  A subsequent search yielded approximately 360 wax folds containing suspected fentanyl, approximately 16 grams of cocaine, approximately 16 grams of crack-cocaine, as well as oxycodone, Xanax, and Adderall pills.  Additionally, cellular telephones, various drug paraphernalia, and U.S. Currency was located.  The cocaine and crack-cocaine seizures each field tested positive for the presumptive presence of cocaine.

17.     WITKEWICZ was arrested by PPD and charged with state narcotics offenses. During a post-*Miranda* interview, and after executing a written waiver of rights, WITKEWICZ admitted to conducting drug sales to various individuals before being stopped by police. WITKEWICZ stated that he works for a "larger dealer" who provides him with a rental car and cell phone to use. WITKEWICZ stated that he then receives phone calls from people he does not know who want to buy drugs. In exchange, WITKEWICZ stated that he gets a small amount of drugs for his own personal use.

18.     An inquiry with a law enforcement database showed that the Chevy Malibu was a rental car registered to Hertz Rental Cars.  An Administrative Subpoena served Hertz Rental Cars showed that the renter of this Chevy Malibu was again OCASIO.

19.     Investigators conducted review of cellular telephone records procured from various service providers during the course of this investigation.  A review of those records included phone number 860-372-6542 ("WITKEWICZ PHONE").  Investigators reviewed the toll records from September 18, 2023 through September 19, 2023 and found that the WITKEWICZ PHONE was in contact with both the TARGET TELEPHONE and the JASSOR TELEPHONE. There were four (4) contacts between the TARGET TELEPHONE and the WITKEWICZ PHONE on September 18, 2023 between approximately 6:14 PM and 6:16 PM. Additionally, there were six (6) contacts between the TARGET TELEPHONE and the WITKEWICZ PHONE on September 19, 2023 between approximately 1:11 PM and 6:59 PM. There were twenty-four (24) contacts between the JASSOR TELEPHONE and the WITKEWICZ PHONE on September 19, 2023 between approximately 12:23 PM and 6:41 PM. WITKEWICZ was arrested by PPD at approximately 8:47 PM.

20.     Based on my training and experience, the contact between the WITKEWICZ TELEPHONE, the TARGET TELEPHONE, and the JASSOR TELEPHONE around the time of his arrest supports investigator's belief that WITKEWICZ was operating as a runner for the OCASIO DTO prior to his arrest in Plainville, CT.

*Arrest of Melissa OUELLETTE in Vernon, CT on November 19, 2023*

21.     On or about November 19, 2023, members of the Vernon Police Department (VPD) were conducting surveillance at the Red Roof Inn, located at 425 Hartford Turnpike, Vernon, CT.  VPD investigators know the Red Roof Inn to be a high drug trafficking area.  VPD investigators observed a Silver Chevy Silverado bearing CT registration C190840 departing the area; a motor vehicle stop was conducted for an observed motor vehicle violation, and investigators contacted Melissa OUELLETTE, the lone occupant.  During a subsequent roadside

interview, OUELLETTE eventually admitted to possessing cocaine inside the vehicle. During a search of the vehicle, investigators located an aggregate total of approximately 22 grams of crack-cocaine in multiple bags, approximately 127 wax folds containing suspected fentanyl, approximately 18 grams of cocaine, as well as oxycodone, Xanax, and Adderall pills. Additionally, investigators seized various drug paraphernalia, over $2,000 in U.S Currency, and a Motorola brand cellular phone. The seized narcotics were later subjected to appropriate field test kits by VPD investigators, with presumptive positive results.

22.    OUELLETTE was arrested by VPD and charged with state narcotics offenses. During a post-*Miranda* interview, OUELLETTE stated that the drugs located by VPD investigators did not belong to her, and that she was delivering them to the Red Roof Inn on behalf of someone else, for which she would be paid $200.

23.    Following the arrest of OUELLETTE by VPD investigators executed a State of Connecticut search warrant for OUELLETTE's cellphone. The cellphone was described as a Motorola Moto G Pure assigned IMEI 357032232037632, Serial Number ZY22GZPHQG, and assigned phone number 860-457-8401, hereinafter referred to as the OUELLETTE TELEPHONE. The extracted data was secured on a flash drive, a copy of which was later furnished to DEA personnel.

24.    DEA investigators later conducted an analysis of the cellphone data. The analysis revealed that the OUELLETTE TELEPHONE was in contact with both the TARGET TELEPHONE and the JASSOR TELEPHONE. The OUELLETTE TELEPHONE's contact list contained both phone numbers. The JASSOR TELEPHONE was labeled "JimJamJimJamJimJam" and the TARGET TELEPHONE was labeled as "Aka Jiminy Cricket JimJam." Based on analysis of the text messages between the OUELLETTE TELEPHONE, the

JASSOR TELEPHONE, and the TARGET TELEPHONE, investigators believe that OUELLETTE was working as a drug runner for the OCASIO DTO from approximately September 2023 through November 2023.  In sum, within the text messages investigators found evidence that OUELLETTE was directed by the JASSOR TELEPHONE or the TARGET TELEPHONE to travel to specific locations to complete drug resupplies, as well as evidence that OUELLETTE would be directed to complete drug sales on behalf of the OCASIO DTO, receiving text messages from the either the JASSOR TELEPHONE or the TARGET TELEPHONE indicating the delivery address, the specific order for particular drug types and quantities, and the purchase price. In addition, OUELLETTE would occasionally be provided with a description of the customer or vehicle.

25.    The following is an example of the previously described text messages from the JASSOR TELEPHONE, which occurred on November 18, 2023:

JASSOR TELEPHONE (2:28 PM):  STOCK UP

50b

29.56s with bag

35.12h with bag

13 (30mg) adderal

20+ bars

25 fake Percs

26.    Based on my training and experience, in the previous text message, the JASSOR TELEPHONE is describing a drug resupply, in which OUELLETTE would receive 50

"Bundles" of fentanyl.  Investigators are aware that a "bundle" of fentanyl is 10 individual wax folds, each containing a single dosage unit of fentanyl, often referred to on the street as "B's." OULLETTE would also receive 29.56 grams of powder cocaine, designated here as "s" for "soft," 35.12 grams of crack-cocaine, designated here as "h" for "hard," 13 Adderall pills, 20 or more Xanax pills, designated here as "bars" due to their unique bar-like shape, and 25 pills pressed with fentanyl, designated here as "fake percs," meaning counterfeit Percocet pills[1]. Investigators are aware that "soft" is a common street term for powder cocaine and that "hard" is a common street term for crack-cocaine.

27.    Immediately thereafter on November 18, 2023, the JASSOR TELEPHONE begins directing OUELLETTE to complete drug sales, designating quantity, drug type, and location using the same code as outlined above.  What follows is small sample:

JASSOR TELEPHONE (2:34 PM):  721 Jerome ave Bristol ct

2b

$40

28.    Based on my training and experience, in the above text messages, the JASSOR TELEPHONE directed OUELLETTE to deliver two bundles of fentanyl to 721 Jerome Ave., Bristol, CT for a price of $40.  This pattern continues on November 18, 2023 with the JASSOR TELEPHONE directing OUELLETTE to complete a dozen or more drug transactions.

---

[1] The coded language referenced in this paragraph has been consistently used by OCASIO DTO members throughout the investigation.  Within this affidavit, references to controlled substances may be made either by proper name (e.g., "cocaine") or by coded terminology (e.g., "soft").

29.     Similarly, the TARGET TELEPHONE also communicated with the OUELLETTE TELEPHONE on November 18, 2023, directing her to complete drug resupplies and drug sales utilizing the same code as the JASSOR TELEPHONE.

> TARGET TELEPHONE (12:40 PM):  Fulton
>
> TARGET TELEPHONE:  Where you at now
>
> TARGET TELEPHONE:  I'm going to start figuring things out

30.     In the preceding three text messages, the TARGET TELEPHONE appears to direct OUELLETTE to "Fulton," which based on my knowledge of this investigation is a residential street in New Britain, CT where the OCASIO DTO completes drug resupplies with runners, such as OUELLETTE.  After asking where she was, the JASSOR TELEPHONE sent a message indicating that he is going to "start figuring things out."  Based on my training and experience, I know this to mean calculating the proper quantities of each drug type to resupply OUELLETTE with.  A few hours later, the TARGET TELEPHONE directed OUELLETTE to complete drug sales in the same manner as the JASSOR TELEPHONE.

> TARGET TELEPHONE (7:07 PM):  Stacey on garden 2b and 0.5h $80

31.     Based on my training and experience, in the above text messages, the TARGET TELEPHONE directed OUELLETTE to deliver two bundles of fentanyl and 0.5 grams of crack-cocaine to "Stacey" on Garden St., for a price of $40.  The TARGET TELEPHONE continues to direct OUELLETTE to complete drug sales from around 7 PM on November 18, 2023 until early the next morning.  Based on the text messages, it appears that around twenty drug sales were

completed at the direction of the TARGET TELEPHONE.  Eventually, during the early morning hours of November 19, 2023, the TARGET TELEPHONE directs OUELLETTE to complete the drug sale that ultimately led to her arrest, as follows:

> TARGET TELEPHONE (12:20 AM):  475 Hartford turnpike Vernon ct
>
> Motel
>
> 10b and 5.2s
>
> $470

32.     Based on my training and experience, in the above text messages, the TARGET TELEPHONE directed OUELLETTE to deliver ten bundles of fentanyl and 5.2 grams of cocaine to the motel located at 475 Hartford Turnpike, Vernon, CT, for a price of $470.  OUELLETTE was later arrested by VPD after leaving the motel.

*ROSADO-ORTIZ Flees Bristol Traffic Stop on June 11, 2024*

33.     During the time frame beginning in approximately spring of 2024, investigators developed information that 52 Plank Hill Rd., Bristol, CT was a known drop location for the OCASIO DTO, whose members were known to come to the house with large quantities of illegal drugs which were delivered to the various residents of the premises.

34.     On or about June 11, 2024, Detective Matthew Godbout from the Bristol Police Department was conducting surveillance at 52 Plank Hill Rd. when he observed a silver Dodge Ram pickup bearing CT registration C300403 arrive and park.  Approximately two minutes later, the Dodge departed.  The short duration of the Dodge's trip to 52 Plank Hill Rd. was consistent with a drug drop, so Det. Godbout followed, eventually effecting a motor vehicle stop.  The

Dodge pulled over, and Det. Godbout approached the operator and lone occupant, a Hispanic male with a hat on.

35.     After speaking with the male, who did not provide any identification, Det. Godbout requested that he exit the Dodge.  At that point, the Hispanic male operator drove away at a high rate of speed, fleeing the motor vehicle stop [2]  No pursuit was initiated.  The Dodge fled the scene at approximately 8:17 PM.

36.     An inquiry with a law enforcement database showed that the Dodge was a rental car registered to EAN Holdings (Enterprise Rental Car.)  Later, investigators contacted Enterprise Rental Car's law enforcement liaison and determined that the Dodge was rented to Joshua OCASIO, with phone number 860-560-6931 (the "OCASIO TELEPHONE"), and address 2 Yellow Orange Cir, Middletown, CT (TARGET LOCATION 1.)  The Dodge was picked up on May 28, 2024 and was due to be returned on June 11, 2024, though Enterprise Rental Car personnel said the return date could be extended by the renter.

*Surveillance of OCASIO DTO "Stock Ups" on July 31, 2024*

37.     On or about July 31, 2024, investigators conducted surveillance on OCASIO, who was at the time driving the same silver Dodge Ram pickup truck bearing CT registration C300403.  As explained above, investigators were aware that this Ram was rented by OCASIO. After locating the Ram in West Hartford, CT, investigators were able positively identify OCASIO as the driver and sole occupant.  Investigators followed OCASIO as he drove the Ram to Batterson Park boat launch in New Britain, CT and parked along the entrance road. Investigators noted that the location afforded concealment from both the public roadway and the

---

[2] Investigators would later identify this male as Jose ROSADO-ORTIZ

parking area for the boat launch; the private location led investigators to believe that OCASIO would likely attempt to conduct drug meets.

38.     Investigators began to surveil the area, including monitoring vehicle traffic entering and exiting the area and conducting foot surveillance, which afforded a clear view of the Ram truck despite its private parking location.  Investigators then observed OCASIO meet with numerous individuals, most of whom entered the truck or approached the driver's side door where OCASIO sat, in a manner consistent with conducting drug transactions.  Investigators noted a degree of precision to the meetups, in which each person who met with OCASIO arrived, conducted their respective transaction, and then departed, immediately following which the next individual would arrive.  From this, investigators inferred that OCASIO was coordinating the meetups via cellular phone, as none of the individuals overlapped during their meets with OCASIO, nor did any individuals arrive too early or too late.   Approximately six individual meets were observed between OCASIO and others; investigators later were able to identify some of these individuals, and based upon the level of coordination suspected some of them to be drug runners for the OCASIO DTO rather than street level customers – a fact which was later confirmed by investigators.

39.     The individual suspected drug transactions occurred as follows:

   a.   At approximately 5:42 PM, a white BMW sedan bearing CT registration BH08065 parked behind the Ram truck in a manner that suggested the occupant was familiar with OCASIO.  Investigators were not yet in a position which afforded a clear view, and were unable to observe the interaction between the operators of each vehicle.  The BMW then left, without meeting any other persons.  Investigators later determined the that the registered owner was Jeffrey

ZIEGENHAGEN, who was found to have operated as a runner for the OCASIO
DTO during periods of time relevant to the investigation.

b.  At approximately 5:43 PM, a white Jeep with CT historical plate 00ZHSX parked
behind the Ram truck.  The operator, who appeared to be male, was observed
entering the truck where he remained briefly, before he exited and returned to his
jeep.  The jeep departed.  Investigators later determined the registered owner to be
Christopher SMITH, who was found to be a frequent drug customer of the
OCASIO DTO.

c.  At approximately 5:48 PM, a maroon Buick SUV bearing CT registration
BC58455, occupied by a petite white female, arrived and parked behind the Ram
truck.  The white female entered the truck, where she remained briefly, before she
exited and returned to the Buick.  The Buick departed and headed to the Noble
Gas station where it parked and remained.  A later check of CT DMV records
showed the Buick to be a rental car from Elite Auto Rental, New Britain, CT.  At
the conclusion of the Batterson Park surveillance, investigators followed the
Buick from the Noble Gas Station to Best Oil, located at 237 Huntingdon Ave,
Waterbury, CT, and then finally to the area of Golfview Dr. in Watertown, CT.
Investigators consulted with the Watertown Police Department (WPD) and
learned that Toni RISUCCI of 61 Golfview Dr. was a white female who matched
the description of the operator of the maroon Buick.  Best Oil is owned by
RISUCCI's parents.  RISUCCI is known to WPD to have a history of drug use
and prostitution.  WPD provided a booking photograph of RISUCCI, and

investigators confirmed her to be the operator of the maroon Buick. It was later
determined that RISUCCI was a high-level drug runner for the OCASIO DTO.



d.  At approximately 5:57 PM, a yellow GMC pickup bearing CT registration
AT16641 arrived and parked alongside the Ram truck. The operator of the GMC
appeared to approach the driver's side of the truck briefly, before re-entering the
GMC and departing the area. While departing, investigators were able to get a
close view of the operator as he turned around in the parking area. A later inquiry
of CT DMV records showed the registered owner to be Michael LEVESQUE.
Investigators viewed a driver's license photograph of LEVESQUE and confirmed
him to be the operator.

e.  At approximately 6:00 PM, a white Volkswagen bearing CT registration BR35582
parked alongside the truck. The operator, who appeared to be male, briefly
approached the driver's side of the truck, before returning to the Volkswagen and
departing the area. A later check of CT DMV records showed the Volkswagen to
be a rental car from Diamond Elite Auto Rentals, Hartford, CT. Investigators

learned after the fact that days later, on August 4, 2024, the Volkswagen was involved in a motor vehicle crash in Bristol, CT; at the time of the crash, the operator was Kyle MASTROIANNI, who investigators would later determine to be a high-level drug runner for the OCASIO DTO.

f.  At approximately 6:08 PM, OCASIO drove the Ram truck further into the parking lot and parked next to a black Lexus sedan with dark tinted windows that had been parked in the parking lot for some time.  Investigators first believed the license plate displayed on the Lexus to be CT registration BP26282, but later determined that they had transposed two digits, and the correct license plate was CT registration BP28262.  Investigators observed OCASIO remove a medium sized duffel style bag, and what appeared to be an item of clothing from the rear of the Lexus sedan, which he placed into the truck.  OCASIO left shortly thereafter, followed by the Lexus.  A later check of CT DMV records for plate BP28262 revealed that it was assigned to a 2019 Lexus ES 350, color black, and that the registered owner was Jose ROSADO-ORTIZ.  Investigators obtained a DMV photograph of ROSADO-ORTIZ, and immediately recognized him as the operator of the gray Dodge Ram pickup when it fled from Det. Godbout of the Bristol Police Department (BPD) on June 11, 2024.  During that incident, Det. Godbout's body worn camera (BWC) captured a clear image of the driver prior to him fleeing the scene.  In the intervening months between when Det. Godbout attempted to stop ROSADO-ORTIZ and the present, multiple sources have identified the male depicted in the image captured from Det. Godbout's BWC as a high-level runner for the OCASIO DTO.



*Drugs Discarded by Suspected OCASIO DTO Member*

40.    On or about September 25, 2024, at approximately 12:40 AM, BPD Ofc. Mitchell was conducting surveillance in the area of 30 Jeannette St., Bristol, CT.  Investigators had advised Ofc. Mitchell of street level narcotics sales occurring at or near the address, related to the OCASIO DTO.

41.    Ofc. Mitchell observed a white sedan with dark tinted windows, believed to be an Acura or Infiniti, backed into an adjacent driveway, occupied and running.  Ofc. Mitchell observed a skinny white male wearing a white tank top and athletic shorts standing at the open passenger side window, engaged in what Ofc. Mitchell determined to be a hand-to-hand drug transaction.

42.      Shortly after, the white sedan left the area, and Ofc. Mitchell followed with the intent to conduct a motor vehicle stop.  The white sedan began to take a series of turns, increasing to a high rate of speed, in an obvious effort to thwart Ofc. Mitchell's attempts to catch up.  After a short time, Ofc. Mitchell lost sight of the vehicle, in the area of Hepworth St./Perry Rd.  The vehicle continued northbound at that time.

43.      Ofc. Mitchell determined that his attempt to stop the white sedan occurred between approximately 12:45 AM and 12:48 AM.

44.      After some time, a citizen contacted BPD to inform them that he had located a bag containing a large amount of narcotics, seemingly discarded in the driveway of his residence, located at an address known to me.  Ofc. Mitchell noted that this address was on the exact route that the white sedan had taken when fleeing from him earlier in the night.  Ofc. Mitchell responded to that address and recovered a gray toiletry style bag and its contents, which included approximately 65 grams of suspected crack-cocaine, approximately 42 grams of suspected fentanyl powder, approximately 870 wax paper folds containing suspected fentanyl packaged for sale, over 100 assorted oxycodone pills, including "M 30's," and dozens of other various pharmaceuticals, including suspected alprazolam, Adderall, and oxycodone pills.

45.      In an effort to identify the possessor of the aforementioned controlled substances, investigators later swabbed the gray bag and certain items of drug paraphernalia for DNA samples and submitted them to the State of Connecticut Forensic Laboratory (hereinafter, the "Laboratory"), in Meriden, CT.  However, the results of testing indicated that the DNA samples contained a mixture from multiple contributors that was too complex for comparison to DNA databases.[3]

---

[3] A comparison with a "known sample" may be possible

46.     Investigators are aware that at the time, 30 Jeannette St. was the residence of Michael BINGHAM, and that BINGHAM was supplied with quantities of narcotics to resell by members of the OCASIO DTO.  Investigators developed intelligence that dating back to approximately December 2023 that multiple vehicles associated with the OCASIO DTO, including the gray Dodge Ram bearing CT registration C300403 and a dark colored Lexus sedan with dark tints that matched the one owned by ROSADO-ORTIZ were frequent visitors to the Jeannette St. address, and were observed conducting what witnesses describe as "drug deals" while there.

47.     Further, during the time frame spanning from approximately May 2024 through September 2024, telephone number 860-461-8622 (the "BINGHAM TELEPHONE"), associated with BINGHAM was in contact with phone numbers believed to be utilized by members of the OCASIO DTO to facilitate drug transactions (TARGET TELEPHONE, JASSOR TELEPHONE) approximately 3,800 times, on a daily or nearly daily basis.

48.     Investigators would later review the JASSOR TELEPHONE pursuant to a search warrant, and learned that on September 24, 2024, at approximately 9:11 PM through September 25, 2024, at approximately 12:36 AM, the BINGHAM TELEPHONE and the TARGET TELEPHONE were in contact approximately 33 times.  Specifically, BINGHAM had placed an order for a "half stack and full ball of candy," which I believe means fifty (50) wax folds of fentanyl and 3.5 grams of crack-cocaine.  The specified price was $200, $39 of which was to be paid via CashApp.  At approximately 12:36 AM, the BINGHAM TELEPHONE sent a screenshot to TARGET TELEPHONE, indicating a CashApp payment for $39 had been made to a recipient called "$Geenicee."  Investigators are aware that this is not the CashApp account that OCASIO was using at the time, which was "$Gee2nice,) but it is similar, a fact which will be

explained in following text messages.  Ofc. Mitchell observed a suspected hand-to-hand transaction occur between the skinny white male and occupant of the unknown white sedan at approximately 12:40 AM.

49.     Upon the white sedan leaving, Ofc. Mitchell attempted to follow the white sedan, which performed evasive maneuvers at a high rate of speed, ultimately eluding Ofc. Mitchell.  Investigators believe that during the flight from Ofc. Mitchell, the occupant of the white sedan discarded his stash of drugs out the window in the area of 52 Hepworth St. believing that he was likely to be caught by police.  Ofc. Mitchell stated that the white sedan was last seen at about 12:48 AM.

50.     Approximately four minutes later, at 12:52 AM, the OCASIO TELEPHONE received an incoming call from the ROSADO-ORTIZ TELEPHONE, and the two engaged in a 15-minute conversation.  Investigators believe this call came from the operator of the white sedan that fled from Ofc. Mitchell, and was likely for the purpose of alerting OCASIO, the head of the OCASIO DTO, that the drug stash had been discarded.

51.     Immediately after the start of the incoming call from the ROSADO-ORTIZ TELEPHONE to the OCASIO TELEPHONE, the TARGET TELEPHONE sent the following text messages to the BINGHAM TELEPHONE:

TARGET TELEPHONE (12:53 AM): You about to get rushed

TARGET TELEPHONE: I'm done with your house

TARGET TELEPHONE: You sent money wrong person

52.     Based on my training and experience, the message "you are about to get rushed" is OCASIO alerting BINGHAM that the police may raid his house.  This message was sent nearly immediately after OCASIO was contacted by ROSADO-ORTIZ, presumably to alert

OCASIO of the police chase that had just occurred. OCASIO goes on to say "I'm done with your house, in an apparent reference to the house being under police surveillance. Lastly, OCASIO noted that BINGHAM had sent the CashApp payment to the wrong person, as explained above.

*November 29, 2024 Arrest of MASTROIANNI*

53.     On or about November 29, 2024, at approximately 3:32 PM, the BPD arrested MASTROIANNI in Bristol, CT after MASTROIANNI was found to have controlled substances in his possession during a motor vehicle accident. MASTROIANNI was operating a gray 2023 Kia Soul bearing Connecticut registration AY72410 and found to be under the influence of drugs or alcohol following police investigation into the motor vehicle accident.

54.     During a subsequent search of MASTROIANNI's Kia, investigators located seven (7) wax paper folds containing an off-white powdery substance in the center console of the Kia as well as a blue backpack on the passenger seat of the vehicle. A search of the backpack discovered it contained approximately 20 wax paper folds of suspected fentanyl, two plastic bags containing seven total grams of white powdery substance which field tested positive for cocaine, a gray scale with a white powdery substance on it, five pills of Alprazolam 2m in a small plastic paper bag.

*Drug Seizure from OCASIO DTO Runner on December 7, 2024 in Bristol, CT*

55.     On or about December 7, 2024, at around 1:07 AM, the BPD received a suspicious person complaint in the area of 65 Mark St., Bristol, CT. The caller reported individuals placing items into or removing items from a mailbox and described the suspect vehicle as a white sedan bearing NY registration plates. After initial responding officers were unable to locate the vehicle, BPD received another complaint at 1:59 AM reporting a suspicious

white sedan circling the neighborhood, and officers believed the vehicle may be involved in

package thefts that had been occurring in the area.

56.    Responding officers located a Chevrolet Malibu bearing NY registration

LKN2480 in the vicinity. This vehicle matched the description of both of the previous

complaints.  BPD Ofc. Pollock began to follow the Malibu, which immediately pulled to the side

of the road, despite Ofc. Pollock not activating his emergency lights and siren, as if trying to

avoid the marked police car.  Ofc. Pollock stopped behind the Malibu, activating his emergency

lights at that time, and contacted the operator, a male later identified as OCASIO DTO associate

David SIROIS and a female passenger identified as Debra JANKOWSKI.  A query of

JANKOWSKI's identifying information through a law enforcement database revealed that she

had an active arrest warrant held by the PPD.  As the investigation continued, SIROIS and

JANKOWSKI provided unclear answers to questioning related to where they were coming from

and what their business was, and whether or not they had removed or stolen items from

mailboxes.

57.    Eventually, investigators asked JANKOWSKI to exit the vehicle in order to take

her into custody on the outstanding warrant.  At that time, Ofc. Pollock observed a large bag

containing a white, chalky rock-like substance between the front passenger seat and center

console, that based on his training and experience he recognized to be crack-cocaine.

58.    At this point, Ofc. Pollock deployed his K-9 "Hero," a narcotics detection dog, to

conduct a K-9 search of the vehicle.[4] K-9 "Hero" ultimately alerted to the presence of narcotics

---

[4] K-9 "Hero" is a trained and certified police service dog through NAPWDA, and is
specifically trained in the detection of narcotics. She is trained to conduct searches of
vehicles, buildings, and open areas to passively "alert" by sitting, laying down, and or
pointing to the odor of narcotics. Hero is trained to indicate on the following odors:
Methamphetamine, Cocaine, and Heroin.

within the vehicle, specifically in the passenger floorboard area where JANKOWSKI had been

seated. Investigators conducted a search of the vehicle, during which the following was located:

An aggregate total of approximately 993 wax folds (purple and white) containing suspected

fentanyl, an aggregate total of approximately 18 grams of crack-cocaine packaged in multiple

bags, an aggregate total of approximately 60 grams of cocaine packaged in multiple bags, as well

as suspected oxycodone, Xanax, and Adderall pills. Additionally, four notebooks containing

drug ledgers, two cellular telephones, including the JANKOWSKI TELEPHONE, various items

of drug paraphernalia, and approximately $5,913 in U.S. Currency was located. The cocaine and

crack-cocaine seizures each field tested positive for the presumptive presence of cocaine.



59.     JANKOWSKI was arrested by PPD on the unrelated warrant. Jankowski was

charged by State of Connecticut arrest warrant at a later date for narcotics offenses related to the

December 7, 2024 seizure. During routine booking procedures at PPD, JANKOWSKI provided

her phone number as 860-770-0845, hereinafter referred to as the JANKOWSKI TELEPHONE.

Investigators served the service provider, T-Mobile, with an Administrative Subpoena, and

confirmed that JANKOWSKI TELEPHONE's subscriber was "Debra Jankowski, 12 Mallard

Dr., Avon." Investigators later sought and obtained a search warrant to examine the

JANKOWSKI TELEPHONE, which was determined to have significant evidence of the

OCASIO DTO's drug trafficking activities, as further described in the OCASIO DTO Telephone

Analysis section of this affidavit.

*JANKOWSKI Drug Ledgers*

60.    During the December 7, 2024, motor vehicle stop and subsequent search,

investigators located four (4) drug ledgers amongst JANKOWSKI's belongings. Investigators

conducted a cursory review of these drug ledgers, finding them to contain significant evidence of

the OCASIO DTO's drug trafficking activities. The ledger pages ranged from highly detailed,

containing seemingly accurate notes of dates, drug orders, and locations, to those that were more

vague or unclear, sometimes containing numbers and codes similar to what investigators

observed in the OUELLETTE PHONE text message review. Some of the more notable ledger

observations are as follows:

61.    On a page titled "Sunday 12/1/24" there were itemized lists under headings for

"Inventory AM," "PM Inventory," and "Added to Stock." Each of these headings had

breakdowns of drug quantities using slang terminology, e.g. "Buns" for fentanyl bundles, "Bars"

for Xanax pills, "Percs" for oxycodone pills, "Percs fk" for counterfeit oxycodone pills pressed

with fentanyl, "Addies" for Adderall pills, "Subs" for Suboxone strips, "Soft" for cocaine, and

"Hard" for crack-cocaine. On an adjoining page, a chart had been drafted indicating

approximately 13 drug sales, with the details of each sale including drug type, quantity, and price

designated.  In sum, the ledger pages described above appear to be a diligent effort to maintain accurate records related to the day's drug sales.  Similar daily ledgers exist for each day between December 1, 2024 and December 5, 2024.



62.    Multiple pages of ledgers exist following a slightly modified format.  These pages are broken into four columns titled "Customer," "Order," "Amount $ Collected," and "Notes."  It is noteworthy that many entries under the customer heading contain addresses rather than names. Based on my earlier review of the OUELLETTE PHONE text messages, I am aware that the TARGET TELEPHONE and the JASSOR TELEPHONE most often designated individual drug sales to runners by address or location, rather than by an actual name of an individual. Additionally, in the notes column, certain customers are documented to have paid via "CashApp to Jay."

| Customer | Order | Amount Collected | Notes |
|---|---|---|---|
| Dave | 0.8H | $40 | |
| 226 N. Washington St Plainfd | 2.5H | $100 | |
| Violet Dr. Guylon Ft | 0.5H + 0.5S | $60 | |
| 124 Worcester St Bristol | 07S | $100 w/1 bottle us | * short 1 FB |
| Summer St Bristol | 2 S regular | $360 | |
| 245 French St Bristol | 1/2 b + 0.7H | $40 | |
| Ascot Pl. Avon | 7b reg + 0.3H | $200 | White chipper back |
| Atkins Ave Bristol | 0.8H | $45 | Tan suv |
| Bliss Memorial | 1.0 S | $60 | |
| " " | 5.5 S | $180 | |
| " " | 1.0 H | free | Harpe 2 door truck |
| " " | 6 Pos | $40 | Didnt show up |
| " " | 0.7 S | $40 | |
| Church St Plainville | 5.2H | $210 | Burgandy Truck |
| Lyons Rd Bristol | 1.4H + 0.2.5b | $120 | White girl walking |
| Violet Dr. Bristol | 3.5S + 3B 5FO 1load | $275 | Kyle |
| 54 Wilbur St Plainville | 2B + 0.7H | $60 | |
| 6 Santa Ctr St Cheshire | 1B + 0.9H | $75 | |
| 5 Maple Rd Southington | 3.5H | $150 | |
| Violet Dr. Bristol | 7.0S 6b LV | $300 | Kyle |
| 191 Central St Bristol | 2.2 S | $100 | |
| 820 Mainhurst St. | 20 O 0.2H | $60 | |
| 27 La Louisiana Ave | 3B regular | $50 pd $75 | ** 4 bars gave $25 tip |
| 260 N. Washington St | 1.7H | $70 | |
| 113 Pleasant Pt Lincoln NB | 1.7 S | $70 | |
| 43 Avery Rd Newington | 0.6H | $40 | |
| 77 William St West | 8 1.7 S | $80 | |
| 9632 Farming Co | | | |
| Newton St Berlin | 6 b LV | $130 | Cash up to Jay |
| 53 Mitchell Dr Southington | 8H b LV | $660 | |
| 96 N main St Plainville | 5b | $140 | |
| 19½ E main St Bristol | 1.7S + 2 Addicts | $120 | |
| Sexton St NB | 1.4H | $60 | Tell her its the bell |
| 34 Clark St Bristol | 0.7 H | $40 | Cash up to Jay |

63.    Other drug ledger pages appear to be a balance sheet, keeping track of how much

money JANKOWSKI owes to the principal targets of this investigation.  These pages indicate

how much was paid to "Jay" on a particular day, which is then subtracted from a running balance

of money owed.



Arrest of Toni *RISUCCI on December 13, 2024 in Newington, CT*

64.     On or about December 13, 2024 Newington Police Department (NPD) responded

to a call of a motor vehicle accident on the Berlin Turnpike.  Responding NPD officers

determined that RISCUCCI was one of the involved drivers, and while conducting an accident

investigation observed a Stop & Shop reusable shopping bag on the floor behind the passenger

seat.  In plain view within the bag was a small plastic bag which contained small blue pills.  As

she attempted to look for the vehicle's paperwork, RISCUCCI was observed by responding NPD officers attempting to conceal the Stop & Shop bag from view by covering it with a jacket.

65.     Having observed suspected narcotics within plain view, NPD officers subsequently conducted a search of RISCUCCI's vehicle, during which a large cache of narcotics were observed.  NPD officers located an aggregate total of approximately 51 grams of crack-cocaine in multiple bags, approximately 438 wax folds containing suspected fentanyl, approximately 35 grams of cocaine, as well as oxycodone, Xanax, and Adderall pills. Additionally, investigators seized various items of drug paraphernalia, a notebook containing a drug ledger, nearly $3,000 in U.S Currency, a "stun gun," and an Apple iPhone in a light blue case, hereinafter referred to as the "RISUCCI TELEPHONE."  Some of the seized narcotics were later subjected to appropriate field test kits by NPD investigators, with presumptive positive results.  RISCUCCI was arrested on State of Connecticut charges.



*Second RISUCCI Seizure*

66.    Despite RISUCCI's December arrest, investigators have determined that she continued to operate as a drug runner on behalf of the OCASIO DTO.  On or about January 4, 2025 the Canton Police Department (CPD) responded to a suspicious vehicle complaint.  A Toyota Prius was reported to be parked in the middle of the road, and the operator was feared to be asleep at the wheel.  Responding CPD officers contacted the female operator, later determined to be RISUCCI, and observed her to be handling U.S. Currency and drug paraphernalia.  At this point, RISUCCI operated the Prius away from responding CPD officers, engaging them in a police pursuit during which RISUCCI was observed throwing wax folds of suspected fentanyl out the window.  The pursuit ended when RISUCCI was involved in a motor vehicle accident. During the subsequent investigation, investigators searched the Prius, locating the following:  An aggregate total of approximately 719 wax folds containing suspected fentanyl, an aggregate total of approximately 34.7 grams of crack-cocaine packaged in multiple bags, an aggregate total of approximately 14.2 grams of cocaine, smaller bags containing fentanyl powder weighing nearly 3 grams, as well as suspected oxycodone, Xanax, and Adderall pills and approximately $1,030 in drug proceeds.



67.     Investigators reviewed telephone toll records related to the TARGET

TELEPHONE and RISUCCI TELEPHONE for the time period between RISUCCI's arrest by

NPD, and her arrest by CPD.  Between approximately December 13, 2024 and January 4, 2025,

the RISUCCI phone was in contact with the TARGET TELEPHONE approximately 158 times.

Specifically, investigators reviewed telephone toll records from January 4, 2025 when RISUCCI

was arrested by CPD.  On the date, there were 36 contacts between the TARGET TELEPHONE

and the RISUCCI TELEPHONE, with sustained messaging beginning at approximately 6:21

PM.  The last outgoing contact from the RISUCCI TELEPHONE to the TARGET TELEPHONE

occurred at approximately 8:02 PM.  RISUCCI was arrested by CPD at approximately 9:02 PM.

Afterwards, the TARGET TELEPHONE attempted to contact the RISUCCI TELEPHONE

fifteen (15) additional times from approximately 9:22 PM until approximately 9:29 PM

*Arrest of Ryan JASSOR on January 17, 2025 in Bristol, CT*

68.     Over the course of this investigation, investigators became aware of a silver Acura TLX A sedan bearing CT Registration BL60275 which was believed to be utilized by OCASIO DTO runners.

69.     On or about January 17, 2025, investigators noted that the Acura's license plate was read on (License Plate Readers) LPR's in Windsor, CT and Southington, CT, before eventually being read in Bristol, CT at around 8:30 pm.

70.     From prior Court authorized searches of the RISUCCI TELEPHONE, in addition to telephone toll analysis, investigators are aware of multiple locations in Bristol, CT where OCASIO DTO runners meet with drug customers.  Investigators, accompanied by members of the BPD began to check these areas in an effort to locate the Acura.

71.     A short time later, investigators observed the Acura parked in the driveway of 276 Louisiana Ave, Bristol, CT, an address of OCASIO DTO drug customer James WOFFORD. The Acura was running, with the vehicle's display screens visible through the tinted windows. Additionally, illumination from a cellular phone was observed, leading investigators to conclude that the Acura was occupied.  After about ten minutes, investigators observed a middle-aged white male exit the residence and approach the driver's side of the Acura.  The driver's side window rolled down, and the middle-aged male and the Acura's operator engaged in a quick conversation while the male stood close to the window.  Investigators were unable to see what, if anything was exchanged between the two, but based on my training and experience, and knowledge of this investigation I believe that a hand-to-hand drug transaction took place.

72.     The Acura departed, but shortly after pulled to the side of the road and appeared to be manipulating a cell phone.  I believe that the Acura's driver was at this point consulting with a cellular phone to determine where the next scheduled drug deal was to occur.  Unable to

pull over next to the Acura for fear of being identified as law enforcement, investigators lost sight of the Acura at this time.

73.    Over approximately 90 minutes that followed, investigators and members of BPD searched for the Acura, with LPR systems reading the Acura's license plate within Bristol two more times over that duration, indicative that the Acura had remained in the area and was traveling around the city.  Investigators focused their search on areas where OCASIO DTO drug customers are known to reside, and areas known to be used as meet locations.

74.    Just before 10:30 PM, investigators located the Acura parked in the driveway of 114 Arlington St, Bristol, CT, the residence of OCASIO DTO drug runner Robert PINNETTE. Investigators noted that the Acura was running, with the headlights off.  Again, the faint illumination from a cell phone screen in the area of the driver's seat, led investigators to conclude that the vehicle was occupied, and the driver was likely waiting to conduct a drug transaction with an individual at the address.

75.    Investigators were unable to see if any person(s) approached the Acura from their vantage points, but after a few minutes, the Acura backed out of the driveway and began to leave the area.  As with the prior departure from 276 Louisiana Ave. the Acura briefly pulled over, and investigators could again see the light from a cell phone screen.  Moments later, the Acura continued on.

76.    Investigators relayed their observations to BPD Officer Genovese, who had been briefed on the details of the investigation and was familiar with the Acura, which he began to follow in a marked BPD patrol car.  Officer Genovese observed a window tint violation, and he conducted a motor vehicle stop for that violation.  The Acura immediately pulled to the right side of the road, but did not stop immediately, slowly rolling a short distance before eventually

coming to a stop.  Based on my training and experience, when vehicle operators fail to stop immediately when signaled to do so by police, it is often to afford them the time to access or hide weapons or contraband.

77.    Officer Genovese contacted the operator, identified by an Arizona driver's license as Ryan JASSOR, at the passenger window.  JASSOR was unable to locate valid insurance for the vehicle, and began calling a friend to help find it.  Shortly thereafter, I arrived on-scene as backup and approached the vehicle.  On the back passenger side floorboard, partially wedged under the front passenger seat, I observed a black and green soft sided lunch box, similar to bags the OCASIO DTO had used in the past to conceal drug stashes.  I walked around to the driver's side where JASSOR was seated, and I immediately noticed that JASSOR was attempting to conceal a small yellow envelope under his left leg.  I asked what it was, and JASSOR eventually replied that it was his "travel money."

78.    At this time, I observed that JASSOR was speaking to an individual on speakerphone, and the phone screen displayed the contact name "Josh" who I believed to be OCASIO.  I instructed JASSOR to step out of the vehicle, and he replied that he, "did not consent to any searches or seizures."  JASSOR made no effort to comply with my instructions, even after I reiterated them, and began to become argumentative.  To avoid the situation escalating further, I reached inside the vehicle and was able to unlock the door from the inside.  At this point, JASSOR stepped from the vehicle.  I escorted him to the roadside and conducted a pat down for weapons with none located.

79.    While JASSOR exited the vehicle, I was able to observe small rock-like fragments on the driver's side floorboard and the seat, which I immediately recognized as crack-

cocaine.[5]  During a roadside interview, JASSOR explained to officers that the vehicle was a

"rental," and that he was unsure of some of the contents.

80.      At this point, a BPD narcotics detection K-9 conducted an exterior sniff of the

Acura, alerting to the presence of the odor of narcotics within the vehicle.[6]  During a subsequent

search of the Acura, investigators located items including, but not limited to, approximately

$3,842 in U.S. Currency, approximately 42 grams of cocaine, approximately 29 grams of crack-

cocaine, approximately 418 wax folds containing suspected fentanyl printed with an image of the

cartoon character "Sonic the Hedgehog," approximately 22 suspected Alprazolam 2 mg pills

bearing imprints "Y 21" and "2090 V," various items of drug paraphernalia, drug ledger

documents, assorted documents bearing the name "Joshua Ocasio," and three apple iPhones,

including the JASSOR TELEPHONE.[7]

81.      The cocaine, crack-cocaine, and fentanyl was later subjected to appropriate field

test kits, each with a presumptive positive result.  A check of the website Drugs.com[8] revealed

that bar shaped white tablets with the imprint "Y 21" are 2 mg Alprazolam pills, manufactured

by Aurobindo Pharma Limited.  Bar shaped white tablets with the imprint "2090 V" were

---

[5] During the subsequent search of the vehicle, these fragments were field tested using a MISTRAL brand Cocaine Wipe, which turned bright blue, indicating a positive result for the presumptive presence of cocaine
[6] As noted above, K-9 "Hero" is a trained and certified police service dog through NAPWDA.
[7] In prior Affidavits submitted to the Court, investigators have included information about the JASSOR TELEPHONE, which had been identified by confidential sources at the onset of the investigation as being held by "G," who investigators identified as Lionel PACHECO.  This phone was described as being the linked to the TARGET TELEPHONE, and investigators believed that it was most often held by OCASIO's "second-in-command" who at one time was PACHECO.  At certain points in the investigation, it appeared that PACHECO had taken on a lessor role, and thus handed off the "second-in-command" telephone.  As of the time of this affidavit, PACHECO appears to again be involved in a leadership role within the OCASIO DTO. The fact that the phone was held by JASSOR at the time of his arrest indicates to investigators that he may hold a similar leadership role in the OCASIO DTO.
[8] The online database Drugs.com has a pill identifier feature in which a user can query shape, color, and/or imprint of a prescription medication and the database will identify the prescription medication.  I have used this online database for a period of several years, finding it to be a reliable resource, and have previously had the results of Drugs.com queries confirmed by a pharmacist licensed in the State of Connecticut.

revealed to be 2 mg Alprazolam pills manufactured by Qualitest Pharmaceuticals Inc.

Alprazolam is a Schedule IV controlled substance under the CSA.



82.    JASSOR was arrested and charged with state drug offenses by the BPD.  Later,

multiple search warrants were authorized by the Court to examine the JASSOR TELEPHONE

and data and information extracted from it.[9]  Investigators were able to review the data seized

from the JASSOR TELEPHONE.

83.    After an initial review of the JASSOR TELEPHONE investigators came to an

important realization.  The JASSOR TELEPHONE appeared to be linked to the TARGET

TELEPHONE, in that text message exchanges involving the JASSOR TELEPHONE and a third

party—such as a drug customer of the OCASIO DTO—also had the TARGET TELEPHONE as

an involved party.  In fact, investigators noted that it was rare for the JASSOR TELEPHONE to

---

[9] I first obtained a search warrant authorizing the forensic examination of the JASSOR TELEPHONE, limited in scope to the time frame beginning on December 4, 2024.  After performing the extraction and examining the data and information during the time frame authorized by the initial warrant, investigators developed probable cause to expand the scope of the search.  I then sought and obtained a search warrant authorizing the search of data extracted from the JASSOR TELEPHONE for the date range from July 11, 2024 through December 3, 2024

send reply messages to any incoming inquiry.  Rather, nearly all of messages involved exchanges between the TARGET TELEPHONE and third-party drug customers.  Simply put, the JASSOR TELEPHONE was merely an observer in that the JASSOR TELEPHONE was privy to text message exchanges between the TARGET TELEPHONE, held by OCASIO, and the numerous drug customers of the OCASIO DTO.

84.    Investigators are aware, through research into Apple's iPhone operating software, that Apple's iMessage and iCloud services enable synchronized message delivery across multiple Apple devices linked to the same Apple ID. When a message is received, it is transmitted via Apple's servers and delivered simultaneously to all connected devices. If "Messages in iCloud" is enabled, messages, including sent, received, and deleted ones, are synchronized and stored securely. SMS/MMS messages from non-Apple users can also be forwarded to other Apple devices through Text Message Forwarding, requiring an active iPhone. These features allow users to access and continue conversations seamlessly across devices.  In the case of the OCASIO DTO, it appears that the TARGET TELEPHONE and the JASSOR TELEPHONE share an Apple ID, allowing messages from third parties to be delivered simultaneously on both devices.  In this manner, OCASIO can receive incoming drug orders, negotiate prices, set up delivery addresses, etc. and all the while the holder of the JASSOR TELEPHONE can remain apprised of the situation, enabling efficient fulfillment of drug orders and easing the burden of communication on OCASIO.

85.    It is important to note that this synchronized message feature does not appear as a "group chat" to the drug customer.  Rather, the drug customer would communicate exclusively with the TARGET TELEPHONE or the JASSOR TELEPHONE and would not be aware that their messages were being delivered across multiple devices.

86.     Investigators conducted a cursory review of data extracted from the JASSOR TELEPHONE pertaining to the January 17, 2025 seizure.  Of note were two particular text message exchanges.  The first exchange involved the WOFFORD TELEPHONE.  It should be noted that in the following transcription, the data extracted from the JASSOR PHONE indicates that the conversation includes the JASSOR TELEPHONE, the TARGET TELEPHONE, and the WOFFORD TELEPHONE, though the JASSOR PHONE does not send any messages.  The conversation is summarized as follows:

WOFFORD TELEPHONE (4:58 PM): *Got 85 even*

WOFFORD TELEPHONE (4:58 PM): *Call me*

WOFFORD TELEPHONE (6:33 PM): *Did you get my message bro*

WOFFORD TELEPHONE (6:34 PM): *Did you get my message kid*

WOFFORD TELEPHONE (6:41 PM): *Let me know what going on kid got 85*

WOFFORD TELEPHONE (7:39 PM): *Bro can you please let me know what going on kid*

TARGET TELEPHONE (7:42 PM): *25 min*

WOFFORD TELEPHONE (7:44 PM): *ok brother thanks*

WOFFORD TELEPHONE (9:08 PM): *Jim this guy was in my driveway for half hour almost he needs to be careful here bro*

87.     Based on my training and experience, in the preceding text message exchange, the WOFFORD TELEPHONE is contacting the TARGET TELEPHONE in an attempt to arrange to purchase $85 dollars' worth of illegal drugs.  After repeated attempts to get in touch, the TARGET TELEPHONE replies at 7:42 PM, "25 min" indicating that the runner will arrive at

about 8:07 PM.  During the earlier referenced surveillance operation, I observed JASSOR parked in the Acura in the driveway of 276 Louisiana Ave. at approximately 8:30 PM, where he remained for about 10 additional minutes.  This accounts for the WOFFORD TELEPHONE's text, "*Jim this guy was in my driveway for half hour almost he needs to be careful here bro,*" in which WOFFORD appears to scold OCASIO for the runner being in his driveway for too long.

88.     A second text message exchange pertaining to the January 17, 2025 seizure involves the DEPREY TELEPHONE.  Investigators believe this phone to be held by Griffin DEPREY, who was identified via the JASSOR TELEPHONE review as an OCASIO DTO runner.  Again, the data extracted from the JASSOR PHONE indicates that the conversation includes the JASSOR TELEPHONE, the TARGET TELEPHONE, and the DEPREY TELEPHONE, though the JASSOR PHONE does not send any messages.  The conversation is summarized as follows:

TARGET TELEPHONE (9:48 PM): *Yo*

DEPREY TELEPHONE (9:48 PM): *Yo yo*

TARGET TELEPHONE (9:49 PM): *Bring the money*

DEPREY TELEPHONE (9:57 PM): *Where*

TARGET TELEPHONE (10:00 PM): *2180*

TARGET TELEPHONE (10:00 PM): *From yesterday*

DEPREY TELEPHONE (10:00 PM): *Just bread or bring everything else too?*

TARGET TELEPHONE (10:12 PM):  *Bring just money*

TARGET TELEPHONE (10:12 PM):  *He's stocking you*

DEPREY TELEPHONE (10:12 PM):  *Ok where I'm going*

TARGET TELEPHONE (10:12 PM): *114 Arlington Street*

89.     Based on my training and experience in the preceding text message exchange, the TARGET TELEPHONE is directing the DEPREY TELEPHONE to bring the drug proceeds from the previous day, in which DEPREY was likely running on behalf of the OCASIO DTO, to 114 Arlington St., Bristol, CT[10].  There, DEPREY would also be "stocked," with a drug resupply by another person.  Investigators believe this person to be JASSOR, who I observed at 114 Arlington St. during the surveillance prior to JASSOR's arrest.  It should be noted that during his arrest, JASSOR was found with approximately $3,842 in U.S. Currency (approximately $2,812 located in yellow envelope; approximately $1,030 located in Acura center console).

*Court Authorization for Interception of Precision Location Data from the TARGET*
*TELEPHONE*

90.     On or about January 24, 2025, I presented an Affidavit in support of a GPS Precision Location intercept on the TARGET TELEPHONE to the Court.  On the same date, the Honorable Robert M. Spector, United States Magistrate Judge authorized the search warrant. Shortly thereafter, investigators began to receive GPS Precision Location information – "Pings" – from the TARGET TELEPHONE.  The search warrant authorized the intercept for a period of thirty days.

*OCASIO DTO's Diminished Use of TARGET TELEPHONE*

91.     Investigators noted that during that thirty-day period, the TARGET TELEPHONE was off or received on "historical" pings for approximately 18 days of the 30-day intercept period.  Investigators noted segments in which the TARGET TELEPHONE appeared to be

---

[10] Investigators know that OCASIO DTO runner Robert PINETTE resides at 114 Arlington St., making the location a secure premise to conduct "stock-ups."

powered off for extended periods of time. These included significant periods in which no pings were received as follows:

      a.   from approximately January 31, 2025 at 4:47 PM through approximately February 8, 2025 at 7:03 PM

      b.   from approximately February 10, 2025 at 9:22 AM through approximately February 17, 2025 at 3:08 PM

      c.   from approximately February 26, 2025 at 3:27 PM through the conclusion of the thirty day intercept period

92.    Investigators also noted multiple durations throughout the intercept period during which no pings were received from the TARGET TELEPHONE for periods ranging from a couple hours to a couple days. Investigators eventually concluded that OCASIO was discontinuing or significantly reducing his use of the TARGET TELEPHONE in furtherance of the OCASIO DTO's drug trafficking goals.

*Identification of TARGET TELEPHONE 2*

93.    Based on my knowledge that drug dealers will often drop or change cellular phones, and my understanding of the OCASIO DTO's reliance on cellular phones to conduct home delivery style drug sales, on or about February 7, 2025 I began efforts to identify a new telephone number used by OCASIO. Using the numerous telephone toll records procured by investigators throughout the case, I began to conduct "Common Caller" analysis; this type of report compares records from multiple target telephone numbers, identifying specific other telephone numbers that one or more of the target numbers contact. I began with approximately five individual numbers who were the most frequently contacted numbers of the TARGET TELEPHONE. I then used software available to law enforcement to generate a report indicating

what other phone numbers the top callers of the TARGET TELEPHONE were each in contact with. The report produced a single result; a telephone number known to me ending in -6658, hereinafter referred to as TARGET TELEPHONE 2.

94.    In an effort to confirm that TARGET TELEPHONE 2 was a new telephone held by OCASIO, I compared "Top Caller" reports – a report showing the numbers most frequently in contact with a particular phone - from the last two weeks of consistent use of the TARGET TELEPHONE to the first two weeks of consistent use of TARGET TELEPHONE 2. In comparing the TARGET TELEPHONE from approximately January 13, 2025 through January 27, 2025 and TARGET TELEPHONE 2 from approximately January 27, 2025 through February 10, 2025, I noted significant similarities. Of the top 25 callers on the TARGET TELEPHONE, I noted that 22 of them were also in contact with TARGET TELEPHONE 2. Expanding the range to include the top 50 callers on the TARGET TELEPHONE, I noted that 40 of them were also in contact with TARGET TELEPHONE 2. Finally, with the range including the top 100 callers on the TARGET TELEPHONE, I noted that 65 of them were also in contact with TARGET TELEPHONE 2. After completing the telephone toll analysis, based on the significant similarities between the most frequently contacted numbers appearing on both TARGET TELEPHONE and TARGET TELEPHONE 2, investigators reasonably concluded that the same person, in this case OCASIO, likely utilized both phones.

*Bulk Currency Seizure from OCASIO on February 27, 2025 in New Britain, CT*

95.    On or about February 27, 2025, members of the New Britain Police Department (NBPD) conducted a motor vehicle stop on an Infiniti Q50 bearing CT registration plate 768SKR. Contact with the operator of the vehicle was made by NBPD after that vehicle's plate returned no results when run. The operator of the Infiniti was identified as OCASIO. OCASIO

was found to have a suspended license and admitted that the vehicle was not legitimately registered. OCASIO further stated to officers that there was a large amount of money in the vehicle.  BPD Ofc. Pollock and K-9 "Hero" responded to the scene and conducted an exterior sniff of the Infiniti, subsequently alerting to the presence of the odor of narcotics within the vehicle.  A search of the Infiniti was conducted, which resulted in the discovery of a white rocklike residue which field tested positive for cocaine in the driver's position of the vehicle, a wax paper fold located in the rear trunk area of the vehicle, and a bulk amount of United States Currency in the center console and glove box.  Investigators also noted that a "void" in the trunk existed that could be used to hide contraband. After noticing inconsistencies with the VIN placard on the vehicle, investigators eventually located a factory engraved VIN on the frame within the engine bay, which helped to determine that the Infiniti was a stolen vehicle on which the VIN had been altered.  OCASIO was placed under arrest and transported to NBPD where he was processed and charged accordingly. The white rocklike substance, wax paper fold and United States Currency were seized from the Infiniti by NBPD as evidence.

96.     Investigators from the Drug Enforcement Administration (DEA) later acquired the United States Currency seized from OCASIO from the NBPD.  The United States Currency was later transported to Brinks, where the cash was counted and deposited into the appropriate account.  The United States Currency totaled $30,338.

*Surveillance of Griffin DEPREY "Stock Up" and Use of TARGET TELEPHONE 2*

97.     On March 18, 2025, at approximately 7:00 PM, investigators established surveillance in the area of 142 Shuttle Meadow Rd, Plainville, CT, the residence of known OCASIO DTO runner Griffin DEPREY.  Earlier on the same date, investigators had observed DEPREY leaving the area of his residence in a gray Kia sedan bearing CT registration

2ALBE2.  A check of CT DMV records indicated that the registered owner of the Kia was DEPREY.

98.    At approximately 7:50 PM, investigators observed DEPREY walk from the rear area of the residence and enter the driver's seat of the Kia, which departed.  Investigators conducted mobile surveillance on the Kia, and followed as it traveled to a Webster Bank ATM located at 51 East Main St., Plainville, CT, where DEPREY appeared to utilize the ATM.

99.    Investigators maintained surveillance as DEPREY continued, entering CT Rt. 72E, where he drove at a high rate of speed.  Eventually, DEPREY continued into CT Rt. 9S, exiting onto Randolph Rd.  Investigators followed as DEPREY drove to the Summer Hill Apartments, located on Summer Hill Rd., Middletown, CT where he arrived at approximately 8:25 PM.  There, DEPREY parked his Kia along the side of a parking area, directly behind a white Infiniti coupe bearing CT registration plate 90C371.  DEPREY remained inside the Kia and began to use his phone.  The Infiniti was also occupied and running.

100.    At approximately 8:43 PM, the Infiniti departed, driving to the front of the apartment complex where it again parked.  Investigators watched the Infiniti and observed as the passenger side door briefly opened and a short male in a gray sweatshirt was visible for a moment.  It appeared that this male had exited quickly and then reentered the Infiniti.  Moments later, a white Honda Accord bearing CT registration AV82177 arrived and pulled up next to the Infiniti.  The operators, who were door to door appeared to briefly talk, and then the Honda continued deeper into the apartment complex.  The Infiniti turned around and quickly followed.  Investigators are aware that the Honda is registered to Mallorie DEJESUS, the mother of OCASIO's child, and that OCASIO often drives the vehicle.

101.     Investigators maintained surveillance as the Honda and Infiniti pulled into a parking area far in the back of the complex.  The two cars parked next to each other and remained running.  I established a surveillance position from an elevated location across the street, on foot, and was able to observe the two vehicles parked next to each other.  After some time, I observed a male wearing dark clothing, who appeared to be white or Hispanic, exit the passenger side of the Honda and enter the driver's side of the Infiniti.  The Infiniti departed the apartment complex.

102.     While the meeting between the Honda and Infiniti was ongoing, investigators had observed the Kia drive a lap around the perimeter of the apartment complex, as if looking for someone, before returning to nearly its original location and again parking.

103.     Then, just after the meeting between the Infiniti and the Honda had concluded, investigators observed the Honda continue to a different parking area within the apartment complex, where it parked just before 9:05 PM.  Investigators observed the Kia move again, driving to the same parking area where the Honda was and noted that the Honda and the Kia parked close to each other, with their driver's doors aligned so that the operators could interact without exiting their respective vehicles.

104.     At approximately 9:10 PM, the meeting between the Honda and the Kia concluded.  Both vehicles exited the parking lot in tandem, and investigators followed.  Upon exiting the parking lot, the Honda continued northbound onto Saybrook Rd.  The Kia turned left onto Randolph Rd. where it entered CT Rt. 9N.

105.     Investigators believe that the meeting between the Honda and Infiniti, and later between the Honda and DEPREY, were each illegal drug resupplies conducted between OCASIO and runners.

106.    Investigators later conducted telephone toll analysis between TARGET TELEPHONE 2 and the DEPREY TELEPHONE, specifically during the timeframe of the suspected drug resupplies that occurred on March 18, 2025.[11]

107.    The telephone toll records revealed that on March 18, 2025, the DEPREY TELEPHONE contacted TARGET TELEPHONE 2 at 6:34 PM, likely in an effort to arrange logistics for the upcoming meeting. The DEPREY TELEPHONE then contacted TARGET TELEPHONE 2 at 7:47 PM. Moments later, at approximately 7:50 PM, investigators observed DEPREY depart his residence in his Kia, leading investigators to conclude that the call had likely consisted of DEPREY attempting to advise OCASIO that he was on his way. Investigators conducted surveillance on the Kia as it traveled to the Summer Hill Apartments, as previously described.  There, investigators observed the Honda believed to be operated by OCASIO meet with an unknown Infiniti, in what appeared to be a drug meet.  While the meeting between the Honda and Infiniti was ongoing, investigators had observed DEPREY drive a lap around the perimeter of the apartment complex, as if looking for someone, before returning to nearly its original location and again parking. Toll records showed that during that time frame, the DEPREY TELEPHONE had an outgoing voice call to TARGET TELEPHONE 2 at 8:49 PM.  Investigators believed the purpose of this call was likely an attempt to assist DEPREY in making contact with OCASIO; investigators had observed the Honda drive directly passed where DEPREY was parked on the way to meet the Infiniti, which DEPREY had undoubtedly also seen.  After recognizing the Honda as OCASIO's, but seeing the Honda disappear from view and not return, DEPREY had likely placed a call to OCASIO wondering where he had gone.

---

[11] Investigators believe that both the DEPREY TELEPHONE and TARGET TELEPHONE 2 are Apple iPhone's, meaning that text messages between them conducted through Apple's iMessage software, which features end-to-end encryption and is not reflected in toll records reviewed by investigators.  What follows is therefore a review of voice calls only.

Finally, at approximately 9:05 PM, investigators observed the Honda and Infiniti depart separate ways as their meeting concluded, with the Honda continuing to a different parking area within the apartment complex.  Toll records show that approximately 9:05 PM, TARGET TELEPHONE 2 placed an outgoing call to the DEPREY TELEPHONE.  At this time, DEPREY's Kia was observed by investigators pulling out from its parking spot and proceeding directly to a dead-end area of the complex where the Honda had also parked.  Investigators noted that DEPREY had no problem locating the Honda at this point, furthering the belief that the phone conversation between the two was to facilitate the clandestine meeting.

*Surveillance of Drug Transaction Conducted by Kyle MASTROIANNI on March 20, 2025 in Bristol, CT*

108.    On or about March 20, 2025, I received an LPR alert in Bristol, CT for CT registration AY72410.  I knew this vehicle to be a Kia Soul, often utilized by Kyle MASTROIANNI, a known drug runner for the OCASIO DTO.

109.    I located the Kia at the Bristol Sports Bar, located at 369 North Main St, Bristol CT at approximately 8:45 PM.  Surveillance was established in the area.  Shortly thereafter, I observed a white Mercedes sedan park in the back parking lot of the bar.  The Mercedes remained occupied and running.

110.    Around 9:00 PM, I observed a male I recognized to be MASTROIANNI exit the bar, wearing dark clothing a white knit hat, and walk directly to the waiting Mercedes.  MASTROIANNI entered the passenger seat of the Mercedes, where he remained for about a minute before exiting.  After speaking briefly to the operator through the driver's side window, MASTROIANNI returned to the bar and the Mercedes departed.

111.    Constant surveillance was maintained on the Mercedes as it traveled to an area business, where the female operator of the Mercedes, later identified as C.N., shopped for some time.  Eventually C.N. departed, and again constant surveillance was maintained.

112.    Investigators requested the assistance of the Bristol Police Department Crime Suppression Unit (BPD CSU) to conduct a motor vehicle stop. BPD CSU officers conducted a stop for a window tint violation and made contact with C.N.  After they observed crack-cocaine fragments in plain view, which field tested positive for the presence of cocaine, a search was conducted.  Investigators located approximately 20 Adderall 30 mg pills, as well as a small container with three other pharmaceutical pills inside.

113.    Investigators conducted a roadside interview with C.N., whose verbal statement is summarized as follows:

That on March 20, 2025, she went to the Bristol Sports Bar where she met with "Kyle" to purchase Adderall pills.  That she paid $15/ pill to Kyle for 20 pills for a total of $300.  That Kyle was wearing jeans, a sweatshirt, and a white hat.  That Kyle had just been arrested for DUI and possession of narcotics.  That on March 20, 2025 she texted directly with Kyle on telephone number 860-414-6746, (the "MASTROIANNI TELEPHONE") but that sometimes she texts directly to "Jay."  That Jay is the "bigger boss" who employs a lot of drug runners.  That she was unsure if Kyle was actively running for Jay.  That she had an old telephone number for Jay, which she showed investigators was 860-538-8837 (the "JASSOR TELEPHONE").  That Jay's real name is "Joshua," but she does not know his last name.

114.    Investigators are aware that "Jay" is in fact Joshua OCASIO.  The telephone number 860-538-8837 is referred to by investigators as the JASSOR TELEPHONE and was

seized from Ryan JASSOR on or about January 17, 2025.  Investigators subsequently confirmed

that messages between C.N. (860-324-8375) and the JASSOR TELEPHONE did in fact exist.

*Arrest of James WARKOSKI on April 15, 2025 in Portland, CT*

115.    On or about April 15, 2025, investigators were conducting surveillance at various

locations which have proven to be relevant to the OCASIO DTO.  At approximately 5:15 PM,

investigators received LPR alert on MA registration 4MNY31, which investigators knew to be

affixed to a GMC Sierra generally driven by OCASIO.  The alert showed the GMC to be in the

vicinity of 802 West St., Southington, CT traveling southbound on West St.

116.    Investigators later determined via an LPR query that CT registration AK95167, a

misuse registration affixed to a magenta-colored Chevy Silverado, was read on the same LPR as

the GMC at approximately 6:18 PM, also traveling southbound on West St.

117.    At approximately 8:35 PM, investigators located the Chevy parked in the

driveway of 276 Louisiana Ave., Bristol, CT.  At the time, investigators were unfamiliar with the

Chevy; however, investigators were aware that 276 Louisiana Ave. is the residence of

WOFFORD, a known customer of the OCASIO DTO.  Investigators observed a white male who

resembled WOFFORD engaging in a conversation with the operator of the Chevy.  In the past,

investigators have determined that interactions of this kind at 276 Louisiana Ave. are often drug

transactions.

118.    At approximately 8:39 PM, the Chevy departed 276 Louisiana Ave. and

investigators followed.  The Chevy traveled to the area of 6th Street/Judd St. New Britain, CT,

where it briefly pulled over next to a gray Acura SUV bearing CT registration BU33979.

Investigators observed the Chevy and the Acura then pull away from the curb together, traveling

together to the 7-11 Convenience Store on New Britain Ave., Newington, CT.

119.    At the 7-11, investigators observed the male driver exit the Acura and approach the driver's side door of the Chevy.  The male, wearing a jacket and hat, interacted with the driver of the Chevy through the open window in a manner consistent with a hand-to-hand transaction, before running back to the Acura and departing the area.  Investigators later conducted a CT DMV inquiry, determining the registered owner of the Acura to be Ronald LENTINI.  Investigators are familiar with LENTINI from this, and other investigations and know him to be a fentanyl user.

120.    Investigators maintained surveillance on the Chevy as it remained stationary at the 7-11 for a few minutes as the male operator, who investigators later identified as WARKOSKI, appeared to utilize his cellular phone.  Eventually the Chevy departed, traveling to an apartment complex located at 1218 Stanley St., New Britain, CT.  The Chevy arrived there at about 9:15 PM and parked.  WARKOSKI never exited the Chevy, and no other persons approached.  At about 9:25 PM, the Chevy departed.

121.    Investigators again maintained surveillance, and follow the Chevy to the area of Clark St., New Britain where the Chevy picked up an unknown female passenger.  The Chevy then continued to Rt. 9 southbound.

122.    Investigators maintained surveillance on the Chevy as it traveled on Rt. 9 South, over the Arrigoni Bridge, and into Portland, CT, eventually arriving at 1503 Portland-Cobalt Rd., Portland, CT at approximately 9:48 PM.  There, it parked at a small motel, and both WARKOSKI and the unknown female remained inside the Chevy.

123.    Investigators established surveillance in the area.  At about 10:01 PM, I observed a white female wearing dark clothing exit the motel and begin to walk around the parking lot while talking on a cellular phone.  Investigators also noted that illumination from WARKOSKI's

cellular phone was visible at the time.  Moments later, the Chevy began to reposition within the parking lot, and investigators concluded that the two were attempting to make contact.

124.    Investigators are aware, from prior knowledge of this investigation that the OCASIO DTO customer (female at motel) and the OCASIO DTO runner (WARKOSKI) would not be contacting each other directly on their cellular phones.  Rather, each would be in contact with OCASIO via TARGET TELEPHONE 2, who would be arranging the meeting between the two.  Oftentimes, this method has led to confusion or difficulty in a runner and customer actually making contact.

125.    At about 10:02, the female walked to an area of the parking lot near where I had established a surveillance position.  Believing that the drug meet may occur nearby, I began to reposition my vehicle to a more concealed vantage point.  Upon doing so the female, apparently believing that I was the drug runner, approached my vehicle as if attempting to meet.  She disconnected her phone call at that point.

126.    I drove away, and the female raised her hands in a confused manner before continuing to walk around the motel.  Moments later, at about 10:04, investigators observed the female contact WARKOSKI at the Chevy's passenger side window.  Investigators observed the two briefly interact through the window, and then the female walked away while placing her left hand in her pocket.  Again, investigators concluded that a hand-to-hand drug transaction had occurred.

127.    The Chevy then drove away from the motel, heading westbound on Portland-Cobalt Rd. At this point, investigators solicited the cooperation of the Connecticut State Police (CSP) to conduct a motor vehicle stop on the Chevy.

128.    A CSP Trooper stopped the Chevy in the area of 204 Marlborough St., Portland, CT.  The Trooper identified the occupants as WARKOWSKI and Leslie Ann MIANO.  The CSP Trooper reported that WARKOSKI was reaching into the crotch area of his pants.  Additionally, a crack pipe push rod was observed in plain view.  The Trooper confronted WARKOSKI about his suspicion that WARKOSKI possessed drugs, at which point WARKOSKI voluntarily surrendered a plastic bag containing crack-cocaine, which he removed from the crotch area of his pants.  During a subsequent search of WARKOSKI and the Chevy, investigators located approximately 6.4 grams of suspected fentanyl powder in a knotted plastic bag, approximately 12.8 grams of suspected crack-cocaine in three separate plastic bags, approximately 100 glassine bags containing suspected fentanyl, and approximately $1,637 in United States currency.  All the aforementioned controlled substances field tested positive for the presumptive presence of their respective controlled substances.

129.    Investigators also seized an Android cell phone in a gray case from WARKOSKI. While processing the phone as evidence, investigators noted that an incoming call appeared on the screen from telephone number TARGET TELEPHONE 2.

130.    WARKOSKI was arrested by CSP.  He was transported by CSP to CSP Troop K, located at 15 Old Hartford Rd., Colchester, CT.  There, investigators interviewed WARKOSKI. WARKOSKI was first advised of his *Miranda* Rights, which were read to him via a printed card. WARKOSKI verbally stated that he understood his rights and was willing to speak with investigators.  WARKOSKI provided a brief statement, which is summarized as follows:

That the drugs found by CSP during the search were not his, and instead belonged to a third party.  That he was delivering drugs on behalf of this third party, who he had met at

around 5:00 PM near Beecher St., Southington, CT to "re-up." That the third party provided him with a number of pre-labeled bags, each containing a drug order for a particular customer. That he had conducted about five deliveries before he was arrested, including some which occurred in New Britain, CT and Portland, CT. That this is about the third time he did drug deliveries for the third party, and he was generally paid a few hundred dollars for the task. That he receives delivery instructions from the third party via telephone, including mostly calls and some texts. WARKOSKI declined to identify the third party.

131.    During the course of his interview, WARKOSKI provided his phone number as a telephone number known to me ending in -2393, which will hereinafter be referred to as the "WARKOSKI TELEPHONE." Investigators are aware that the WARKOSKI TELEPHONE is subscribed to WARKOSKI and has been in frequent contact with both the TARGET TELEPHONE and TARGET TELEPHONE 2. To confirm the telephone number of the device seized from WARKOSKI, investigators called the WARKOSKI TELEPHONE from a law enforcement telephone and noted that the screen on the device seized from WARKOSKI illuminated and displayed an incoming call from the law enforcement telephone number.

*Court Authorization for Interception of Precision Location Data from TARGET TELEPHONE 2*

132.    On or about April 17, 2025, I presented an Affidavit and Application in support of a search warrant to the Court, seeking authorization to search for records and information held by T-Mobile associated with TARGET TELEPHONE 2; specifically, investigators requested the prospective collection of information about the location of TARGET TELEPHONE 2, included all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, commonly referred to as a "GPS Ping." The Honorable Maria E. Garcia, U.S.

Magistrate Judge for the District of Connecticut, authorized the search warrant on the same day. On or about April 18, 2025, investigators began to receive GPS Pings pertaining to the location of TARGET TELEPHONE 2 from T-Mobile.

*Surveillance of Drug Resupply between OCASIO and RIBACK*

133.    On or about April 21, 2025 at approximately 5:24 PM, investigators had received several back-to-back pings from TARGET TELEPHONE 2 showing that it was in the area of New Britain Avenue and Cromwell Avenue, Rocky Hill, CT. At approximately 5:40 PM, investigators located a white Acura sedan bearing CT registration AR89817 parked in the parking lot of Jake's Wayback Burgers located at 346 Cromwell Ave Rocky Hill, CT. Investigators were aware that the registration plate is being misused, but that the Acura is frequently driven by OCASIO.  Investigators have regularly observed the Acura parked in the area of OCASIO's residence in the days leading up to the surveillance described here.  The Acura was parked next to a red Chevy Trax bearing Maine Registration 443JVH and was occupied by a white male seated in the driver's seat, who appeared to be OCASIO. After investigators passed by the Acura, it immediately squared the block, before returning to a more secluded area of the apartment complex located behind Jake's Wayback Burgers.  It should be noted that during recent periods of surveillance, OCASIO has appeared to have identified the vehicles of multiple surveillance team members and has employed counter-surveillance techniques to thwart law enforcement efforts to follow him.

134.    Investigators maintained surveillance on the Acura until approximately 6:05 PM, when it pulled back into the parking lot of Jake's Wayback Burgers and parked with the passenger's side directly next to the driver's side of the Chevy Trax. Investigators observed a white male, with blonde hair, wearing a baseball cap and a blue shirt enter the driver's seat of the

Chevy Trax. The male would later be identified by investigators as Ryan RIBACK. Based on my training and experience, I believed that a drug "stock up" was just completed, given that OCASIO and RIBACK had spent some time in the vehicle together and had moved to a more secluded area to complete this action. Both vehicles then departed the parking lot, with the Acura traveling northbound on Cromwell Ave and the Trax traveling southbound on Cromwell Ave.

135.    Investigators maintained constant surveillance on the Trax as it traveled into the parking lot of Apple Rehab located at 156 Berlin Rd Cromwell, CT, arriving at approximately 6:20 PM. It should be noted that while following the Trax, investigators observed that RIBACK was constantly looking down towards the center console area and fidgeting his hands with items located in that area. The Trax parked in the rear of the Apple Rehab building, and a heavy-set white female with a long brown ponytail, wearing a light blue colored scrub top, exited the rear door of the building and entered the front passenger's seat of the Trax. The Trax immediately pulled forward as if exiting the parking lot, but quickly stopped at the rear door of the building and to let out the unidentified female. The female entered the rehab center and the Trax headed towards the exit of the parking lot. Investigators observed RIBACK throw what appeared to be a small plastic bag from the driver's side window into the parking lot before exiting westbound onto Berlin Road.  Based on my training and experience, I believed that this point that RIBACK was running drugs for the OCASIO DTO; RIBACK had first been "stocked up" by OCASIO to begin his shift during the longer meet at Jake's Wayback Burgers and now was completing street level drug sales on behalf of the OCASIO DTO.  This is consistent with investigators' beliefs about the general way in which the OCASIO DTO conducts its illegal business.

136.    Investigators maintained constant surveillance on the Trax as it traveled through Cromwell, into New Britain, and Plainville, without making any stops.  Investigators believed

that the Trax was likely heading into Bristol, CT where the OCASIO DTO maintains a significant customer base, and had arranged for members of the BPD to conduct a motor vehicle stop on the Trax once it entered Bristol, CT.  However, at about 6:42 PM, as the Trax approached the last exit on CT-72 West, it suddenly turned off of the highway onto the exit, and then quickly circled back to an entrance ramp where it entered CT-72 East.  Based on investigators' knowledge that OCASIO is generally aware of multiple law enforcement vehicles involved in the surveillance, it is believed that at this point, RIBACK was intentionally attempting to thwart law enforcements efforts to follow.

137.    The Trax continued on CT-72 East, exiting onto Martin Luther King Jr. Blvd in New Britain, CT.  Investigators followed the Trax into the neighborhood between East Main St and Smalley St., New Britain, CT where the Trax began to perform counter-surveillance maneuvers, in an obvious effort to lose the law enforcement tail, which had at this point become an overt effort by police to continue to follow. The Trax squared a small block in the area of Olive St and Noble St., New Britain, CT and was observed on Connerton St. I saw that the Trax had stopped across from 1 Connerton St., New Britain, CT with the driver's door open. I then observed RIBACK run across the street and re-enter the driver's seat of the Trax before taking off at a high rate of speed. Investigators believed that RIBACK had stashed drugs in the vicinity, before again taking off. Investigators followed the Trax onto CT-72 West, before it quickly exited onto Corbin Avenue, where investigators lost contact with the Trax, which was last seen pulling into the McDonald's parking lot.

138.    Shortly after, investigators returned to the area of 1 Connerton St., New Britain, CT to check for any contraband that may have been stashed by RIBACK. Along the eastern sidewalk of Noble St., New Britain, CT, investigators located a plastic Ziplock bag protruding

from a row of hedges.  Investigators noted that this bag was located in the direction from which RIBACK had come running, before re-entering the Trax and fleeing the scene.  Investigators photographed the Ziplock bag and then removed it, finding that it contained a large quantity of small white glassine bags suspected to contain fentanyl, as well as white rock-like substances suspected to be crack cocaine, and white powder-like substances suspected to be cocaine.

139.    Later, investigators processed the evidence, finding the ziplock to contain an aggregate total of approximately 20 white wax folds containing suspected a white powder suspected to be fentanyl, approximately 200 white wax folds containing a purple powder suspected to be fentanyl, an aggregate total of approximately 16.8 grams of crack-cocaine packaged in multiple bags, an aggregate total of approximately 9.7 grams of cocaine packaged in multiple bags, as approximately 6.3 grams of a blue powder in a knotted plastic bag, also suspected to be fentanyl.  Investigators subjected each individual drug to the appropriate field test kit, with results indicating presumptive positives for the presence of fentanyl, cocaine, and crack-cocaine, respectively.

140.    During the aforementioned processing of the evidence located on Noble St., New Britain, CT, investigators collected Cap-Shure swabs containing suspected DNA material from some of the narcotics packaging.  Specifically, swabs were collected from the seal area of the outer Ziploc bag that contained the entirety of the drug stash, as well as from the knotted area of a plastic bag which contained cocaine.  On or about April 24, 2025, these swabs were submitted to the Laboratory for further analysis. As discussed below, the analysis provides further evidence of the commission of the Target Offenses by the DTO.

*Identification of RIBACK*

141.    Investigators later conducted a toll analysis of the TARGET TELEPHONE 2, which revealed that on April 21, 2025 at approximately 6:37 PM, TARGET TELEPHONE 2 received an incoming call from telephone number 860-490-4934 (the RIBACK TELEPHONE) that lasted for a duration of 7 minutes and 33 seconds. The phone call was conducted during the time investigators were maintaining surveillance of the Chevy Trax as it headed towards Bristol on CT-72 West before exiting, entering CT-72 East, and travelling back towards New Britain, CT where the Trax began aggressive counter-surveillance tactics clearly intended to lose the police tail.  Based on my training and experience, and knowledge of this investigation, I am aware that in many cases where an OCASIO DTO drug-runner encounters law enforcement or suspects that police are near, they contact OCASIO by phone, and I believe that to be the case in this instance.

142.    A previous DEA Administrative Subpoena served on Verizon Wireless covering the time frame spanning from January 18, 2025 through February 17, 2025 revealed the subscriber for the RIBACK TELEPHONE to be Robert Riback, with an address of 34 McDonald St., Plainville, CT. An open-source search revealed a user of the phone number to be Ryan RIBACK with a similar address of 30 McDonald St Plainville, CT. An NCIC/COLLECT check of Ryan RIBACK revealed a DMV photograph that investigators readily identified as the operator of the Chevy Trax. Additionally, RIBACK was found to have four (4) active PRAWN warrants, some to include failing to appear at court for various narcotics related charges.[12]

*Arrest of RIBACK by Glastonbury, CT Police on April 23, 2025*

---

[12] PRAWN is the Judicial Branch's Paperless Re-Arrest Warrant Network, implemented in 2002 for warrants for Failure to Appear.

143.     After the incident involving RIBACK, investigators entered the license plate from the Trax into LPR software available to law enforcement and set up an "alert," which would notify investigators in real time if the Trax's license plate was scanned by any LPRs.

144.     On or about April 23, 2025 at about 11:20 AM, investigators received an LPR alert indicating that the Trax was in Glastonbury, CT in the area of Glastonbury Blvd. at CT-3 East.  A subsequent LPR alert indicated that the Trax was in the area of Griswold St. at House St. Investigators contacted members of the Glastonbury Police Department (GPD) and asked them to be on the lookout for the Trax.  Ofc. Bryan Verillo from GPD informed me shortly thereafter that he had located the Trax at the Enterprise Rental Car location, located at 289 Williams St. East, Glastonbury, CT.  Ofc. Verillo further reported that a young white male matching the description of RIBACK and an older white male, later identified as Alan O'DONNELL, appeared to be returning the Trax to Enterprise.  Investigators arrived in the area and observed RIBACK and the older white male appearing to move belongings into a black Buick sedan bearing CT registration AY88866.  A check of DMV records revealed that the plate belonged on an Audi sedan and was being misused.

145.     Shortly thereafter, investigators observed the Buick depart the Enterprise, operated by O'DONNELL with RIBACK in the passenger seat.  GPD Ofc. Verillo and Ofc. Lynch conducted a motor vehicle stop based on the improper registration plate.  RIBACK initially provided a fake name to the GPD officers but was later identified by a CT driver's license.  The Buick was towed due to the lack of proper registration, and a routine inventory was conducted.  During the inventory, GPD officers located drugs and drug paraphernalia in a backpack that was on the passenger side floorboards, including a small zip bag containing suspected methamphetamine/MDMA, weighing approximately 0.6 grams with packaging,

approximately (2) broken Xanax pills with imprint "2090 V", approximately (8) white glassine bags containing purple powder suspected to be fentanyl, approximately (12) white glassine bags with the stamp "Scorpion" containing white powder suspected to be fentanyl, and items of drug paraphernalia, including a digital scale, cut straws, and scoop for fentanyl powder. RIBACK was later arrested by GPD on various state drug charges.

146.    During the course of the GPD investigation, RIBACK was found to possess an Apple iPhone in a clear case. While RIBACK was holding it, and while GPD officers stood by, I called the number assigned to the RIBACK TELEPHONE from my law enforcement phone. GPD officers confirmed that the incoming call appeared on the screen of the RIBACK TELEPHONE at that time, thereby validating the number for the RIBACK TELEPHONE. GPD officers later seized the RIBACK TELEPHONE for further investigation.

147.    Later, investigators observed the phone, and noted an incoming notification was present on the lock screen, indicating an iMessage from "Jim" with an emoji of an electrical plug. Investigators are aware that OCASIO is known to many of his customers as "Jim" or "Jimmy," and are further aware that the word "plug" or its accompanying emoji is commonly used to denote a drug source of supply in the parlance of individuals involved in the illegal drug trade.

148.    On or about May 28, 2025, I received notification from the Laboratory that they had obtained DNA profiles from each of the submitted swabs pertaining to the discarded drug stash thought to involve RIBACK. Furthermore, the DNA profile obtained from the swab collected from the seal area of the outer Ziploc bag had been entered into the CODIS database to be analyzed for any positive CODIS associations.

149.    On or about June 4, 2025, I received an Offender Hit Notification Form from the Laboratory, indicating that the DNA profile obtained from the swab collected from the seal area of the outer Ziploc bag generated a positive association with the State or National Offender DNA Database.  Specifically, the DNA profile matched that of Ryan RIBACK.

150.    The Laboratory further stated that a formal laboratory report will be issued upon the submission and processing of a confirmatory biological sample from the listed individual, in this case RIBACK.

151.    On or about August 18, 2025, I submitted an affidavit and application for a search warrant to the Court seeking authorization to obtain a known sample of DNA from RIBACK via a buccal swab.  On the same date, the search warrant was authorized by the Honorable Maria E. Garcia, U.S. Magistrate Judge for the District of CT.

152.    On or about August 19, 2025, investigators served the search warrant and obtained known samples of DNA from RIBACK, which were subsequently sent to the Laboratory for analysis.

153.    On or about September 19, 2025, the Laboratory provided a supplemental DNA report containing the following conclusions:

    a.    #001-001 (Swab - "knotted bag") The results are consistent with the DNA profile from item #001-001 being a mixture of three contributors with at least two of them being male. Assuming three contributors, the DNA profile from item #001-001 is at least 1 trillion times more likely to occur if it originated from Ryan Riback and two unknown individuals than if it originated from three unknown individuals.

b. #002-001 (Swab - "zip-lock bag") The results are consistent with the DNA profile from item #002-001 being a mixture of four contributors with at least two of them being male. Assuming four contributors, the DNA profile from item #002-001 is at least 1 trillion times more likely to occur if it originated from Ryan Riback and three unknown individuals than if it originated from four unknown individuals

*Arrest of Kyle MASTROIANNI on May 15, 2025 in Bristol, CT*

154.    On or about May 10, 2025, while conducting surveillance related to the OCASIO DTO, I located MASTROIANNI in Bristol, CT.  He was riding as the passenger in a particular Kia Seltos bearing CT registration AC10737.  Investigators queried this vehicle through available LPR software and saw LPR hits in areas frequented by other runners of the OCASIO DTO.

155.    Investigators began to monitor the whereabouts of the Kia, and on or about May 15, 2025, located it at a gas station in Bristol, CT.  Again, MASTROIANNI was observed to be a passenger in the vehicle.  Investigators began to surveil the Kia, and watched as it traveled to the Pond Ridge Apartments located at 155 Redstone Hill Rd., Bristol, CT.  There, investigators observed MASTROIANNI exit the vehicle and approach the door of one of the apartment units.  Due to line-of-sight constraints, investigators were not able to see what transpired at the door, but moments later MASTROIANNI returned to the Kia.  Believing that MASTROIANNI was likely engaged in drug sales, investigators requested the assistance of the BPD CSU to further investigate.  After observing the Kia commit a red-light violation and a turn signal violation, officers from BPD CSU conducted a motor vehicle stop.  They contacted the driver and MASTROIANNI and reported that both displayed signs of extreme nervousness about the police encounter.  BPD CSU officers also reported seeing crack-cocaine fragments in plain view within

the Kia, as well as observing that MASTROIANNI had small rubber bands, of the type commonly used to package bundles of glassine bags containing fentanyl together, around his fingers. BPD CSU officers field tested the suspected crack-cocaine fragments with presumptive positive results, confirming the presence of crack-cocaine within the vehicle.

156. During a subsequent search, BPD CSU officers located approximately 15.4 grams of cocaine, approximately 13.4 grams of crack-cocaine, approximately 24 wax folds containing suspected fentanyl, approximately 13 suspected Alprazolam 2 mg pills bearing imprints "Y 21," approximately 2 suspected Adderall pills bearing imprints "E 404," and various items of drug paraphernalia including a digital scale and plastic bags. Additionally, BPD CSU officers located an Apple iPhone belonging to MASTROIANNI.

157. While BPD CSU officers stood by with the iPhone, I called a phone number known to me ending in -9746 (the MASTROIANNI TELEPHONE.) BPD CSU officers observed the incoming call appear on the iPhone, thereby confirming it to be the MASTROIANNI TELEPHONE. The MASTROIANNI TELEPHONE was seized by investigators at this point.

158. MASTROIANNI was arrested by BPD and charged with State of Connecticut narcotics offenses.

*Tentative Identification of TARGET TELEPHONE 3*

159. Similar to TARGET TELEPHONE, at approximately the end of April 2025, investigators noted diminished use of TARGET TELEPHONE 2, to include long periods of time in which GPS Ping data showed the device to be powered off. Acting under the belief that again, OCASIO was dropping his telephone, investigators began to conduct common caller analysis and identified a new telephone assigned a call number known to me ending in -2988, hereinafter

referred to as TARGET TELEPHONE 3. Investigators noted that many of the OCASIO DTO's regular customers were in contact with TARGET TELEPHONE 3, a telephone number that none had previously been in contact with. Investigators thus believe that TARGET TELEPHONE 3 is likely used by the OCASIO DTO as a direct replacement for TARGET TELEPHONE 2.

*Drug Seizure from Steven HORNBERGER and Confirmation of TARGET TELEPHONE 3*

160.    On or about June 20, 2025, investigators became aware, via LPR alerts, that a 2025 GMC Sierra, color black, bearing RI registration 1ZS345 was traveling in Bristol. Investigators were aware that the truck had been rented by OCASIO and was being used in furtherance of the OCASIO DTO's drug trafficking activities. As such, I dispatched members of BPD CSU to areas frequently used for drug transactions, including Beths Ave., Bristol, CT.

161.    Upon arrival in the area, BPD CSU Ofc. Levine reported locating a black GMC Sierra pickup truck bearing Rhode Island registration 1ZS345 parked on the south side of Beths Avenue. The operator of the RI GMC was a light-skinned Hispanic male, wearing a white t-shirt, with a medium build. The male had a "clean" skin fade style haircut.

162.    Ofc. Levine observed a white male, later identified as Mark DUSO, appearing to speak to the driver of the RI GMC at the passenger side window in a manner consistent with a narcotics transaction. A second male, later identified as Steven HORNBERGER, was standing on the sidewalk nearby, appearing to act as a lookout. As the suspected drug transaction concluded, the RI GMC drove away.

163.    As DUSO and HORNBERGER walked away together from the Beths Ave. area, Ofc. Levine approached them. During a cursory interview, they admitted to possessing drug paraphernalia including hypodermic syringes used for injecting narcotics. During a subsequent search of HORNBERGER's person, Ofc. Levine located approximately 50 blue glassine baggies

of a white powdery substance suspected to be fentanyl, and a knotted plastic bag containing approximately 6 grams of a white powdery substance suspected to be cocaine.

164.    Investigators later conducted field tests of the seized narcotics, which indicated presumptive positive results for the presence of fentanyl (blue glassine bags) and cocaine (knotted plastic bag).

165.    During an interview, HORNBERGER admitted to contacting the drug dealer via call and text message to arrange the drug transaction.  I later sought and obtained written consent to search HORNBERGER's phone.  During that search, I captured a video depicting text messages between HORNBERGER and TARGET TELEPHONE 3, which was saved in HORNBERGER's phone as "J Marks Guy."  I later reviewed a portion of those messages, and noted that since May 19, 2025, HORNBERGER and DUSO had arranged and conducted numerous drug transactions with the OCASIO DTO via text messages with TARGET TELEPHONE 3.  In some of those messages, they refer to the user of TARGET TELEPHONE 3 as "Jay," who investigators know to be OCASIO.

*Warrant Arrest of JANKOWSKI on July 9, 2025*

166.    As previously stated, investigators from BPD obtained a State of Connecticut arrest warrant for JANKOWSKI related to her involvement in the December 7, 2024 incident. Investigators were aware that JANKOWSKI was frequently in the company of SIROIS, and that the two most often utilized a white Chevy Malibu bearing CT registration BT24720. Investigators set up LPR alerts for that license plate and frequently received LPR alerts indicating that the Malibu was being operated in Bristol, Southington, Glastonbury, Manchester, and other locations frequented by members of the OCASIO DTO.

167.    On or about July 9, 2025, I received an LPR alert indicating that the Malibu was departing Bristol, heading towards Plainville, CT.  I traveled to Plainville, where I located the Malibu driving westbound on CT-372.  At that time, I was able to identify JANKOWSKI as the driver, and SIROIS as the passenger.  I followed the Malibu, continuing surveillance as it traveled through Plainville, Farmington, Burlington, and finally into Bristol, CT.  JANKOWKSI and SIROIS made multiple stops at a convenience store, a gas station, and a pharmacy during their travels, but I was unable to determine if they were meeting with any person(s) at those locations in a manner consistent with JANKOWSKI's known role as a drug runner for the OCASIO DTO.

168.    At approximately 2:00 PM, as the Malibu traveled along Redstone Hill Rd. in Bristol, CT, I coordinated with members of the BPD to conduct a motor vehicle stop on the Malibu to effect the arrest of JANKOWSKI.  Ofc. Draper and Ofc. Taylor stopped the Malibu, confirmed JANKOWSKI's identification, and took her into custody on the active warrant.

169.    I advised JANKOWSKI of her constitutional rights from a preprinted DEA-13 card.  During subsequent questioning, JANKOWSKI admitted to possessing a crack-cocaine smoking pipe within the vehicle.  During the ensuing search, I located personal use quantities of crack-cocaine and fentanyl, in addition to the JANKOWSKI TELEPHONE 2, which were seized as evidence.

170.    During routine booking procedures, JANKOWSKI identified the JANKOWSKI TELEPHONE 2 as belonging to her and stated that the assigned telephone number was 860-426-4574.  I dialed that phone number from a BPD telephone, and noted that the JANKOWSKI TELEPHONE 2 began to ring, displaying the BPD telephone number on the caller ID screen and confirming the assigned telephone number.  This incoming call was photographed.

*Suspected Drug Transaction Conducted by Quran MUHAMMAD on August 27, 2025 in Bristol,*

*CT*

171.    On or about August 13, 2025, investigators observed a suspected drug resupply occur at TARGET LOCATION 1 involving a black male with braided hair, while reviewing electronic surveillance video, as will be further described later.  At that time, investigators identified a white Lexus bearing CT Registration BS55966, registered to Quran MUHAMMAD. Investigators noted that a CT DMV photograph of MUHAMMAD matched the black male observed in the surveillance video.  Investigators activated LPR alerts for the Lexus' registration plate.

172.    On or about August 27, 2025, at about 4:25 PM, I received a LPR alert indicating that the Lexus had entered Bristol by way of East Main St. Investigators began to look for the Lexus, and at about 4:36 PM I located it parked at the gas pumps at the BP gas station located at the intersection of Brook St./Stafford Ave in Bristol. The Lexus was parked in line with a second vehicle, the listed gray Ford Escape bearing CT registration BK89555. Neither vehicle was getting gas, and it appeared likely that the two may be involved in a drug meet, though at the time I was not able to observe such a meet occur. Shortly thereafter, the Lexus departed. I followed as the Lexus left Bristol via Washington St. heading into Plainville before terminating the surveillance.

173.    BPD Ofc. Fisher and I returned to the BP Station, where we requested to review surveillance camera video of the incident involving the Lexus and Escape.  BP Station staff voluntarily allowed investigators access to their surveillance footage, and I confirmed that video of the suspected drug meet did exist.  A copy of the surveillance footage was later retained by investigators for evidence.

174.    Investigators reviewed the video, and observed the following[13]:

The Lexus arrived first, backing up to the gas pump where I had observed it. The Escape arrived right after the Lexus, pulling up to the next pump. No one exited the Lexus. The Escape, driven by a black female with blond hair, allowed a passenger to exit. The passenger was described as a middle-aged Hispanic male, with short hair, wearing black pants and a black sweatshirt with white markings on the sleeves, and was later identified as Angel TORRES. Angel TORRES entered the gas station, where he appeared to access an ATM and then make a purchase. Angel TORRES exited, handed a small item that appeared to be product from the gas station to the black female driver, and then approached the passenger side of the Escape briefly. Angel TORRES then approached the driver's side of the Lexus and was seen reaching his hands inside in a manner consistent with a hand-to-hand drug transaction.  Angel TORRES then walked away, reaching his right hand into his pocket as he did so. Both vehicles departed shortly thereafter.

175.    A check of CT DMV records revealed the registered owner of the Escape to be male whose identity is known to me with the initials N.T.; he did not resemble the male I had observed conduct the hand-to-hand transaction with the operator of the Lexus. A search of BPD in-house records revealed an investigation which occurred on or about February 14, 2024. In that case, a male named Angel TORRES was stopped by BPD driving a different vehicle registered

---

[13]  During a review of the video, I first noted that the date stamp of the video was not correct; it displayed August 22, 2025, rather than the correct date (August 27, 2025), but did capture the previously mentioned event. The time stamp appeared to be reasonably accurate.

to N.T. A check of a CT DMV photograph of Angel TORRES closely matched the male I had seen conduct the suspected drug transaction with the Lexus.

176.     Ofc. Fisher and I then responded to 39 Washington St. Apt 104, the listed address for Angel TORRES. There, Ofc. Fisher knocked on the door to conduct a ruse operation. The door was answered by the same male I observed conduct the hand-to-hand drug transaction with the operator of the Lexus.  As part of the ruse, Ofc. Fisher explained that the Escape had been called in to BPD as an erratic driver and inquired who was in it. At that point, I was able to positively identify Angel TORRES as the male seen conducting the transaction with the Lexus, based on the comparison of our face-to-face encounter with the CT DMV photograph. Angel TORRES was uncooperative, providing evasive answers.

*September 3, 2025 Arrest of MUHAMMAD in Bristol, CT*

177.     On or about September 3, 2025, at approximately 6:34 PM, I again received an LPR alert that the Lexus had entered Bristol via East Main St. Investigators quickly responded to the area of 39 Washington St., the home of Angel TORRES; there, I observed the Lexus backed into a parking spot in the parking lot. BPD Ofc. Levine reported seeing a Hispanic male matching the description of Angel TORRES exit the passenger seat of the Lexus and enter the apartment building. I then observed the Lexus depart, heading eastbound on Washington St. I noted that the Lexus did not display a front registration plate and had darkly tinted front windshield and side windows.

178.     Believing that MUHAMMAD had just conducted a drug transaction, investigators followed the Lexus.  Shortly thereafter, members of BPD CSU conducted a motor vehicle stop on the Lexus and identified MUHAMMAD as the driver and sole occupant.  BPD Ofc. Mitchell instructed MUHAMMAD to exit the Lexus, but MUHAMMAD refused to do so.  Ofc. Mitchell

attempted to reach through the partially opened window to unlock the door, at which point MUHAMMAD rolled the window up on Ofc. Mitchell's arm, though Ofc. Mitchell was able to successfully unlock the door and free his arm. MUHAMMAD was detained without further incident and placed under arrest on state charges of Interfering with a police officer, because he intentionally rolled the window up on Ofc. Mitchell's arm in an effort to hinder a lawful order to exit the vehicle.

179.    As MUHAMMAD was being detained, investigators observed multiple small fragments of a rock-like substance they recognized to be crack-cocaine. Some of these fragments were subjected to a Sirchie Cocaine ID Swipe field test kit, yielding a presumptive positive result.

180.    A search of the Lexus was conducted, during which investigators located and seized over one pound of marijuana, approximately 70 orange glassine bags containing fentanyl, approximately 1 gram of loose fentanyl packaged in a knotted plastic bag, approximately 14.8 grams of crack-cocaine, four (4) individual knotted bags containing 1-2 grams each of crack-cocaine packaged for sale, six (6) suspected MDMA pills, and various items of drug paraphernalia including digital scales and packaging materials. Additionally, investigators seized approximately $3,790 of United States currency suspected to be drug proceeds and multiple cellular devices. MUHAMMAD was additionally charged with State of Connecticut narcotics offenses.

*Identification of MUHAMMAD TELEPHONE 2 and MUHAMMAD TELEPHONE 3*

181.    During the previous search, investigators located and seized multiple cellular devices. After rolling up the window on Ofc. Mitchell's arm, MUHAMMAD was positioned at the rear of the Lexus where he was not initially handcuffed. There, MUHAMMAD used an

iPhone in a black case (MUHAMMAD TELEPHONE 2) to attempt to audio or video record the

investigation.  As MUHAMMAD was later placed under arrest and secured in handcuffs, he

quickly grabbed MUHAMMAD TELEPHONE 2 and attempted to place it into his pocket.  I

immediately secured the phone, pulling it from his hand, to ensure that no evidence could be

tampered with or deleted.

182.    During the search of the Lexus, investigators located a second iPhone in a teal and

blue case (MUHAMMAD TELEPHONE 3.) Investigators noted that at the time of seizure, the

teal and blue iPhone had a GPS application open displaying driving directions to the Residence

Inn, located at 680 Cromwell Ave, Rocky Hill, CT.  Additionally, the teal and blue iPhone

received multiple incoming messages from a contact named "Brii."  The messages referenced a

planned meeting, with "Brii" inquiring about MUHAMMAD's ETA, whether he was still

coming, etc.  Based on training and experience, investigators believed that MUHAMMAD was

likely using the teal and blue iPhone to arrange and conduct a drug transaction with "Brii,"

which was thwarted when police arrested MUHAMMAD.

183.    The teal and blue iPhone displayed a "sticky note" taped to the back of the phone

indicating that the phone number was 617-823-6565.  Investigators are familiar with these

"sticky note phones," most notably from the JASSOR seizure, where similar phones were

located.  I believe, based on my training and experience, that these phones are readily purchased

at bodegas and convenience stores, and are "prepaid."  This means that to acquire such a phone,

the user need not provide subscriber information nor a recurring payment method.  As such,

these phones can be purchased for cash and are largely untraceable.  Commonly referred to as

"burner phones," these phones are a favorite of individuals involved in the commission of drug

related offenses and other criminal conduct, due to the anonymity of their use, and the ease in which a phone line can be "burned," or dropped if compromised, hence the name.

184.    To confirm the phone number, I dialed 617-823-6565 from a law enforcement phone and noted that MUHAMMAD TELEPHONE 3 began to ring, displaying the law enforcement number on the caller ID.

185.    The telephone number assigned to MUHAMMAD TELEPHONE 2 was not initially known to investigators. However, the investigation revealed that MUHAMMAD was a supervised person reporting the State of CT Department of Corrections Parole and Community Services Unit ("Parole"). Investigators contacted MUHAMMAD's Parole officer and gathered multiple phone numbers he had used in the past from Parole's records. I dialed one such number, 860-984-6278, from a law enforcement phone and noted that MUHAMMAD TELEPHONE 2 began to ring, displaying the law enforcement number on the caller ID.

## V.    OCASIO DTO TELEPHONE ANALYSIS

*Court Authorized Searches of Cellular Devices*

186.    Throughout the investigation described herein, investigators have made frequent use of Court authorized searches of cellular devices seized from OCASIO DTO members as described above. After forensic analysis of these devices, investigators reviewed data and information in a variety of forms that had been extracted from the various devices. The information gleaned during this analysis has proven to be invaluable evidence that OCASIO and his coconspirators have committed the TARGET OFFENSES and has helped investigators to understand and quantify the criminal conduct of the OCASIO DTO.

187.    During the investigation, investigators seized and obtained search warrants to forensically analyze the following cellular devices:

a.  The JANKOWSKI TELEPHONE was seized by investigators on or about December 7, 2024.  The Honorable Maria E. Garcia, United States Magistrate Judge for the District of Connecticut authorized a search warrant to forensically analyze the JANKOWSKI TELEPHONE on or about December 19, 2024.  See, 3:24-mj-01146-MEG.  The warrant allowed the search of the JANKOWSKI TELEPHONE for the time period beginning on or about March 1, 2024.

b.  The RISUCCI TELEPHONE was seized by investigators on or about December 13, 2024.  The Honorable Maria E. Garcia, United States Magistrate Judge for the District of Connecticut authorized a search warrant to forensically analyze the RISUCCI TELEPHONE on or about December 19, 2024.  See, 3:24-mj-01146-MEG.  The warrant allowed the search of the RISUCCI TELEPHONE for the time period beginning on or about June 1, 2024.

c.  The JASSOR TELEPHONE was seized by investigators on or about January 17, 2025.  The Honorable Robert M. Spector, United States Magistrate Judge for the District of Connecticut authorized a search warrant to forensically analyze the JASSOR TELEPHONE on or about January 29, 2025.  See, 3:25-mj-00082-RMS.  The warrant allowed the search of the JASSOR TELEPHONE for the time period beginning on or about December 4, 2024.  After performing the extraction and examining the data and information during the time frame authorized by the initial warrant, investigators developed probable cause to expand the scope of the search.  Investigators then sought and obtained a search warrant authorizing the search of data extracted from the JASSOR TELEPHONE for the date range beginning on or about July 11, 2024 and ending on or about December 3, 2024.

This second warrant was authorized by the Honorable Maria E. Garcia, United States Magistrate Judge for the District of Connecticut on or about April 17, 2025

d.  The WARKOSKI TELEPHONE was seized by investigators on or about April 15, 2025.  The Honorable Maria E. Garcia, United States Magistrate Judge for the District of Connecticut authorized a search warrant to forensically analyze the WARKOSKI TELEPHONE on or about April 25, 2025.  See, 3:25-mj-00391-MEG.  The warrant allowed the search of the WARKOSKI TELEPHONE for the time period beginning on or about January 28, 2025.

e.  The RIBACK TELEPHONE was seized by investigators on or about April 23, 2025.  The Honorable Robert M. Spector, United States Magistrate Judge for the District of Connecticut authorized a search warrant to forensically analyze the RIBACK TELEPHONE on or about May 2, 2025.  See, 3:25-mj-00410-RMS. The warrant allowed the search of the RIBACK TELEPHONE for the time period beginning on or about July 14, 2024.

f.  The MASTROIANNI TELEPHONE was seized by investigators on or about May 15, 2025.  The Honorable Robert M. Spector, United States Magistrate Judge for the District of Connecticut authorized a search warrant to forensically analyze the MASTROIANNI TELEPHONE on or about May 27, 2025.  See, 3:25-mj-00503-RMS.  The warrant allowed the search of the MASTROIANNI TELEPHONE for the time period beginning on or about February 29, 2024.

g.  The JANKOWSKI TELEPHONE 2 was seized by investigators on or about July 9, 2025.  The Honorable Robert M. Spector, United States Magistrate Judge for the District of Connecticut authorized a search warrant to forensically analyze the

JANKOWSKI TELEPHONE 2 on or about July 18, 2025.  See, 3:25-mj-00665-RMS.  The warrant allowed the search of the JANKOWSKI TELEPHONE 2 for the time period beginning on or about January 19, 2025.

h.   The LAFLAMME TELEPHONE was seized by investigators on or about August 11, 2025.  The Hon. S. Dave Vatti, United States Magistrate Judge for the District of Connecticut authorized a search warrant to forensically analyze the LAFLAMME TELEPHONE on or about August 22, 2025.  See, 3:25mj782(SDV).  The warrant allowed the search of the LAFLAMME TELEPHONE for the time period beginning on or about July 23, 2024.

i.   The MUHAMMAD TELEPHONE 2 and the MUHHAMAD TELEPHONE 3 were seized by investigators on or about September 3, 2025.  The Honorable Robert M. Spector, United States Magistrate Judge for the District of Connecticut authorized search warrants to forensically analyze the MUHAMMAD TELEPHONE 2 and the MUHHAMAD TELEPHONE 3 on or about September 12, 2025.  See, 3:25-mj-00878-RMS.  The warrants allowed the search of the MUHAMMAD TELEPHONE 2 and the MUHHAMAD TELEPHONE 3 for the time period beginning on or about May 5, 2025.

j.   The WOFFORD TELEPHONE was seized by investigators on or about September 24, 2025.  The Honorable Robert M. Spector, United States Magistrate Judge for the District of Connecticut authorized a search warrant to forensically analyze the WOFFORD TELEPHONE on or about September 23, 2025.  See, 3:25mj910(RMS).  The warrant allowed the search of the WOFFORD TELEPHONE for the time period beginning on or about September 18, 2024.

*Cellular Device Analysis Protocol*

188.    In what follows, I will further explain how investigators used information gathered from the previously referenced cellular telephone searches, together with other facts known to investigators, to establish the participation and scope of involvement of various persons in the OCASIO DTO's scheme to distribute controlled substances throughout Connecticut.  When using the cellular device searches to calculate the quantities of drug transactions, drug weight totals, and drug proceeds paid related to a particular person's involvement, investigators utilized a simple protocol to ensure accuracy.  In messages from any of the OCASIO DTO's main telephones to a drug runner, a location, drug type and quantity, and dollar amount were almost always specified.  In these instances, the date and time of the transaction, the location of the transaction, the drug type and quantity[14], and the dollar amount paid to the runner were noted, provided that based on the context of the messages it appeared reasonably certain that the transaction did occur.  Throughout the review of messages, investigators noted that in the event that a drug transaction was changed or cancelled it was nearly always noted in the messages.  In the event of a changed drug transaction, the record would be updated to reflect the new information.  In the event of a cancelled drug transaction, the record would be updated to remove the totals from the cancelled transaction entirely.  In certain cases, OCASIO would prepackage drugs and label them for the runner; in these instances, the messages usually reflected only the label (such as "order A" or similar) a location and dollar amount to be paid.  In these instances, the tabulation reflects only the known information about

---

[14] As will be further explained, drug types and quantities were generally written in the text messages using a semi-coded language favored by the OCASIO DTO, utilizing slang terminology for specific drugs commonly used on the street, e.g. "B's" for fentanyl bundles, or "ball" for 1/8th ounce quantity of cocaine.  Investigators tabulated each drug deal, and reported the results as gross weight in grams.  In the specific instance of fentanyl packaged in wax paper folds, each fold was assumed to contain approximately 0.035 grams of fentanyl mixture.

the transaction, such as the location and dollar amount paid. At no time did investigators assume drug types or quantities, nor did investigators attempt to extrapolate drug types or quantities based on dollar amounts paid. In instances where transactions were altogether unclear or lacking sufficient information to be considered, they were not included. In sum, investigators attempted to quantify the drug distribution of each individual drug runner on behalf of the OCASIO DTO and believe that the totals listed in this Affidavit are reasonably accurate, albeit conservative estimates. However, as investigators are aware that in some cases transactions may have occurred in a slightly different manner than outlined in the text messages, the totals listed herein should be considered estimates and not taken to be exact. Finally, investigators note that the time periods reviewed during the cellular device analysis described here represent comparatively small sample sizes when contrasted with the known timeframe in which the OCASIO DTO has been operating and therefore believe that the scope of the OCASIO DTO's drug distribution is actually far greater than can be explained here.

*Debra JANKOWSKI*

189.    Investigators reviewed the JANKOWSKI TELEPHONE, the JASSOR TELEPHONE, the JANKOWSKI TELEPHONE 2, and others to establish JANKOWSKI's participation and scope of involvement in the OCASIO DTO's ongoing scheme to distribute drugs. It is again noted that the JASSOR TELEPHONE was linked to TARGET TELEPHONE, and therefore a review of the JASSOR TELEPHONE allowed investigators to see messages exchanged between the TARGET TELEPHONE and the JANKOWSKI TELEPHONE.

190.    Investigators noted that the JANKOWSKI TELEPHONE was saved in the JASSOR TELEPHONE as "Debbie Wild Jim Girl $550," and was in regular contact with the TARGET TELEPHONE. The analysis concluded that JANKOWSKI operated as a runner for

the OCASIO DTO from on or about November 23, 2024 until at least December 7, 2024. This time range included the night in which JANKOWSKI and SIROIS were stopped by BPD Ofc. Pollock. Many of the conversations contain direction by the TARGET TELEPHONE instructing the JANKOWSKI TELEPHONE to conduct drug sales by sending the location, type and amount of drug, negotiated price, and often a description of the customer or their vehicle. The messages frequently followed the same or a similar format to the specific examples below:

> TARGET TELEPHONE [12/04/2024 9:58:43 PM (UTC)]: *Go see this person real quick Lufkin Street Bristol Ct 1.5b white and 0.5h*
>
> TARGET TELEPHONE [12/04/2024 9:58:58 PM (UTC)]: *243 French street Bristol Ct 3b white and 0.3h $100*

191.    In the preceding messages, the TARGET TELEPHONE uses the standard shorthand for drug orders, as seen by investigators in the RISUCCI TELEPHONE and others. This includes "b" designating "bundles" of fentanyl, and "h" designating "hard," meaning crack-cocaine.

192.    According to the cellular device review, during the aforementioned time frame, investigators determined that JANKOWSKI conducted approximately 324 separate drug deals on behalf of the OCASIO DTO. During these transactions, JANKOWSKI delivered large quantities of multiple drugs to street level customers, which are approximated as follows:

a.  Crack-Cocaine – 243.7 grams

b.  Cocaine – 200.6 grams

    c.  Fentanyl – 7,140 bags / Approx. 249.9 grams

    d.  Oxycodone – 97 pills

    e.  Adderall – 98 pills

    f.  Xanax – 167 Xanax

    g.  Counterfeit Oxycodone – 20 pills

    h.  Suboxone – 115 strips

    i.  Drug Proceeds - $38,700

193.    It should be noted that the above drug and cash totals do not include seizures from the December 7, 2024 stop.  When accounting for the physical seizure from the December 7, 2024 stop in addition to the aforementioned drug deals spelled out in the text messages, drug and drug proceeds attributable directly to JANKOWSKI are approximated as follows:

    a.  Crack-Cocaine – 261.7 grams

    b.  Cocaine – 260.6 grams

    c.  Fentanyl – 8,133 bags / Approx. 284.65 grams

    d.  Oxycodone – 97 pills

    e.  Adderall – 98 pills

    f.  Xanax – 167 Xanax

    g.  Counterfeit Oxycodone – 20 pills

    h.  Suboxone – 115 strips

    i.  Drug Proceeds - $44,613

194.    Also noted in the review, were instances in which the TARGET TELEPHONE and the JANKOWSKI TELEPHONE communicate for the purpose of counting inventory of drugs and money, such as was the case in the following text message exchange:

JANKOWSKI TELEPHONE (6:27 PM): *Final inventory for Tuesday 12/03/24 Buns: 24.5  Bars:   Addies:0  Perks Fk: 3  Subs: 27  Soft: 0  Hard: 1.84  Cash: $2,525 (Gas deducted $30)*

JANKOWSKI TELEPHONE (6:28 PM): *Lmk when you can meet with me*

TARGET TELEPHONE: (6:29 PM): *Gas -30*

TARGET TELEPHONE: (6:29 PM): *No more Addy?*

JANKOWSKI TELEPHONE (6:32 PM): *No and I forgot to put the bars i have 20 bars*

JANKOWSKI TELEPHONE (6:33 PM): *Completely out of Addie's, percs, soft, purple b's*

JANKOWSKI TELEPHONE (8:41 PM): *What time are we meeting up?*

TARGET TELEPHONE: (9:24 PM): *Wya now*

TARGET TELEPHONE: (9:36 PM): *Ready to meet?*


195.    Based on my training and experience, in the preceding conversation the JANKOWSKI TELEPHONE provides an inventory after the completion of a shift operating as an OCASIO DTO runner, specifying the amounts of fentanyl ("Buns"), cocaine ("soft"), crack-cocaine ("hard"), counterfeit oxycodone ("Perks Fk"), Adderall ("Addies"), Xanax ("Bars"), Suboxone ("Subs"), and money ("Cash") she still has.

*Toni RISUCCI*

196.    Investigators reviewed the RISUCCI TELEPHONE, the JASSOR TELEPHONE, and others to establish RISUCCI's participation and scope of involvement in the OCASIO DTO's ongoing scheme to distribute drugs.

197.    Investigators noted voluminous text message exchanges between the RISUCCI TELEPHONE and the TARGET TELEPHONE, which was saved in the RISUCCI TELEPHONE's contact list as "Manchester." Based in part on these messages, investigators believe that RISUCCI was first a drug customer of OCASIO; later, he recruited RISUCCI for employment as a drug runner on behalf of the OCASIO DTO, a position which she held from approximately October 3, 2024 through the date of her arrest on January 4, 2025, and possibly beyond.

198.    For example, investigators reviewed text messages which occurred during the afternoon on July 31, 2024, the same date on which law enforcement had conducted surveillance on OCASIO during the suspected drug meets at Batterson Park, which read as follows:

RISUCCI TELEPHONE (3:01 PM):  *Yoo where should I go I need 5 more purple*

RISUCCI TELEPHONE (3:20 PM): *?*

TARGET TELEPHONE (3:36 PM): *Nb cool?*

RISUCCI TELEPHONE (3:36 PM): *Yeah*

RISUCCI TELEPHONE (3:36 PM): *What road*

RISUCCI TELEPHONE (3:50 PM): *I'm about to get off the new Britain exit lmk what road*

TARGET TELEPHONE (3:59 PM): *950 Farmington ave Nb*

RISUCCI TELEPHONE (4:00 PM): *I'm 10 min away*

RISUCCI TELEPHONE (4:08 PM): *Here*

TARGET TELEPHONE (4:10 PM): *Pulling up shortly*

RISUCCI TELEPHONE (4:19 PM): *Ok*

RISUCCI TELEPHONE (4:57 PM): *You close?*

TARGET TELEPHONE (5:14 PM): *5 min out*

RISUCCI TELEPHONE (5:26 PM): *Ok*

TARGET TELEPHONE (5:37 PM): *I'm at the lake*

RISUCCI TELEPHONE (5:38 PM): *You want me to come there*

TARGET TELEPHONE (5:38 PM): *Yeah park behind me I'm in my truck k*

RISUCCI TELEPHONE (5:38 PM): *What's the address*

*Note: RISUCCI's prior question is never answered. A phone call may have occurred between the two, but is not captured in the digital data extracted from RISUCCI's phone*

RISUCCI TELEPHONE (5:49 PM): *I'm behind the truck behind you*

TARGET TELEPHONE (5:50 PM): *Walk to passenger love*

TARGET TELEPHONE (5:50 PM): *I'm inside my truck k*

RISUCCI TELEPHONE (5:50 PM): *Ok*

199.    Based on my training and experience and knowledge of the July 31, 2024 surveillance, in the above text messages, RISUCCI is attempting to make a drug purchase of "5 more purple" – investigators know this to mean five bundles of fentanyl in purple wax folds – from OCASIO. OCASIO directs RISUCCI to the drug meet, which includes his use of the TARGET TELEPHONE contemporaneous to the drug deal itself, i.e., "Walk to the passenger love…I'm inside my truck k," which OCASIO texted at 5:50 PM after RISUCCI arrived. Investigators conducting surveillance then observed RISUCCI briefly enter OCASIO's Dodge Ram pickup, where the drug deal occurred.

200.    During continued review of the text messages between the TARGET
TELEPHONE and the RISUCCI PHONE, investigators came to learn that RISUCCI had begun
to work as a drug runner on behalf of the OCASIO DTO.  This began slowly, starting around
early September in which text messages indicate that RISUCCI was assisting OCASIO by
picking up drugs and/or money to return to OCASIO when other runners ran into problems doing
so, or assisting by serving a customer as needed.  Eventually, on or about October 3, 2024,
RISUCCI began to work planned "shifts" in which she was supplied with a cache of drugs to sell
by OCASIO, and directed via text messages from the TARGET TELEPHONE to complete
numerous drug transactions on his behalf.

201.    Most of these "shifts" begin with a meet between OCASIO and RISUCCI which
is coordinated through use of the TARGET TELEPHONE, in which OCASIO supplies
RISUCCI with drugs, such as the following text messages which occurred on October 5, 2024
during the early morning hours.  RISUCCI had spent the late night hours of October 4, 2024
serving customers as directed by OCASIO, and her stock began to get low.  The pertinent
messages are as follows:

TARGET TELEPHONE (1:42 AM):  *Want me to stock you up tonight?  For tomorrow?*

RISUCCI TELEPHONE (1:42 AM):  *Sure if you are close to me*

*Note:  The conversation between the two continues as they determine whether or not to
conduct the drug resupply, eventually deciding to go forward with it.  After the two agree
that the "shift" would start at 9 am the following day, they plan where the drug resupply
will occur*

RISUCCI TELEPHONE (1:47 AM):  *That works 9 to what what where you wanna meet*

TARGET TELEPHONE (1:50 AM): *Ima go near newton. Ima see her quick and then meet you. So that way you fully stocked for morning and then I wanna give you something bread for yesterday*

RISUCCI TELEPHONE (1:50 AM): *Ok.*

RISUCCI TELEPHONE (1:56 AM): *Newton st is only 5 min from where I am the gas station I was at closed so I moved to cvs on w main st*

TARGET TELEPHONE (1:57 AM): *I'll be at newton in 10*

RISUCCI TELEPHONE (1:59 AM): *Ok I'll wait here*

TARGET TELEPHONE (2:25 AM): *I'm on Clinic Dr. Did Newton. I'm getting your stuff ready. ADDING 50b 15.4h. I'm here. Wya?*

202.    Based on my training and experience, in the preceding messages, OCASIO and RISUCCI agree to meet for the purpose of a drug resupply, that way RISUCCI is "fully stocked for tomorrow morning," a reference to her next drug running shift, scheduled for 9 AM the following morning. The two agree to meet on "Newton," where OCASIO will serve a female customer first, and then meet RISUCCI to resupply her. After some delay, OCASIO arrives, sending a text message to RISUCCI with the TARGET TELEPHONE to tell her he is "getting your stuff ready." I believe means that OCASIO was preparing, weighing, and packaging a quantity of drugs to provide to RISUCCI. OCASIO then specifies that he is "ADDING 50b 15.4h" which I believe means fifty (50) bundles of fentanyl, specified here in code as "b" for bundle, and 15.4 grams of crack-cocaine, specified here in code as "h" for hard.

203.    RISUCCI continued to run drugs on behalf of the OCASIO DTO on multiple occasions during the month of October, continuing into November. On November 1, 2024,

RISUCCI had spent the evening hours serving customers as directed by OCASIO receiving messages from the TARGET TELEPHONE, when she began to run low on stock. The following messages then occurred between the TARGET TELEPHONE and the RISUCCI TELEPHONE:

RISUCCI TELEPHONE (9:42 PM): *French St is gonna take my last bun I only had 11. And I need one for me tonight*

TARGET TELEPHONE (9:43 PM): *1b $20. Ima meet you*

RISUCCI TELEPHONE (9:44 PM): *On dix*

RISUCCI TELEPHONE (9:48 PM): *On mount vista*

RISUCCI TELEPHONE (10:23 PM): *I'm on shuttle but there's nothing here*

RISUCCI TELEPHONE (10:26 PM): *Yoo*

TARGET TELEPHONE (10:38 PM): *28 stafford ave Bristol Ct 3b and 3.5h $200*

RISUCCI TELEPHONE (10:55 PM): *I'm on garden*

TARGET TELEPHONE (11:05 PM): *ADDING TO STOCK 28s 36.4h 110 b 14 oxy 30mg 22 adderal 15mg 30 Xanax bars.*

204.    Based on my training and experience, in the preceding text messages, RISUCCI alerts OCASIO that she is down to her last bundle of fentanyl. OCASIO responds that he will meet her, with the implication being that he will resupply her drug stock. RISUCCI then proceeds to continually update OCASIO with her location, e.g., "On dix," "On mount vista," and "I'm on garden." Though the specific meet location is not known to investigators, at some point during this time period, OCASIO meets with RISUCCI to conduct the drug resupply, using the TARGET TELEPHONE to text "ADDING TO STOCK 28s 36.4h 110 b 14 oxy 30mg 22

adderal 15mg 30 Xanax bars." I believe this to mean that the resupply consisted of 28 grams of cocaine, specified here in code as "s" for soft, 36.4 grams of crack-cocaine, specified here in code as "h" for hard, 110 bundles of fentanyl, specified here in code as "b" for bundles, in addition to 14 oxycodone pills, 22 Adderall pills, and 15 Xanax bars.

205.    RISUCCI continued to work as a drug runner on behalf of the OCASIO DTO on multiple additional days during the month of November 2024. Their agreement persists into December, during which RISUCCI spends multiple days running drugs on behalf of the OCASIO DTO, including December 7, 2024 into December 10, 2024. At the end of her shift on December 10, 2024, RISUCCI meets with OCASIO to provide him with the proceeds from the weekend's drug sales. The following text message exchange occurs:

RISUCCI TELEPHONE (12:55 AM):  *Wya*

RISUCCI TELEPHONE (12:56 AM):  *I'm turning onto Mansfield I got them ready for you*

RISUCCI TELEPHONE (12:57 AM):  *I'm here*

TARGET TELEPHONE (12:58 AM):  *20 seconds swear. Away. You got Saturday and Sunday money?*

RISUCCI TELEPHONE (12:58 AM):  *Yeah*

TARGET TELEPHONE (12:59 AM): *Make sure separate I got 400 for plus that 100 from other day unless you took it?*

RISUCCI TELEPHONE (12:59 AM):  *Imma count it quick what did you have I didn't take anything out*

TARGET TELEPHONE (12:59 AM): *You don't have to I'll count it if you want. I'm pulling up*

RISUCCI TELEPHONE (1:00 AM): *I had 1522 -50 for gas is 1472 And then 715-40 for gas is 675*

TARGET TELEPHONE (1:01 AM): *okay*

Note: *At this point, RISUCCI gets a system message within the text that says she stopped sharing her location with the TARGET TELEPHONE*

206.    Based on my training and experience, in the preceding text message exchange, OCASIO and RISUCCI plan to meet in order for OCASIO to collect the drug proceeds from the weekend's drug sales. As the meet nears, OCASIO uses the TARGET TELEPHONE to text that he is pulling up. OCASIO then specifies that he has $400 cash, plus an additional $100 to pay RISUCCI, and instructs her to keep the proceeds from Saturday and Sunday separate. RISUCCI specifies, after a count, that she has $1,522 in proceeds from one day, and $715 in proceeds from the other.

207.    Investigators determined that from on or about October 3, 2024 through at least January 4, 2025, and likely beyond, RISUCCI acted as a runner for the OCASIO DTO. During the aforementioned time frame, investigators determined that RISUCCI conducted approximately 553 separate drug deals on behalf of the OCASIO DTO. During these transactions, RISUCCI delivered large quantities of multiple drugs to street level customers, which are approximated as follows:

    a.    Proceeds: $55,617.00

    b.    Crack cocaine: 389.8 grams

    c.   Cocaine: 329.9 grams

    d.   Fentanyl: 10,005 bags / Approx. 350.175 grams

    e.   Fentanyl powder: 14.20 grams

    f.   Oxycodone: 57 pills

    g.   Adderall: 194 pills

    h.   Xanax: 252 pills

    i.   Fake Oxycodone: 30 pills

    j.   Suboxone: 28

208.    It should be noted that the above drug and cash totals do not include seizures from RISUCCI's arrests in Newington and Canton. When accounting for those seizures, in addition to the aforementioned drug deals spelled out in the text messages, drug and drug proceeds attributable directly to RISUCCI are approximated as follows:

    a.   Proceeds: $59,647.00

    b.   Crack cocaine: 475.5 grams

    c.   Cocaine: 379.1 grams

    d.   Fentanyl: 10,005 bags / Approx. 390.67 grams

    e.   Fentanyl powder: 17.20 grams

    f.   Oxycodone: 57 pills

    g.   Adderall: 194 pills

    h.   Xanax: 252 pills

    i.   Fake Oxycodone: 30 pills

    j.   Suboxone: 28

209.    Investigators noted other relevant text message exchanges between the RISUCCI TELEPHONE and the TARGET TELEPHONE, including one that occurred on or about October 25, 2024 where RISUCCI attempts to solicit business for the OCASIO DTO by attempting to recruit a buyer for a quarter-kilogram of crack-cocaine:

RISUCCI TELEPHONE (3:03 PM): *Also one of my friends usually buys a quarter key of h from his boy at time and sells it I told him I would get a price from you he pays 4600*

TARGET TELEPHONE (3:23 PM): *Tell him I'll do 4400*

TARGET TELEPHONE (4:06 PM): *What he says*

RISUCCI TELEPHONE (4:06 PM): *He just reupped but he said he'll keep it in mind for next time*

210.    Investigators also located messages believed to outline the OCASIO DTO's use of shipping services to acquire drugs. On or about November 16, 2024 at approximately 1:57 AM, TARGET TELEPHONE sent multiple drug orders to Newton St, Berlin while RISUCCI was working a shift as a drug runner. RISUCCI received instructions via text message to give a woman walking a dog on Newton St 1b, .3h, and .3s for $20. TARGET TELEPHONE later inquired if RISUCCI had given the woman her order, leading to the following text message:

RISUCCI TELEPHONE (2:37 AM): *Yeah I gave it to her and she gave me 20 and a box you had mailed to her house*

211.    Investigators are aware through training and experience that drug traffickers often purchase drugs such as fentanyl and counterfeit pharmaceutical pills from the dark web and have them shipped to addresses in the US. Investigators believe that OCASIO may have used this customer's residence as a shipping location for one of these types of packages. Based on previous text messages with RISUCCI, as well as an analysis of the JASSOR phone, investigators were

able to determine that the customer was a female known to me with the initials, "J.K.," of 226 Newton St., Berlin, CT. As will be further explained, further investigation revealed that J.K. was found deceased from an overdose on January 2, 2025 at her residence.

*Griffin DEPREY*

212.    Investigators reviewed the JASSOR TELEPHONE and others to establish DEPREY's participation and scope of involvement in the OCASIO DTO's ongoing scheme to distribute drugs.

213.    During a review of the JASSOR TELEPHONE, investigators observed text message conversations with a contact saved in the JASSOR TELEPHONE as "Griff Nicole BD," which investigators knew to be the DEPREY TELEPHONE. During that review, investigators noted that between July 13, 2024 and January 17, 2025, and likely beyond those dates, DEPREY was in regular contact with the TARGET TELEPHONE. The substance of the conversations consisted initially of DEPREY acting as a customer and negotiating the purchase of drugs from the OCASIO DTO. Then, on December 1, 2024, DEPREY is asked to act as a runner for the DTO:

> TARGET TELEPHONE [12:27 PM (UTC -5)]: *Can you do me a favor*
>
> DEPREY TELEPHONE: *What's up?*
>
> TARGET TELEPHONE: *Go to 26 burnham street Plainville ct Put a bundle in the mailbox and bring me the rest*
>
> DEPREY TELEPHONE: *Yea I got you*

214.    Investigators believe that this arrangement is likely something that had been ongoing, though not clearly identifiable in the text messages prior to December 1, 2024, due to the ease in which DEPREY agrees to deliver drugs, in addition to the fact that the TARGET TELEPHONE instructs him to "bring me the rest," implying that DEPREY is in possession of further drugs controlled by the OCASIO DTO.

215.    DEPREY continued to act as a drug runner on behalf of the OCASIO DTO through the date of the seizure of the JASSOR TELEPHONE, and likely beyond.  A review of the text messages followed a similar format to what investigators have observed with other OCASIO DTO drug runners, such as the example text messages below:

> a.  TARGET TELEPHONE (12/23/2024  4:05:30 PM UTC): *820 Mathew, 1b and 0.3 of hard, $40*
>
> b.  TARGET TELEPHIONE (01/13/2025 10:33:19 PM UTC): *Norton Park, apartments across street. Black pick up 4.5h (200)*
>
> c.  TARGET TELEPHONE (01/13/2025 10:35:39 PM UTC): *26 Dwight street Bristol, 1.0s and 0.7h (130)*
>
> d.  TARGET TELEPHONE (01/13/2025 10:46:17 PM UTC): *276 Louisiana Ave, 6b (140)*

*216.*    Also noted in the JASSOR TELEPHONE messages, were instances in which the TARGET TELEPHONE would direct the DEPREY TELEPHONE to deliver drug proceeds or "stock up" his drug stash, such as the one described in the preceding section titled "*Arrest of Ryan JASSOR on January 17, 2025 in Bristol, CT*" that occurred just prior to the arrest of JASSOR and seizure of the JASSOR TELEPHONE.

217.    During the time frame spanning, at a minimum, from December 1, 2024 through January 17, 2025, and likely beyond, investigators determined that DEPREY acted as a drug runner on behalf of the OCASIO DTO.  During that time frame, a review of the JASSOR TELEPHONE indicated that he conducted approximately 553 separate drug deals on behalf of the OCASIO DTO.  During these transactions, DEPREY delivered large quantities of multiple drugs to street level customers, which are approximated as follows:

a.  Proceeds: $21,619.00

b.   Crack cocaine: 165.10 grams

c.  Cocaine: 150.00 grams

d.  Fentanyl: 3605 bags / Approx. 126.18 grams

e.  Oxycodone: 20 pills

f.  Adderall: 18 pills

*James WARKOSKI*

218.    Investigators reviewed the WARKOSKI TELEPHONE, the JASSOR TELEPHONE, and others to establish WARKOSKI's participation and scope of involvement in the OCASIO DTO's ongoing scheme to distribute drugs.

219.    A review of those cellular devices revealed that the WARKOSKI TELEPHONE was in contact with both TARGET TELEPHONE and TARGET TELEPHONE 2.

220.    Investigators reviewed text message conversations between the WARKOSKI TELEPHONE and TARGET TELEPHONE 2 which occurred between on or about January 28, 2025 and on or about April 15, 2025.  The conversation appeared to be a continuation of a previously established conversation/relationship.  As with DEPREY, the conversation initially consists primarily of WARKOSKI arranging to purchase narcotics for himself, several female

companions, and a male who is identified in the conversations, who investigators know to be D.L.[15]  An example appears below, which occurred on or about February 17, 2025:


WARKOSKI TELEPHONE (12:22 PM): Yo

WARKOSKI: You around

TARGET TELEPHONE 2: Yesh

WARKOSKI TELEPHONE: Where you at?

TARGET TELEPHONE 2: Airway

TARGET TELEPHONE 2: Fairway

TARGET TELEPHONE 2: ETA

WARKOSKI: Leaving the house now

TARGET TELEPHONE 2: Ok

TARGET TELEPHONE 2: Need order

WARKOSKI TELEPHONE: Half and maybe a bun too. D.L. coming with me so it's gonna take a couple minutes to get him in the truck

WARKOSKI TELEPHONE: I'll be there in 20 minutes

WARKOSKI TELEPHONE: You still meet me

TARGET TELEPHONE 2: I'm here

WARKOSKI TELEPHONE: Where

WARKOSKI TELEPHONE: Yo

TARGET TELEPHONE 2: 37 Fairway

WARKOSKI TELEPHONE: I'm here

---

[15] In the following text message transcriptions, WARKOSKI repeatedly refers to this male by his first name.  To protect that male's privacy, I have changed the name to "D.L"

TARGET TELEPHONE 2: Okay

WARKOSKI TELEPHONE: Yo, I have D.L. with me and he hates to wait

TARGET TELEPHONE 2: Well I'm 2 min out

WARKOSKI TELEPHONE: Cool


221.     Investigators are aware that D.L. suffered from certain medical complications which caused him to be unable to walk.  D.L. was reliant on a wheelchair.  D.L. also resided at 35 Jasmine St., Bristol, CT – a residence that he allowed many other drug users to reside at. Additionally, D.L. had inherited a significant sum of money, and thus tended to fund narcotics purchases for many of those who resided at the residence.

222.     On or about March 3, 2025, TARGET TELEPHONE 2 and WARKOSKI have the following conversation regarding WARKOSKI working as a runner for the OCASIO DTO.

TARGET TELEPHONE 2 (7:23 PM): Yo

WARKOSKI TELEPHONE: Yo

TARGET TELEPHONE 2: Wanna do me a favor

WARKOSKI TELEPHONE: Sure

TARGET TELEPHONE 2: Wanna bring my boy around to meet ppl

WARKOSKI TELEPHONE: I can't do all that right now

TARGET TELEPHONE 2: At all?

WARKOSKI TELEPHONE: No, I need another half though

TARGET TELEPHONE 2: Meet me

223.    On or about March 17, 2025, TARGET TELEPHONE 2 again attempts to recruit WARKOSKI as a runner for the OCASIO DTO:

WARKOSKI TELEPHONE (9:50 PM): I'm here

TARGET TELEPHONE 2: Yo

WARKOSKI TELEPHONE: I'm here on church st

TARGET TELEPHONE 2: Might have to meet me

TARGET TELEPHONE 2: Runner got high and not responding

WARKOSKI TELEPHONE: Ok no prob

WARKOSKI TELEPHONE: Wya

TARGET TELEPHONE 2: Can you make a couple stops for me and grab some money?

TARGET TELEPHONE 2: I'll give you extra

WARKOSKI TELEPHONE: I guess

TARGET TELEPHONE 2: Okay hold on

WARKOSKI TELEPHONE: What's up

TARGET TELEPHONE 2: Come meet me

WARKOSKI TELEPHONE: Where

WARKOSKI TELEPHONE: Fairway?

TARGET TELEPHONE 2: You'll make couple drops?

WARKOSKI TELEPHONE: Yeah

TARGET TELEPHONE 2: I can send you to runner house and you can knock on door

224.    On or about April 7th, 2025, TARGET TELEPHONE 2 and the WARKOSKI TELEPHONE have another conversation regarding WARKOSKI working as a runner for the OCASIO DTO:

WARKOSKI TELEPHONE (9:09 PM): Do you still want me to make some stops

TARGET TELEPHONE 2: Yes

WARKOSKI TELEPHONE: I'm in the truck

TARGET TELEPHONE 2: 7 railroad ave unionville Knock on door, give him order number 9 and collect 165

TARGET TELEPHONE 2: Your order is number 3, put your 130 with all The money

WARKOSKI TELEPHONE: Okay

TARGET TELEPHONE 2: 2 bliss memorial rd unionville ct Blue jeep, give them order number 5 and collect 95

WARKOSKI TELEPHONE: Still waiting for your boy. Is he walking or driving

TARGET TELEPHONE 2: 115 Beth's ave Bristol ct Give him order 6 and collect 60

TARGET TELEPHONE 2: 96 simms rd Bristol Give them order 8 and collect 400

TARGET TELEPHONE 2: 369 north main street Bristol Park in back and give order number 2 and collect 80

225.    Investigators are aware that during this time, the OCASIO DTO had begun supplying some runners with prepackaged orders with numbers or letters written on them to designate specific orders.

226.    During the review of the text conversation between WARKOSKI TELEPHONE and TARGET TELEPHONE 2, investigators also located text messages instructing WARKOSKI to "stock up." his drug stash.  These meets generally happened before or during WARKOSKI's "shift" as a drug runner.  Below is an example, which occurred on or about April 14, 2025:

WARKOSKI TELEPHONE (7:32 PM): Address

TARGET TELEPHONE 2: Goodwin park

WARKOSKI TELEPHONE: okay

WARKOSKI TELEPHONE: I'm here

WARKOSKI TELEPHONE: Wya

TARGET TELEPHONE 2: Here

WARKOSKI TELEPHONE: Me too

TARGET TELEPHONE 2: Ima putting everything together now

227.    Below is a second example, which occurred on or about April 15, 2025:

TARGET TELEPHONE 2 (3:59 PM): Yo

WARKOSKI TELEPHONE: Yo

TARGET TELEPHONE 2: Ready?

WARKOSKI TELEPHONE: If you are

TARGET TELEPHONE 2: Bring the rest of soft

WARKOSKI TELEPHONE: Ok

WARKOSKI TELEPHONE: Wya

TARGET TELEPHONE 2: Go to Beecher street

TARGET TELEPHONE 2: Southampton

TARGET TELEPHONE 2: Southington

WARKOSKI TELEPHONE: Trying to get the truck, gonna take couple minutes

TARGET TELEPHONE 2: I'm ready made all the orders

228.    In the previous "stock ups" TARGET TELEPHONE 2 appears to direct WARKOSKI where to head, and indicates that the prepackaged and labeled orders have been completed by OCASIO, i.e., "I'm ready made all the orders."  Investigators also noted that the April 15, 2025 conversation – the day WARKOSKI was arrested by CSP in Portland, CT – closely matches information he provided to investigators during his post-*Miranda* statement late that night.

229.    The text message conversations between TARGET TELEPHONE 2 and the WARKOSKI TELEPHONE also show evidence of "money pickups;" instances where WARKOSKI was instructed by TARGET TELEPHONE 2 to collect money from other individuals, or to turn drug proceeds in his possession over to someone else. Examples of "money pick-ups" are seen in the conversations such as the one below, occurring on or about April 8, 2025, where WARKOSKI is instructed to go to 28 Monte Vista Avenue, Newington CT in order to obtain drugs and collect money from an individual at that address named "Larry:"

TARGET TELEPHONE 2: Go back to Larry he's going to give you some soft

TARGET TELEPHONE 2: Grab the money from him

WARKOSKI TELEPHONE: Really

TARGET TELEPHONE 2: Yeah he's fucking using my money

TARGET TELEPHONE 2: I'm calling you

230.    A further example occurs on or about April 13, 2025:

WARKOSKI TELEPHONE (2:07 AM): Can you meet me now

TARGET TELEPHONE 2: Ok

WARKOSKI TELEPHONE: Hartford?

WARKOSKI TELEPHONE: Wya

TARGET TELEPHONE 2: Wya now

WARKOSKI TELEPHONE: Park st

\WARKOSKI TELEPHONE: Yo

WARKOSKI TELEPHONE: I counted 975

TARGET TELEPHONE 2: Wya

WARKOSKI TELEPHONE: I spent 30 on gas for both cars

WARKOSKI TELEPHONE: Franklin

TARGET TELEPHONE 2: Yeah that's fine

TARGET TELEPHONE 2: Go to magnolia street Hartford

TARGET TELEPHONE 2: Should be 1000

TARGET TELEPHONE 2: If you used 30

WARKOSKI TELEPHONE: Got shorted a couple times

TARGET TELEPHONE 2: 25?

TARGET TELEPHONE 2: 36 magnolia street

TARGET TELEPHONE 2: Who shorted you

WARKOSKI TELEPHONE: Beth's ave 10, circle 10

TARGET TELEPHONE 2: Right and with them short you should have 1030 but you took 30 for gas

TARGET TELEPHONE 2: Eta?

WARKOSKI TELEPHONE: I'm here

WARKOSKI TELEPHONE: Where on magnolia

WARKOSKI TELEPHONE: How much did I make

TARGET TELEPHONE 2: I could give it tonight I or see you in the morning myself and bless you

TARGET TELEPHONE 2: Let's do this

TARGET TELEPHONE 2: Give the money to my girl


231.    In summary, between on or about April 7, 2025 through April 15, 2025, and likely beyond, WARKOSKI acts as a runner on behalf of the OCASIO DTO on and off until his arrest Based on the review of text messages it is estimated that WARKOSKI completed approximately 56 drug transactions at the direction of the OCASIO DTO resulting in approximately $6,240.00 in drug proceeds. Specific drug types and quantities could not be determined due to the orders being prepackaged and designated with labels as discussed above.

232.    Investigators review of the text message conversation between the WARKOSKI TELEPHONE and TARGET TELEPHONE 2 also covered the date of WARKOSKI's April 15, 2025 arrest and revealed that WARKOSKI was working as a runner for the OCASIO DTO at that time. After the previously noted text messages in which WARKOSKI was "stocked up" on

Beecher St. in Southington, CT, TARGET TELEPHONE 2 begins sending orders to the WARKOSKI TELEPHONE.

233.    At approximately 8:10 PM, TARGET TELEPHONE 2 asked WARKOSKI "What orders are in the bag" and WARKOSKI replies with the following, "Jb," "Celine," "Tp," "Ron," "That's it." TARGET TELEPHONE 2 then sends WARKOSKI to 276 Louisiana Avenue, Bristol, CT where investigators would initiate surveillance on WARKOKSI. The following messages between the WARKOSKI TELEPHONE and TARGET TELEPHONE 2 consist of TARGET TELEPHONE 2 directing WARKOSKI to specific locations to complete drug sales, which were consistent with the locations investigators saw WARKOSKI travel to during the surveillance operation prior to his arrest.  A portion of those messages appear as follows:


      TARGET TELEPHONE 2 (8:21 PM): 276 Louisiana ave Bristol Jb and giving you 100

      WARKOSKI TELEPHONE: 3 more, who's next

      TARGET TELEPHONE 2: 7 sixth street newington ct It says Ron and giving you 120

      TARGET TELEPHONE 2: Yo

      TARGET TELEPHONE 2: He's giving you 550

      TARGET TELEPHONE 2: Yo

      TARGET TELEPHONE 2: You have a scale?

      WARKOSKI TELEPHONE: I left it home

      WARKOSKI TELEPHONE: I have 2 orders left

      TARGET TELEPHONE 2: 1503 Portland colbolt road Portland Order TP giving you 125


      *Ryan RIBACK*

234.    Investigators reviewed the RIBACK TELEPHONE, the JASSOR TELEPHONE, and others to establish RIBACK's participation and scope of involvement in the OCASIO DTO's ongoing scheme to distribute drugs.

235.    Investigators noted that RIBACK TELEPHONE is saved in the JASSOR TELEPHONE under the contact name "Ryan (dog emoji)." On July 12, 2024, the JASSOR TELEPHONE sent a link to the RIBACK TELEPHONE to download the "Signal" app, an encrypted messaging application. July 14, 2024, the TARGET TELEPHONE and the RIBACK TELEPHONE engaged in the following conversation:

TARGET TELEPHONE (9:25 PM): *Ready?*

RIBACK TELEPHONE (9:26 PM): *Yeah getting on clothes signal me the first two orders*

236.    Based on my training and experience, I believe that at this time, RIBACK was working as a drug runner for the OCASIO DTO and was receiving drug orders on signal. Additional conversations between the two discuss being short on money, as well as inquiring about how much money to take out for gas. Additionally, on July 20, 2024 at approximately 7:37 PM, the TARGET TELEPHONE messaged, "Ima delete order off signal." Later, at 7:52 PM, the TARGET TELEPHONE messaged, "Text on signal Full inventory."

237.    During a continued review of text messages exchanged between the TARGET TELEPHONE and the RIBACK TELEPHONE, further messages related to drug sales are observed, with many appearing to be logistical conversations referencing other messages sent between the two on the Signal App.  However, during some time periods the two appear to have

abandoned use of the Signal App,[16] such as the following conversation, which occurred on or about September 15, 2024:

> TARGET TELEPHONE (2:14 PM): *28 Stafford Ave Bristol Ct Big white cgicn 1.7 h $70*
>
> RIBACK TELEPHONE (2:31 PM): *Tell Dorsett come out*
>
> RIBACK TELEPHONE (2:36 PM): *Yoooo*
>
> TARGET TELEPHONE (2:42 PM): *28 Stafford Red suv 0.7s $20 and 5 subs*
>
> TARGET TELEPHONE (2:54 PM): *276 Louisiana Ave Brisotl Ct 4b and 0.4h $120*
>
> RIBACK TELEPHONE (2:56 PM): *[REPLYING TO TARGET TELEPHONE'S 2:14 PM MESSAGE] Parked in Back*
>
> RIBACK TELEPHONE (2:56 PM): *[REPLYING TO TARGET TELEPHONE'S 2:42 PM MESSAGE] Only 3 subs*
>
> TARGET TELEPHONE (3:04 PM): *Okay*

238.    Based on my training and experience, and knowledge of this investigation, in the preceding messages I believe that the TARGET TELEPHONE is directing the RIBACK TELEPHONE to complete drug deliveries.  For example, "*28 Stafford Ave Bristol Ct Big white cgicn 1.7 h $70*" directs the RIBACK TELEPHONE to travel to 28 Stafford Ave., Bristol, CT to serve a "big white chick" 1.7 grams of "hard," specified here as "h" in a reference to crack-cocaine, for a price of $70.  Similarly, "*28 Stafford Red suv 0.7s $20 and 5* subs" directs the RIBACK TELEPHONE to serve an additional customer at 28 Stafford Ave.  Investigators are

---

[16] Signal is an end-to-end encrypted messaging platform.  Signal does not retain content of messaging on its servers, and messages within the physical device itself are stored in an on-device encrypted database tied to the phones secure key storage, making recovery from the physical device unlikely.  In the case described here, investigators did not review Signal messages.

aware that OCASIO will often direct multiple customers to the same location to save time.  In this order, 0.7 grams of "soft," specified here as "s" is a reference to powder cocaine.  The price is $20 cash, and a trade for 5 "subs" which investigators know to be Suboxone sublingual strips. "276 *Louisiana Ave Brisotl Ct 4b and 0.4h $120*" directs the RIBACK TELEPHONE to travel to 276 Louisiana Ave., Bristol, CT to serve four "bundles" of fentanyl, designated here by "b" and 0.4 grams crack-cocaine for a price of $120.  Later, the RIBACK TELEPHONE confirms arrival at the 28 Stafford Ave. location, texting "*Parked in Back."* The RIBACK TELEPHONE then advises the TARGET TELEPHONE that the customer at 28 Louisiana Ave. that was supposed to trade five suboxone strips only actually traded three.

239.    In sum, a review of the JASSOR TELEPHONE indicated that RIBACK worked as a drug runner from on or about July 23, 2024 through on or about November 9, 2024, and likely beyond.

240.    Investigators continued their review, turning next to the RIBACK TELEPHONE. Investigators noted a text message exchange between the RIBACK TELEPHONE and TARGET TELEPHONE 2 discussing the previous mentioned drug "stock up" that occurred at Jake's Wayback Burgers, which occurred on or about April 21, 2025 as follows:

RIBACK TELEPHONE (5:27 PM): I'm here at Wayback

TARGET TELEPHONE 2 (5:31 PM): Here

TARGET TELEPHONE 2 (6:26 PM): 1325 Farmington Ave Bristol Order S (410)

TARGET TELEPHONE 2 (6:26 PM): L (50)

241.    In the preceding messages, the RIBACK TELEPHONE and TARGET TELEPHONE 2 appear to confirm the Jake's Wayback Burgers meet, after which TARGET

TELEPHONE 2 directs RIBACK to serve prepackaged and labeled drug orders ("S" and "L") in Bristol, CT. This corresponds with investigators surveillance of RIBACK at the time, leading to the point where RIBACK identified the law enforcement tail, fled in the Chevy Trax, and discarded a large drug stash containing prepackaged and labeled orders later recovered by investigators.

242.     During a continued review of the RIBACK TELEPHONE, investigators uncovered further evidence indicating that RIBACK continued to operate as a drug runner on behalf of the OCASIO DTO. The messages observed closely matched the format investigators had come to expect; messages indicating a location, drug type and quantity, and dollar amount for particular transactions, and messages indicating a prepackaged order with a label for others. An example, occurring on or about April 10, 2025 is as follows:

TARGET TELEPHONE 2 (2:12 PM): Order 1(500)

TARGET TELEPHONE 2: Fulton nb

TARGET TELEPHONE 2: Fulton Burgundy pick up Give him 5 b and the ball of Hard from order 7 (270)

TARGET TELEPHONE 2: Fulton Kia soul Give him 5b and ball of Soft From order 7 (230)

TARGET TELEPHONE 2: Kia soul is also giving you 285 and a card food stamps

TARGET TELEPHONE 2: Fulton, small little blue suv Order 3 (90)

RIBACK TELEPHONE: At the end of fulton

243.     During the time frame spanning, at a minimum, from on or about July 23, 2024 through on or about April 21, 2025, and likely beyond, investigators determined that RIBACK worked as a drug runner on behalf of the OCASIO DTO.  During that time frame, a review of the JASSOR TELEPHONE and RIBACK TELEPHONE indicated that he conducted approximately 626 separate drug deals on behalf of the OCASIO DTO.  During these transactions, RIBACK delivered large quantities of multiple drugs to street level customers, which are approximated as follows:

 a.   Proceeds: $63,768.00

 b.    Crack cocaine: 479.0 grams

 c.   Cocaine: 336.3 grams

 d.   Fentanyl: 10,020 bags / Approx. 350.7 grams

 e.   Oxycodone: 48 pills

 f.   Adderall: 90 pills

 g.   Xanax: 200 pills

 h.   Fake Oxycodone: 75 Pills

 i.   Suboxone: 27 strips

244.     It should be noted that the above totals are likely underreported.  RIBACK's use of the Signal App during certain time periods he worked as a runner likely means that significant drug deals were conducted that investigators are unable to quantify.  Additionally, during certain time periods, the OCASIO DTO had transitioned to prepackaging and labeling orders, and these too are unable to be quantified by investigators.

245.     It should be noted that the above drug and cash totals also do not include the drug seizure made by investigators when RIBACK discarded drugs during the police chase on April

21, 2025. When accounting for that seizure, in addition to the aforementioned drug deals spelled out in the text messages, drug and drug proceeds attributable directly to RIBACK are approximated as follows:

    a. Proceeds: $63,768.00

    b. Crack cocaine: 495.84 grams

    c. Cocaine: 346.14 grams

    d. Fentanyl: 10,240 bags / Approx. 358.4 grams

    e. Oxycodone: 48 pills

    f. Adderall: 90 pills

    g. Xanax: 200 pills

    h. Fake Oxycodone: 75 Pills

    i. Suboxone: 27 strips

    j. Synthetic substance a.k.a. "gray death" (bromazalam, xylazine, lidocaine, diphenhydramine): 5.06 grams

*Kyle MASTROIANNI*

246.    Investigators reviewed the MASTROIANNI TELEPHONE, the JASSOR TELEPHONE, and others to establish MASTROIANNI's participation and scope of involvement in the OCASIO DTO's ongoing scheme to distribute drugs.

247.    Investigators learned that MASTROIANNI had been participating in the OCASIO DTO's scheme to distribute drugs in various capacities since at least late 2022. The MASTROIANNI TELEPHONE was in contact with the TARGET TELEPHONE, TARGET TELEPHONE 2, and TARGET TELEPHONE 3.

248.    Investigators conducted a review of records from the JASSOR TELEPHONE between the dates of July 11, 2024 and January 17, 2025 which showed text message conversations between a contact listed as "Kyle Mama Lukes $2955," which investigators known to be the MASTROIANNI TELEPHONE, and the TARGET TELEPHONE.  Review of the text conversation showed that the text thread, beginning on or about July 11, 2024, began in the middle of an ongoing conversation between OCASIO and MASTROIANNI.

249.    From on or about July 11, 2024 to on or about July 22, 2024, the MASTROIANNI TELEPHONE and TARGET TELEPHONE discuss numerous drug transactions. During this time, MASTROIANNI appears to be acting in a customer capacity, requesting to purchase various drugs from TARGET TELEPHONE. The two negotiate the amount of drugs to be purchased by MASTROIANNI, the cost of the drugs, and where MASTROIANNI could meet to complete the transactions. An example, which occurred at approximately 1:50 PM on July 11, 2024, is detailed in substance and part below:

MASTROIANNI TELEPHONE: Yo

TARGET TELEPHONE: Yo

MASTROIANNI TELEPHONE: Can you pull up pls

TARGET TELEPHONE: Yeag

MASTROIANNI TELEPHONE: Ok

MASTROIANNI TELEPHONE: ETA

TARGET TELEPHONE: 30 min

MASTROIANNI TELEPHONE: Yo

TARGET TELEPHONE: What you need

MASTROIANNI TELEPHONE: 2 bs and 20 short of re

MASTROIANNI TELEPHONE: Eta

TARGET TELEPHONE: I'll call when to come pot

MASTROIANNI TELEPHONE: Damn bro

TARGET TELEPHONE: 10

TARGET TELEPHONE: Come outside

250.    Based on my training and experience, in the preceding messages, MASTROIANNI places an order for drugs, specifying "2 bs and 20 short of re." I believe this to mean two bundles of fentanyl and $20 less than his usual order of cocaine, specified here as "re" which is short for the term "re-up," meaning a drug resupply.

251.    It also appears that in this time that MASTROIANNI may be acquiring drugs through the TARGET TELEPHONE in order to resell them. However, between these dates, there does not appear to be any conversation between TARGET TELEPHONE and the MASTROIANNI TELEPHONE indicating that MASTROIANNI is acting as an official runner for the OCASIO DTO. Rather, it appears that MASTROIANNI is acting as a redistributor, sourcing drugs through the OCASIO DTO and then selling them on his own, with the knowledge of OCASIO. An example, which occurred at approximately 7:37 PM on July 12, 2024, is detailed in substance and part below:

MASTROIANNI TELEPHONE: Gonna need re n more bs soon

MASTROIANNI TELEPHONE: u heard

MASTROIANNI TELEPHONE: yoo

TARGET TELEPHONE: ?

MASTROIANNI TELEPHONE: I need to re up

TARGET TELEPHONE: Ok

MASTROIANNI TELEPHONE: And need a few more bs

MASTROIANNI TELEPHONE: And prob 4 more of those 20s

MASTROIANNI TELEPHONE: Yo

TARGET TELEPHONE: Yo

MASTROIANNI TELEPHONE: Eta

MASTROIANNI TELEPHONE: I'm on 5th st at the moment

TARGET TELEPHONE: Meet ?

MASTROIANNI TELEPHONE: My car is fucked bro

MASTROIANNI TELEPHONE: Popped 2 tires

MASTROIANNI TELEPHONE: Luckily one is a slow leak and I was able to use a donut

to get it off the side of the road

MASTROIANNI TELEPHONE: I got the worst luck istg

MASTROIANNI TELEPHONE: And of course I got like 4 ppl waiting

MASTROIANNI TELEPHONE: I just re yesterday too it's been a good 24 hours


252.    Based on my training and experience, in the preceding messages,

MASTROIANNI requests a drug resupply from OCASIO including fentanyl ("B's"), cocaine

(MASTROIANNI simply refers to his cocaine resupply as a "re" or "re-up." As the two have an

established relationship, OCASIO knows MASTROIANNI's usual order, and it is thus

unnecessary for MASTROIOANNI to explicitly state it), and 20 mg oxycodone pills ("4 more of those 20s.)

253.    In another example, investigators learned that the drugs seized from MASTROIANNI during his November 29, 2024 arrest were acquired, in whole or in part, from the OCASIO DTO. A review of text messages between the TARGET TELEPHONE and MASTROIANNI TELEPHONE showed the two negotiate a drug transaction just prior to MASTROIANNI's arrest by BPD.  Portions of that conversation appear as follows:


November 29, 2024 at approximately 7:17 AM

MASTROIANNI TELEPHONE: Yo I need to see you ASAP

MASTROIANNI TELEPHONE: I knew you were stunting last night

TARGET TELEPHONE: Need order my bad bro

TARGET TELEPHONE: I was tired

MASTROIANNI TELEPHONE: 5g s 4.5 bs 180

MASTROIANNI TELEPHONE: Where can I meet


254.    The conversation continues throughout the morning into the afternoon hours, consisting primarily of MASTROIANNI complaining about OCASIO's wait time to serve customers.  The conversation continues as follows:

November 29, 2024 at approximately 1:04 PM:

MASTROIANNI TELEPHONE: Call me bro

MASTROIANNI TELEPHONE: I need to see these people

MASTROIANNI TELEPHONE: I'm grabbing a rental for the day

MASTROIANNI TELEPHONE: What the fuck is going on?


November 29, 2024 at approximately 1:19 PM:

MASTROIANNI TELEPHONE: Who's running

TARGET TELEPHONE: Outside

MASTROIANNI TELEPHONE: They're not outside I promise you

TARGET TELEPHONE: Tan sedan

MASTROIANNI TELEPHONE: This shorting shit had got to stop

MASTROIANNI TELEPHONE: [sends image depicting white powder being weighed on a small scall]

TARGET TELEPHONE: It's only You

MASTROIANNI TELEPHONE: I guess so cause right when I get it, I weigh it


November 29, 2024 at approximately 2:29 PM:

MASTROIANNI TELEPHONE: I just want what I paid for

TARGET TELEPHONE: Read the text they just send me

MASTROIANNI TELEPHONE: I was supposed to get 5 g

MASTROIANNI TELEPHONE: I don't know what you can't read or figure out

TELEPHONE: And we spoke on the phone

TARGET TELEPHONE: And I told You 4.5

TARGET TELEPHONE: And you agreed

MASTROIANNI TELEPHONE: Yeah but I still didn't get my 4.5 bees

TARGET TELEPHONE: They gave you 4

TARGET TELEPHONE: I told You I was giving you 4 cause they running low

MASTROIANNI TELEPHONE: I understand that


November 29, 2024 at approximately 6:43 PM:

MASTROIANNI TELEPHONE: I need more powder

MASTROIANNI TELEPHONE: Yooo

TARGET TELEPHONE: Order

MASTROIANNI TELEPHONE: I need a half ball

MASTROIANNI TELEPHONE: Asap

MASTROIANNI TELEPHONE: I'm going to a concert and I just got bagged with everything I just got from you.

TARGET TELEPHONE: Wya

255.    Based on my training and experience, in the preceding messages, MASTROIANNI places an order for drugs, is served, and engages in a back-and-forth with OCASIO where he complains about getting "shorted," meaning that he was not served all of the drugs he paid for. Later, MASTROIANNI explains that the police seized the drugs he purchased from OCASIO, stating "I just got bagged with everything I got from you."

256.    Beginning on or about July 22, 2024, the TARGET TELEPHONE and the MASTROIANNI TELEPHONE converse about MASTROIANNI becoming an official runner for the OCASIO DTO.  An example, which occurred on or about July 22, 2024, is detailed in substance and part below:

TARGET TELEPHONE: If I decide to have you work tomorrow, would you keep it to yourself ?

MASTROIANNI TELEPHONE: Yeah but how we gonna do that

MASTROIANNI TELEPHONE: I don't have a v

TARGET TELEPHONE: So you would work first shift tomorrow?

MASTROIANNI TELEPHONE: What's the plan

MASTROIANNI TELEPHONE: Talk to me

TARGET TELEPHONE: Yes or no ?

MASTROIANNI TELEPHONE: Yeah but we gotta be on the same page

TARGET TELEPHONE: Well I can Uber you to the car now and have you pick up the bag so everything prepared for the morning

MASTROIANNI TELEPHONE: Where's the car

TARGET TELEPHONE: North

MASTROIANNI TELEPHONE: I can prob save you the Uber fee

MASTROIANNI TELEPHONE: But it would be me getting dropped off I cant be out there waiting

MASTROIANNI TELEPHONE: Cars registered and insured?

MASTROIANNI TELEPHONE: I got him on his way

TARGET TELEPHONE: Montville street


257.    Based on my training and experience, in the preceding messages, MASTROIANNI and OCASIO discuss MASTROIANNI working a "shift" as a drug runner,

including conversation about OCASIO sending an Uber to give MASTROIANNI a ride to pick up the OCASIO DTO car he will use to make deliveries.

258.     Beginning on or about July 22, 2024 to on or about September 12, 2024 MASTROIANNI acts on and off as a runner on behalf of the OCASIO DTO. The text conversations between TARGET TELEPHONE and MASTROIANNI TELEPHONE on the days when MASTROIANNI was working as a runner consist of the TARGET TELEPHONE, believe to be utilized by OCASIO, instructing MASTROIANNI on where, when and with whom drug sales are to be conducted and the negotiated price that is to be collected by MASTROIANNI from the customer. The messages follow the same general format as seen in the examples below:

July 22, 2024

TARGET TELEPHONE (3:32 AM): Hawthorn Guy on foot 7.0h $220

TARGET TELEPHONE (5:12 PM): 85 birch street Southington ct Blue pick up truck, inside cup holder 19.5s $500

August 17, 2024

TARGET TELEPHONE (6:31 PM): Kent Street Plainville ct 5b $100

259.     In total, MASTROIANNI conducted approximately 445 drug transactions on behalf of the OCASIO DTO between July 22, 2024 to on or about September 12, 2024.  The approximate totals of drug proceeds and drug quantities associated with those transactions are as follows:

    a.   Drug proceeds: $41,124.00

    b.   Crack-cocaine: 291.55 grams

    c.   Cocaine: 208.80 grams

    d.   Fentanyl: 9,069 glassine bags (Approximately 317.42 grams)

    e.   Oxycodone: 22 pills

    f.   Adderall: 132 pills

    g.   Xanax: 219 pills

    h.   Pressed Fentanyl Pills/Counterfeit Oxycodone: 69 pills

    i.   Suboxone: 111

260.    Beginning on approximately September 12, 2024, MASTROIANNI appeared to revert back to a reseller; he maintained his close association with the OCASIO DTO, continuing to use OCASIO as a source of supply to serve his own customer base, but no longer appeared to be officially acting as a runner for the OCASIO DTO.

261.    In total, MASTROIANNI conducted approximately 97 additional drug transactions in the manner described above, from on or about September 12, 2024 through on or about January 17, 2025.  The approximate totals of drug proceeds and drug quantities associated with those transactions are as follows:

    a.   Drug proceeds: $17,375.00

    b.   Cocaine: 192.40 grams

    c.   Fentanyl: 3,935 bags (Approximately 137.73 grams)

    d.   Fentanyl powder: 0.3 grams

    e.   Oxycodone: 42 pills

    f.   Adderall: 131 pills

g.  Xanax: 259 pills

262.     During MASTROIANNI's previously described May 15, 2025 arrest in Bristol, CT investigators acquired the MASTROIANNI TELEPHONE, which was later analyzed. Investigators reviewed the data extracted from the MASTROIANNI TELEPHONE and found extensive evidence of the ongoing drug conspiracy between OCASIO, MASTROIANNI, and others.

263.     Specifically, the analysis revealed text message conversations between the MASTROIANNI TELEPHONE and TARGET TELEPHONE 2 that occurred between on or around January 27, 2025 and May 5, 2025.  Additionally, investigators noted text message conversations between the MASTROIANNI TELEPHONE and TARGET TELEPHONE 3 that occurred between on or around January 27, 2025 and May 5, 2025.

264.     Investigators observed that between approximately January 31, 2025 and April 30, 2025, the MASTROIANNI TELEPHONE was in contact with TARGET TELEPHONE 2 on numerous occasions to arrange drug transactions.  A large number of these transactions appear to be MASTROIANNI restocking his supply by purchasing from the OCASIO DTO in order to resell to his own customer base, such as the following:

March 8, 2025 (12:51 PM)

TARGET TELEPHONE 2: What you need

MASTROIANNI TELEPHONE: Ball and 5 bs

MASTROIANNI TELEPHONE: ETA

MASTROIANNI TELEPHONE: Anytime soon? I got someone waiting for pow

TARGET TELEPHONE 2: Tokyo

TARGET TELEPHONE 2: Yo

MASTROIANNI TELEPHONE: Yo

MASTROIANNI TELEPHONE: What's good

MASTROIANNI TELEPHONE:?

MASTROIANNI TELEPHONE: Yoo

MASTROIANNI TELEPHONE: U hit me an hour n half ago... what's going on bro

MASTROIANNI TELEPHONE: Sheesh haven't gotten to Bristol yet?

TARGET TELEPHONE 2: It's not that

MASTROIANNI TELEPHONE: Wym

MASTROIANNI TELEPHONE: You don't got an eta

MASTROIANNI TELEPHONE: Broooo

MASTROIANNI TELEPHONE: This why I told you last night I need to be seen early smh I missed a few sales already

265.    Throughout the referenced time frame, MASTROIANNI and OCASIO have multiple conversations about MASTROIANNI continuing to work as an official runner for the OCASIO DTO.  Two such conversations are as follows:

April 10, 2025 (9:50 PM)

TARGET TELEPHONE 2: Need a solid

TARGET TELEPHONE 2: Tell your driver I'll Give him a bun

MASTROIANNI TELEPHONE: He doesn't do that

MASTROIANNI TELEPHONE: What

MASTROIANNI TELEPHONE: ?

MASTROIANNI TELEPHONE: Yo what's the solid I'm here

TARGET TELEPHONE 2: Does he smoke

MASTROIANNI TELEPHONE: What's the solid bro

TARGET TELEPHONE 2: See 3:4 pls

MASTROIANNI TELEPHONE: We don't have gas for that

TARGET TELEPHONE 2: Ima give you gas

MASTROIANNI TELEPHONE: Gas and a b? Pls

TARGET TELEPHONE 2: Yeah

MASTROIANNI TELEPHONE: Got u


April 17, 2025 (8:51 PM)

MASTROIANNI TELEPHONE: I think it's about time you give me work and let me take care of Bristol

TARGET TELEPHONE 2: You sure ?

TARGET TELEPHONE 2: But you can't speak to anyone Bro I'm telling you

MASTROIANNI TELEPHONE: All I do is be friendly that's it


266.    In total, the review of the MASTROIANNI TELEPHONE conversation with TARGET TELEPHONE 2 showed that MASTROIANNI conducted approximately 145 drug transactions, from on or about January 31, 2025 through on or about April 30, 2025.  These transactions including both instances in which MASTROIANNI is restocking his supply to serve

his own customer base, as well as instances in which he is operating as an OCASIO DTO runner, as the two are interspersed together.  The approximate totals of drug proceeds and drug quantities associated with those transactions are as follows:

    a.  Drug proceeds: $11,169.00

    b.  Cocaine: 158.1 grams

    c.  Crack-cocaine: 59.6

    d.  Fentanyl: 4,620 bags (Approximately 161.7 grams)

    e.  Adderall: 18 pills

    f.  Xanax: 54 pills

267.    Investigators observed that the MASTROIANNI TELEPHONE and TARGET TELEPHONE 3 were in contact from on or about May 7, 2025 through the date of MASTRIANNI's arrest on May 15, 2025.  During the majority of this time frame, the text messages indicate that MASTROIANNI was acting as a runner for the OCASIO DTO.  Occasionally, MASTROIANNI restocks his own supply, which is noted in the text messages.  Investigators noted that the conversations closely matched that which was observed during MASTROIANNI's previous conversations with TARGET TELEPHONE and TARGET TELEPHONE 2, including the following conversation which concluded nearly simultaneously with MASTROIANNI's arrest, after he had spent the previous night running for the OCASIO DTO:

May 15, 2025 (3:52 PM)

TARGET TELEPHONE 3: Yo

MATROIANNI TELEPHONE: Watup Bro

TARGET TELEPHONE 3: I gotta grab that

MASTROIANNI TELEPHONE: Come thru

MASTROIANNI TELEPHONE: I might be going to make a couple sales but I'll bring everything with me

MASTROIANNI TELEPHONE: More bs?

TARGET TELEPHONE 3: Huh

MASTROIANNI TELEPHONE: U got more bs? Last night u said were running low

MASTROIANNI TELEPHONE: 5 Addys 75

TARGET TELEPHONE 3: Yeah been

MASTROIANNI TELEPHONE: My driver got pulled over

TARGET TELEPHONE 3: Why you telling me that?


268.    In total, the review of the MASTROIANNI TELEPHONE conversation with TARGET TELEPHONE 3 showed that MASTROIANNI conducted approximately 45 drug transactions, from on or about May 7, 2025 through on or about May 15, 2025.  In most of the transactions, MASTROIANNI is operating as an OCASIO DTO runner, although there are a small number in which MASTROIANNI appears to restock his own drug supply.  The approximate totals of drug proceeds and drug quantities associated with those transactions are as follows:

    a.  Drug proceeds: $6,975.00

    b.  Cocaine: 95.6 grams

    c.  Crack-cocaine: 14.8

    d.  Fentanyl: 1,346 bags (Approximately 47.11 grams)

e. Adderall: 8 pills

269. The above referenced totals are aggravated from a review of the relevant cellular devices, and do not include actual drugs seized from MASTROIANNI during his May 15, 2025 arrest. When accounting for that seizure, in addition to the time periods in which MASTROIANNI acted as an OCASIO DTO runner, or restocked his own supply while acting as a redistributor, drug and drug proceeds attributable directly to MASTROIANNI are approximated as follows:

a. Drug proceeds: $79,411.00

b. Cocaine: 654.9 grams

c. Crack-Cocaine: 379.4 grams

d. Fentanyl: 18,994 bags (Approximately 664.8 grams)

e. Fentanyl powder: 0.3 grams

f. Oxycodone: 64 pills

g. Adderall: 291 pills

h. Xanax: 545 pills

i. Pressed Fentanyl: 69 Pills

*Robert PINETTE*

270. Investigators reviewed the JASSOR TELEPHONE, and others to establish PINETTE's participation and scope of involvement in the OCASIO DTO's ongoing scheme to distribute drugs.

271. During the review of the JASSOR TELEPHONE, investigators located a conversation between the TARGET TELEPHONE and the PINETTE TELEPHONE that spanned the entire time period covered by the JASSOR TELEPHONE extractions, with the first

contact occurring on or about July 11, 2024 and continuing through January 17, 2025. Like many of the OCASIO DTO's drug runners, PINETTE's relationship with the OCASIO DTO began as a customer; the text message conversations showed PINETTE regularly placing orders for drugs from the OCASIO DTO.

272.    Eventually, PINETTE is recruited to work as a runner for the OCASIO DTO, with the first documented instance occurring on or about November 16, 2024, in the conversation that follows:

TARGET TELEPHONE (3:08 AM UTC -5): Yo

PINETTE TELEPHONE: What

TARGET TELEPHONE: Can you see these ppl for me

TARGET TELEPHONE: Can I call you later?

TARGET TELEPHONE: I'm in hospital with my son

PINETTE TELEPHONE: Where do you want me to go to get the stuff

TARGET TELEPHONE: Text me

TARGET TELEPHONE: Vega Street Nb

PINETTE TELEPHONE: Yup. I'm not sitting there waiting

TARGET TELEPHONE: Okay look

PINETTE TELEPHONE: Omw

PINETTE TELEPHONE: I'm on the highways don't make sure they're ready

PINETTE TELEPHONE: Pulling up

PINETTE TELEPHONE: You'll wear on vega

PINETTE TELEPHONE: Dude, start talking.I'm leaving not sitting out here at three thirty

TARGET TELEPHONE: I never catch a break

PINETTE TELEPHONE: What am I doing on vega

PINETTE TELEPHONE: ???

PINETTE TELEPHONE: Leaving

TARGET TELEPHONE: She's there white jaguar

TARGET TELEPHONE: Seen her?

PINETTE TELEPHONE: Yes, I got 2 of them.Tell me where am I going.And how much am I getting

PINETTE TELEPHONE: Sitting there like a r***** Had nothing ready.

PINETTE TELEPHONE: Where am I going?I'm getting the highway

TARGET TELEPHONE: She gave you a bag with some soft and hard in it

TARGET TELEPHONE: That's 26 Dwight Street Bristol

TARGET TELEPHONE: The other bag with the bundle and hard is 82" Mathew's

TARGET TELEPHONE: 810

TARGET TELEPHONE: 820

PINETTE TELEPHONE: yes w

TARGET TELEPHONE: Both of them total giving you 110

273.    Another instance of PINETTE being recruited to work as a drug runner for the OCASIO DTO occurs on or about December 31, 2024:

TARGET TELEPHONE (9:45 PM UTC): Wanna work

PINETTE TELEPHONE: I'm actually at work. Buddy and he could have people come here yeah

PINETTE TELEPHONE: Especially because my boss is on vacation. So I can blow this spot up.

274.     In the following conversations, investigators noted that PINETTE regularly worked as a drug runner for the OCASIO DTO.  The bulk of the messages contain direction by TARGET TELEPHONE instructing PINETTE to conduct drug sales by sending the location, type and amount of drug to be sold, negotiated price, and often a description of the customer or their vehicle. The messages, which were consistent with what investigators have seen from other OCASIO DTO drug runners, frequently followed the same or a similar format to the specific examples below:

January 1, 2025 4:35:57 AM (UTC)

TARGET TELEPHONE: 42 Hubbard rd meriden 8b and 2.0h (300)


January 1, 2025 4:37:05 AM (UTC)

TARGET TELEPHONE: 68 summer street meridan 2b and 0.6s and 0.5h (120)


275.     Investigators observed that PINETTE continued to conduct drug transactions on behalf of the OCASIO DTO, completing approximately 69 transactions between the periods of January 1, 2025 and January 15, 2025.  The approximate totals of drug proceeds and drug quantities associated with those transactions are as follows:

    a.  Proceeds: $7,264.00

    b.  Crack cocaine: 53.3 grams

    c.  Cocaine: 48.8 grams

    d.  Fentanyl: 1490 bags / Approx. 52.15 grams

e.  Xanax: 7 pills

276.    Certain associates of the OCASIO DTO, including JASSOR, ROSADO-ORTIZ, and MUHAMMAD appear to be trusted members of the OCASIO DTO, and as such are able to communicate with OCASIO on his "personal" phone, the OCASIO TELEPHONE.  In these instances, as investigators do not yet have phone extractions related to the OCASIO TELEPHONE, investigators were unable to quantify amounts of drugs, drug proceeds, and transactions in the manner that had been done with the previously mentioned drug runners.[17] Still, as discussed below, the analysis of cellular devices available to investigators did provide insight into the operations of the OCASIO DTO.

*Jose ROSADO-ORTIZ*

277.    During the review of the JASSOR TELEPHONE, investigators noted a text message conversation that occurred between the TARGET TELEPHONE and the ROSADO-ORTIZ TELEPHONE.  Investigators are aware that ROSADO-ORTIZ and OCASIO generally communicate using a separate phone line held by OCASIO; in this instance, as explained in the text messages, that phone line had nearly run out of battery life causing OCASIO to contact ROSADO-ORTIZ using the TARGET TELEPHONE.

278.    Investigators were aware, from a surveillance operation conducted on July 31, 2024 that at approximately 6:08 PM, that OCASIO met with a Lexus bearing CT registration BP28262, which was registered to ROSADO-ORIZ and believed to be operated by him, in the Batterson Park parking lot in New Britain, CT.  OCASIO had previously conducted multiple suspected drug transactions, including drug "restocks" to runners only moments earlier.

---

[17] Investigators have to date been unable to seize the OCASIO TELEPHONE.  Toll Records indicate that the OCASIO TELEPHONE is still in use.

OCASIO was observed removing a medium sized duffel style bag and what appeared to be an item of clothing from the rear of the Lexus sedan, which he placed into his truck.

279.     The text messages conversation between the two began shortly thereafter, on July 31, 2024 at approximately 6:43 PM, and continued until August 1, 2024 at approximately 1:25 AM.  That conversation appears in substance and part as follows:

TARGET TELEPHONE: Yo it's me j

TARGET TELEPHONE: My phone about to die so we need to run through this one

ROSADO-ORTIZ TELEPHONE: Jose?

TARGET TELEPHONE: Birch

ROSADO-ORTIZ TELEPHONE: Oh

ROSADO-ORTIZ TELEPHONE: You home?

TARGET TELEPHONE: My phone died im at a movie

ROSADO-ORTIZ TELEPHONE: Almost at your house

TARGET TELEPHONE: Ok

ROSADO-ORTIZ TELEPHONE: What I need to do when I get there

TARGET TELEPHONE: Code 12378912 Go to basement and get 2 cajas 1 purple 1 white

TARGET TELEPHONE: And jump in Maxima

TARGET TELEPHONE: First order 10 p $180

TARGET TELEPHONE: Ready?

ROSADO-ORTIZ TELEPHONE: Send orders gotta put gas and stop for a bite rq

TARGET TELEPHONE: 42 Avery rd Newington ct 0.6h $ free

TARGET TELEPHONE: 26 burnham street plainvillle Ct 2b and 0.5h $80

TARGET TELEPHONE: Avery rd Newington Minivan 12 adderal $180

ROSADO-ORTIZ TELEPHONE: I gotta go back to fkn middle town after these order bro forgot the bag in the back

TARGET TELEPHONE: 6 south center street Southington Ct 1b and 0.4h $50

TARGET TELEPHONE: Go back now bro

TARGET TELEPHONE: No point

ROSADO-ORTIZ TELEPHONE: I'm closs on avery let me atleast take care of these

ROSADO-ORTIZ TELEPHONE: Minivan?

ROSADO-ORTIZ TELEPHONE: +40

ROSADO-ORTIZ TELEPHONE: Left yo middle

TARGET TELEPHONE: Huh

ROSADO-ORTIZ TELEPHONE: Bich with h gave me 40 Mini never showed Left to middle town

TARGET TELEPHONE: Good $40

TARGET TELEPHONE: Leave

ROSADO-ORTIZ TELEPHONE: [Photograph sent of maroon Ford Fusion style sedan]

TARGET TELEPHONE: Yeah that's neighbor Brodie

TARGET TELEPHONE: I seen car before

ROSADO-ORTIZ TELEPHONE: That's the model and color of the cop from bristol

TARGET TELEPHONE: Minivan on way Avery like 6 min out

TARGET TELEPHONE: Yeah I know

ROSADO-ORTIZ TELEPHONE: I left. Bro turn arounf?

TARGET TELEPHONE: Bur that's neighbor

TARGET TELEPHONE: Seen it

TARGET TELEPHONE: Before e

TARGET TELEPHONE: Aren't you at Middletowns

ROSADO-ORTIZ TELEPHONE: No that Pic from earlier keep it bro

ROSADO-ORTIZ TELEPHONE: Lmao

TARGET TELEPHONE: Omg

TARGET TELEPHONE: Wya now

ROSADO-ORTIZ TELEPHONE: How can I be in Middletown when I just serve avery

ROSADO-ORTIZ TELEPHONE: Highway

ROSADO-ORTIZ TELEPHONE: 20 min to middle town Like to 10 averry

ROSADO-ORTIZ TELEPHONE: From*

TARGET TELEPHONE: Wya now

TARGET TELEPHONE: Trumbull street Plainville ct Grey Acura 1b and 0.3h $20

ROSADO-ORTIZ TELEPHONE: Call burham

TARGET TELEPHONE: Summer street Bristol Ct Chick walking heavy set 4b $315

TARGET TELEPHONE: Summer street Chick walking Skinner chick 14.0h and 10b $575

ROSADO-ORTIZ TELEPHONE: Don't sww gre yac

ROSADO-ORTIZ TELEPHONE: Don't see Grey ac

TARGET TELEPHONE: 5 min

ROSADO-ORTIZ TELEPHONE: Tf

ROSADO-ORTIZ TELEPHONE: I'm super behind

TARGET TELEPHONE: Yeah

ROSADO-ORTIZ TELEPHONE: Wasn't a question

ROSADO-ORTIZ TELEPHONE: Yo gang where g at

TARGET TELEPHONE: Lmfao

TARGET TELEPHONE: Wya

ROSADO-ORTIZ TELEPHONE: Bro don't ask me a dumb question like that I'm already annoyed

TARGET TELEPHONE: He's there

ROSADO-ORTIZ TELEPHONE: No he not

TARGET TELEPHONE: 4b and 1.0s and 0.5 $160

TARGET TELEPHONE: 1.7s and 50 cash -50 & 61 pills

TARGET TELEPHONE: Dwight street Bristol Ct 0.5a and 0.5h $ free

ROSADO-ORTIZ TELEPHONE: [Photograph sent of Stop Sign]

ROSADO-ORTIZ TELEPHONE: Conlon St

TARGET TELEPHONE: 3b and 3bars $85 cash app

TARGET TELEPHONE: 176 Glen street Nb 0.3h $20

TARGET TELEPHONE: Summer 3b and 0.3h $100

TARGET TELEPHONE: F $900

280.    From my training and experience, and knowledge of this investigation, I believe that portions of this text message conversation provide valuable insight into the operations of the OCASIO DTO and both OCASIO's and ROSADO-ORTIZ's roles, including the following:

a.  The conversation begins with reference being made to ROSADO-ORTIZ going to OCASIO's house, which is later described as "Middletown."  Investigators know this to be OCASIO's residence, located at 2 Yellow-Orange Circle, Middletown, CT.  OCASIO instructs ROSADO-ORTIZ to go into the basement and "get 2 cajas 1 purple 1 white."  Investigators know this to mean two "boxes" of fentanyl, specified by the white or purple wax paper sleeves the OCASIO DTO packages fentanyl in, each representing a different "blend" of fentanyl powder.  Through review of numerous text messages obtained via Court authorized searches conducted throughout the investigation, investigators are aware that many OCASIO DTO customers have a strong preference for one type or the other.  Investigators thus concluded that OCASIO stores quantities of fentanyl packaged for sale in the basement of 2 Yellow-Orange Circle, and in this instance sent ROSADO-ORTIZ to "restock" there.

b.   Investigators note that OCASIO instructs ROSADO-ORTIZ to "Jump in Maxima" in an apparent reference to a Nissan sedan.  Investigators note that this is consistent with their prior understanding that OCASIO often provides the use of a vehicle to drug runners operating on behalf of the OCASIO DTO.

c.  Investigators noted that ROSADO-ORTIZ sent OCASIO a picture of a maroon Ford Fusion styled sedan with the explanation that it was "…the model and color of the cop from Bristol."  Investigators are aware, that on June 11, 2024 Det. Matthew Godbout from the BPD conducted a motor vehicle stop on a male believed to be ROSADO-ORTIZ.  After initially pulling over, ROSADO-ORTIZ fled from the scene at a high rate of speed in a Dodge Ram pickup truck rented by

OCASIO.  At the time, Det. Godbout was driving a maroon Ford Fusion

unmarked police car.  The text messages reviewed here seem to confirm that

ROSADO-ORTIZ was the driver who fled from police.

d.    Investigators noted that in a short time, OCASIO directed ROSADO-ORTIZ to

conduct approximately ten (10) drug transaction on behalf of the OCASIO DTO.

*Ryan JASSOR*

281.    Investigators arrested JASSOR on State of Connecticut charges on or about

January 17, 2025, at which point a cellular device known as the JASSOR TELEPHONE was

seized.  Investigators were aware, from the onset of the investigation, that the JASSOR

TELEPHONE was one of the OCASIO's two main phone lines that customers could call or text

to place an order for illegal drugs.  During the early parts of the investigation, investigators

believed that the JASSOR TELEPHONE was held and utilized by PACHECO, who at the time

held a leadership role in the OCASIO DTO alongside OCASIO, and during this time frame

investigators believed communications with customers were split evenly between the TARGET

TELEPHONE and the JASSOR TELEPHONE.

282.    During the subsequent Court authorized extraction and analysis of the JASSOR

TELEPHONE, investigators determined that it was linked to the TARGET TELEPHONE, as

described in detail above.  Investigators determined that calls and texts continued to come into

both the TARGET TELEPHONE and the JASSOR TELEPHONE from OCASIO DTO

customers seeking to place orders, but as the investigation progressed, investigators noted that

the majority of communications with customers shifted towards the TARGET TELEPHONE.

Still, the JASSOR TELEPHONE remained privy to the content of communications between the

TARGET TELEPHONE and the OCASIO DTO customer base, and thus had knowledge of

OCASIO DTO methods and practices, including identity of customers, "stock up" locations and times, and earnings and inventory of the OCASIO DTO. As such, investigators concluded that the holder of the JASSOR TELEPHONE – at first, PACHECO, and later JASSOR – were high ranking members of the OCASIO DTO who operated in a leadership role.

283.    However, investigators are aware that JASSOR communicated with OCASIO via his personal phone and the OCASIO TELEPHONE, which investigators do not currently have access to. Additionally, since JASSOR was privy to all content on the TARGET TELEPHONE because of the linked nature of the two devices, he could have participated in any number of individual drug deals, "stock ups" or other OCASIO DTO activities outlined in the phone extraction without creating an additional record of his involvement on the JASSOR TELEPHONE. Unlike other runners, whose one-on-one communications with the TARGET TELEPHONE clearly quantify their involvement, incoming orders to the linked TARGET TELEPHONE and JASSOR TELEPHONE could have been served by OCASIO, by JASSOR himself, or dispatched to a third-party runner. Due to this variability, investigators cannot quantify JASSOR's involvement in regards to total drug weights, drug proceeds earned, etc. when viewed from the perspective of the JASSOR TELEPHONE.

*Quran MUHAMMAD*

284.    During the review of the data extraction from MUHAMMAD TELEPHONE 2, investigators located a text messages and phone calls between the MUHAMMAD TELEPHONE 2 and the OCASIO TELEPHONE, which is saved in MUHAMMAD TELEPHONE 2 as contact "Kindle." The conversation thread between OCASIO TELEPHONE and MUHAMMAD TELEPHONE 2 includes conversations regarding money and the transfer of monies to and from third party individuals as well as number's that appear to be dollar amounts believed to be total

drug proceeds attributed to certain days of running. These conversations are consistent with conversations investigators have seen between other members of the OCASIO DTO related to the sale of narcotics, the collection of drug debts, and the transfer/collection of drug proceeds held by runners of the DTO.

285.    Specific to the activity observed on August 13, 2025 at TARGET LOCATION 1, investigators located the following text messages between OCASIO TELEPHONE and MUHAMMAD TELEPHONE 2:

> August 13, 2025 at approximately 10:11 AM (UTC -4)
>
> MUHAMMAD TELEPHONE 2: yo
>
> MUHAMMAD TELEPHONE 2: need those clothes and shoes i leave tomorrow
>
> MUHAMMAD TELEPHONE 2: and please bro give me the crease protector
>
> OCASIO TELEPHONE: Wya now
>
> MUHAMMAD TELEPHONE 2: nb

286.    Investigators also found that following those text messages, MUHAMMAD TELEPHONE 2 received a Facetime call from OCASIO TELEPHONE at approximately 10:29 AM which showed a duration of approximately 27 minutes. A short time later, at approximately 12:16 PM MUHAMMAD TELEPHONE 2 made an outgoing Facetime call to OCASIO TELEPHONE.

287.    Following the Facetime calls, MUHAMMAD would be observed at OCASIO's residence at TARGET LOCATION 1 between approximately 12:47 PM and 1:54 PM and was observed leaving the residence with a black duffle bag that appeared to be weighted.

288.    Based upon the extended duration of the Facetime calls and the time MUHAMMAD spent inside OCASIO's residence, investigators believed that the meeting likely was in regards to OCASIO DTO drug trafficking activities, and the use of the phrase "clothes and shoes" was likely coded to avoid detection.

289.    Investigators further found that during the timeframe that MUHAMMAD was at TARGET LOCATION 1, MUHAMMAD TELEPHONE 2 made outgoing calls to multiple airlines including United Airlines, Southwest Airlines, and Jet Blue. Conversations located in the MUHAMMAD TELEPHONE 2 showed there to be conversations pertaining to travel to Puerto Rico on or around the date of August 13, 2025:

<u>MUHAMMAD TELEPHONE 2 to OCASIO TELEPHONE, August 13, 2025 at approximately 6:23 PM (UTC-4)</u>

MUHAMMAD TELEPHONE 2: I would grab them but i need some extra money for pr

<u>MUHAMMAD TELEPHONE 2 to contact "Mom" (860-597-4768), August 12, 2025 at approximately 8:31 PM (UTC-4):</u>

MOM: Where u going on the 14

MOM: Florida

MUHAMMAD TELEPHONE 2: im not sure bro bought my ticket

<u>August 14, 2025 at approximately 9:39 AM (UTC-4):</u>

MOM: Did you get in safe I'm pr

MUHAMMAD TELEPHONE 2: nah im in air my plan e took off at 8:30

MUHAMMAD TELEPHONE 2: takes about 4 hours


August 15, 2025 at approximately 2:37 AM (UTC-4):


MUHAMMAD TELEPHONE 2: she aint call me all day

MOM: She said u was in a business trip lol


290.    Internet search history on the MUHAMMAD TELEPHONE 2 data extraction showed that on August 15, 2025 a number of searches for "jet car Puerto Rico" were made. Additionally, location information on the phone extraction showed Puerto Rico as the location assigned to several videos and pictures dated August 15, 2025.

291.    A review of the images contained in the data extraction of MUHAMMAD TELEPHONE 2 located what appeared to be a screenshot of booked flights through Expedia. The screenshot showed flight itinerary for a flight from Bradley international Airport (BDL) to Luis Munoz International Airport (SJU) in San Juan, Puerto Rico for the date of August 14, 2025. The screenshot also showed an itinerary for a flight from SJU to BDL on August 19, 2025.

292.    Based on information in the MUHAMMAD TELEPHONE 2 data extraction, it appears that MUHAMMAD travelled to Puerto Rico from on or about August 14, 2025 through on or about August 18, 2025. From text conversations it appears that MOHAMMAD's trip was organized at least in part by another party and that it appears to have involved business of some sort. Investigators are aware, through training and experience, that Puerto Rico is considered a

"source state/territory" for cocaine that is trafficked into the contiguous United States. Investigators are further aware that oftentimes drug dealers operating out of the northeast with ties to Puerto Rico will send or transport quantities of drug proceeds into Puerto Rico.

293.    During a further review of MUHAMMAD TELEPHONE 2 investigators located the below conversation which occurred after MUHAMMAD left OCASIO's residence on August 13, 2025 pertaining to MUHAMMAD acquiring drugs for the OCASIO DTO.

August 13, 2025 at approximately 6:05 PM (UTC-4):

MUHAMMAD TELEPHONE 2: bro got 100 (Emoji of 10) his mom low key taxing do

OCASIO TELEPHONE: How much

MUHAMMAD TELEPHONE 2: They told me 14

OCASIO TELEPHONE: Can he do 13?

MUHAMMAD TELEPHONE 2: Gimmie a min

OCASIO TELEPHONE: I thought you was gon say 13 At first tbh

MUHAMMAD TELEPHONE 2:  yeah i though he was honna say that too but its his mom shit

OCASIO TELEPHONE: What he say

MUHAMMAD TELEPHONE 2: he said hld up

MUHAMMAD TELEPHONE 2: they said best the gonna do is meet in the middle

OCASIO TELEPHONE: 1350?

MUHAMMAD TELEPHONE 2: yeah

MUHAMMAD TELEPHONE 2: I would grab them but i need some extra money for pr

OCASIO TELEPHONE: Okay I'll grab them

MUHAMMAD TELEPHONE 2: ok are u coming out anytime soon?

OCASIO TELEPHONE: Yeah now

MUHAMMAD TELEPHONE 2: these not even pinks bro

MUHAMMAD TELEPHONE 2: got em down to 1150

294.    Additionally, while reviewing the images contained within the data extraction for MUHAMMAD TELEPHONE 2, investigators located an image of a hand holding a prescription pill bottle labeled Oxycodone which can be seen to contain a number of pills. The image's information showed it to have been created on August 13, 2025 at approximately 7:45 PM which is approximately 25 minutes after the conclusion of the above detailed conversation regarding the purchase of Oxycodone pills.

295.    Based on the above conversation investigators believe that after leaving OCASIO's residence on August 13, 2025 MUHAMMAD conducted a drug transaction during which MUHAMMAD purchased one-hundred (100) 10 mg oxycodone pills (often referred to by their common color, "pinks") for $1150.00 on behalf of the OCASIO DTO. In addition to the negotiation in text message communication detailed above, call logs on the MUHAMMAD TELEPHONE 2 showed that OCASIO TELEPHONE and MUHAMMAD TELEPHONE 2 exchanged Facetime calls during the time that the transaction negotiation was occurring.

## VI.    THE OVERDOSES

296.    Over the course of the investigation into the drug trafficking activities of the OCASIO DTO, investigators became aware of multiple instances of opiate related overdoses, many of which were fatal, and can be tied to the OCASIO DTO.

*April 18, 2024 Overdose Death of E.N.*

297.    On or about April 18, 2024, the BPD responded to the apparent death of a 50-year-old male "E.N." at his residence in Bristol, CT.  E.N. had last been seen alive by his wife at approximately 9:00 PM on April 17, 2024 when she went to bed.  The following morning, she found E.N. unresponsive on the kitchen floor at around 6:30 AM.  Both the wife of E.N. and responding officers from BPD attempted life saving measures to no avail.  E.N. was pronounced deceased by Bristol Hospital EMS paramedics upon their arrival.

298.    BPD Detectives conducted a death investigation, which included an autopsy and toxicology screen conducted by the State of Connecticut Office of the Chief Medical Examiner (CT OCME).  The report provided by the CT OCME listed the manner of death as "accidental" and the cause of death as the acute intoxication by the combined effects of effects of ethanol, cocaine, xylazine, gabapentin, and fentanyl.

299.    During subsequent interviews with the wife of E.N., she stated that prior to his death, E.N. would purchase drugs from a male known to her as "Kyle."  She provided Kyle's phone number, which investigators know as the MASTRIANNI TELEPHONE. I later confirmed with the wife of E.N. that he had utilized the E.N. TELEPHONE prior to his death.

300.    Investigators later conducted a telephone toll analysis of contact between the E.N. TELEPHONE and the MASTROIANNI TELEPHONE.  That analysis revealed that between March 2, 2024 and May 6, 2024 there were approximately 823 contacts between the two parties. After the date of E.N.'s death, there were no contacts until May 6, when the MASTROIANNI TELEPHONE attempted to contact the E.N. TELEPHONE three times.   On April 16,  2024, there were approximately 18 contacts between the two.[18]  On April 18, 2024, there were two

---

[18] In an earlier affidavit related to this investigation, after a typographical error, this date was written as April 17, 2024.  The correct date is April 16, 2025

contacts between the two, occurring at approximately 1:01 AM, about four hours after E.N. had last been seen by his wife, and about five and a half hours before E.N, would be found deceased.

301.     Additionally, investigators conducted telephone toll analysis of the MASTROIANNI TELEPHONE's contacts with known phone numbers utilized by the OCASIO DTO (TARGET TELEPHONE 1, the JASSOR TELEPHONE) around the timeframe of E.N.'s death.

302.     On April 16, 2024, the MASTROIANNI TELEPHONE had one contact with the TARGET TELEPHONE.  On April 17, 2024, the MASTROIANNI TELEPHONE had two contacts with the TARGET TELEPHONE. On April 18, 2024 the MASTROIANNI TELEPHONE had five contacts with the TARGET TELEPHONE, occurring between approximately 3:13 PM to 8:11 PM.

303.     On April 16, 2024, the MASTROIANNI TELEPHONE had three contacts with the JASSOR TELEPHONE.  On April 17, 2024, the MASTROIANNI TELEPHONE had eight contacts with the JASSOR TELEPHONE. On April 18, 2024, the MASTROIANNI TELEPHONE had seven contacts with the JASSOR TELEPHONE, occurring between 2:29 PM to 9:52 PM.

304.     From the telephone toll analysis, investigators concluded that the E.N. TELEPHONE was in contact with the MASTROIANNI TELEPHONE in the days leading up to E.N.'s death, to include in the hours immediately before.  Additionally, the MASTROIANNI TELEPHONE was in contact with both the TARGET TELEPHONE and JASSOR TELEPHONE in the days leading up to, and the day of, E.N.'s death.  Information extracted from the JASSOR TELEPHONE available to investigators dates back only as early as July 11, 2024, and therefore does not cover the date of the E.N. overdose death.

305.    As described above, investigators would later seize the MASTROIANNI

TELEPHONE during his May 15, 2025 arrest, and subsequently perform a forensic extraction

and analysis on the MASTROIANNI TELEPHONE pursuant to a warrant authorized by the

Court.  However, during a review of the MASTROIANNI TELEPHONE, investigators

determined that information located on the device from the time frame of E.N.'s death appears to

be incomplete, as complete message threads and other data do not appear to have been extracted.

*October 26, 2024 Overdose Death of M.O.*

306.    On or about October 26, 2024, the BPD responded to a double overdose, in which

a 20-year-old male "C.M" was unresponsive, and a 20-year-old female "M.O" was apparently

deceased.  Family members provided doses of naloxone, an opiate antagonist used to reverse

overdoses, to C.M., who was ultimately transported to the hospital by Bristol Hospital EMS and

survived.  BPD officers and Bristol Hospital EMS personnel attempted life-saving measures, but

M.O. was pronounced deceased at about 2:28 PM[19].

307.    BPD Detectives conducted a death investigation, which included an autopsy and

toxicology screen conducted by the State of Connecticut Office of the Chief Medical Examiner

(CT OCME).  The report provided by the CT OCME listed the manner of death as "accidental"

and the cause of death as the acute intoxication by the combined effects of effects of ethanol,

cocaine, and fentanyl.

308.    Investigators also obtained[20] medical records documenting the treatment of C.M.

at Bristol Hospital on or about October 26, 2024.  These records included treatment provided to

C.M. by Bristol Hospital EMS as well as the Bristol Hospital Emergency Department, and

---

[19] Signs of Rigor Mortis, including a clenched jaw existed, indicating that M.O. had likely been dead for as many as 8 hours prior to being pronounced deceased
[20] These records were obtained via written consent from C.M.

indicated that prior to EMS arrival, family members had administered 4 mg of intranasal

naloxone.[21]  Upon arrival and initial assessment, Bristol Hospital EMS found that C.M.

continued to "nod off" and suffered from irregular respirations, and this administered an

additional 1 mg dose of intranasal naloxone.  Bristol Hospital EMS personnel reported an

improvement in C.M.'s condition as a result of the naloxone doses.

309.    Upon arrival, Bristol Hospital Emergency Department concluded that C.M. had

suffered an opiate overdose, citing his positive response to naloxone, and noting that while C.M.

admitted to using cocaine and alcohol, he denied opiate use.  C.M. was ultimately monitored and

later released after being provided with a prescription for naloxone and educational materials

related to opiate abuse.

310.    During subsequent interviews with C.M., the surviving victim, investigators

learned that C.M and M.O. had been hanging out together all night, drinking alcohol and using

cocaine.  On October 26, 2024, at about 7:00 AM, C.M. had received a delivery of about $40

worth of a substance that he believed to be cocaine from MASTROIANNI.  C.M. and M.O. then

each began to use the suspected cocaine, which is the last thing C.M. remembers, as he lost

consciousness thereafter.  C.M. explained to investigators that he had had been texting

MASTROIANNI throughout the night on the MASTROIANNI TELEPHONE, using his iPhone,

to arrange for the purchase of the cocaine.  He further stated that he and MASTROIANNI were

in contact via phone calls around the time of the delivery.

311.    Investigators conducted telephone toll analysis related to contacts between the

MASTROIANNI TELEPHONE and the C.M. TELEPHONE around the timeframe of M.O.'s

---

[21] Naloxone is a medication that rapidly reverses opiate overdoses by blocking the effects of opiates on the brain and restoring normal respiratory function; naloxone is only effective on opiates, and would have no effect on overdoses caused by other classes of drugs, such as cocaine.

death.  That analysis revealed that from May 25, 2024 through October 26, 2024, there were approximately 245 contacts between the MASTROIANNI TELEPHONE and the C.M. TELEPHONE. Specifically, investigators noted calls which occurred between the two at 6:49 AM, 7:03 AM, and 7:05 AM on October 26, 2024, which corresponds with the time of the alleged drug delivery.  These represent telephone calls only, as both the C.M. TELEPHONE and the MASTROIANNI TELEPHONE are Apple iPhones, meaning that text messages between the two are transmitted via Apple's iMessage app, and are not reflected in telephone toll records available to investigators.

312.    Investigators next looked to the JASSOR TELEPHONE for information about communications between MASTROIANNI and the OCASIO DTO during the timeframe surrounding M.O.'s death.  Investigators located a text message conversation between the MASTROIANNI TELEPHONE, the TARGET TELEPHONE, and the JASSOR TELEPHONE that was active during that time frame.  A portion of the text message exchange, in relevant part, is detailed below:

October 25, 2024

MASTROIANNI TELEPHONE (7:22 PM): U got footballs

TARGET TELEPHONE (7:22 PM): Yup

MASTROIANNI TELEPHONE (7:43 PM): Prob need some for somebody.  6 a pop?

TARGET TELEPHONE (7:44 PM): Yeah


313.    Based on my training and experience, in the preceding portion of the conversation, MASTROIANNI is attempting to ascertain the availability of alprazolam – "footballs" – from OCASIO, who confirms availability and a price of $6 per pill.  Additionally,

MASTROIANNI informs OCASIO that he plans to sell the pills to a third party, stating "…need some for somebody." Investigators conclude that OCASIO is aware that MASTROIANNI plans to resell the pills he purchases from the OCASIO DTO. The conversation continues as the two discuss the logistics of when and where to meet. It later continues as follows:

October 26, 2024

TARGET TELEPHONE (12:44 AM): Vera Rd

MASTROIANNI TELEPHONE (1:00 AM): When. Be for real

TARGET TELEPHONE (1:00 AM): Now. What car. And order

MASTROIANNI TELEPHONE (1:04 AM): Silver Volkswagen

MASTROIANNI TELEPHONE (1:05 AM): 6 footballs. U got new bs?

TARGET TELEPHONE (1:06 AM): Yeah. But its loose. So hurry so she can weigh it

MASTROIANNI TELEPHONE (1:10 AM): Bro I can't be wasting my money on nothing

TARGET TELEPHONE (1:10 AM): (racial slur) you good I got you

314.    Based on my training and experience, in the preceding messages, MASTROIANNI is directed to Vera Rd. to complete the deal. He then inquires about the availability of fentanyl, using the street terms "b's" in reference to a "bundle" (10 glassine bags) of fentanyl. MASTROIANNI's use of the term "new" indicates that he is inquiring about the availability of a new batch or fentanyl, likely different then what he had previously purchased. This is further demonstrated when MASTROIANNI states "Bro I can't be wasting my money…" indicating that he was likely unhappy with the quality of a previous order. Investigators also recognize that OCASIO states that the fentanyl is "loose," as opposed to bagged up in individual

glassine bags, a fact which may become relevant in regards to the overdose death of M.O. The conversation continues below:

> MASTROIANNI TELEPHONE (1:13 AM): 6 foot balls n a b
>
> MASTROIANI TELEPHONE (1:14 AM): Whats that gonna weigh to
>
> TARGET TELEPHONE (1:14 AM): .3

315.    The two exchange numerous messages related to the arrival of the OCASIO DTO drug runner. Eventually, the messages continue as follows:

> TARGET TELEPHONE (1:43 AM):  She there
>
> MASTROIANNI TELEPHONE (1:45 AM): Bro I'll be right there. Tell her to sit in
>
> Vera. What car is she in.  I'll be there in 30 sec. Bro if she not there.
>
> TARGET TELEPHONE (1:45 AM): Black sedan
>
> MASTROIANNI TELEPHONE (1:50 AM):  The Hyundai
>
> MASTROIANNI TELEPHONE (1:50 AM):  Same bullshit you just poured it out the
>
> bags that's crazy

316.    Based on my training and experience, in the preceding portion of the conversation, MASTROIANNI finalizes his order for six alprazolam pills and one bundle of fentanyl. Having been previously advised that the fentanyl would be packaged loose as opposed to in glassine bags, MASTROIANNI asks what the weight will be. OCASIO states that it will be 0.3 grams of fentanyl. After further discussion, it is determined that the female runner has

arrived in a black Hyundai sedan. Finally, MASTROIANNI confirms that the drug deal occurred by complaining about the quality of the fentanyl, texting "Same bullshit you just poured it out the bags that's crazy," apparently referencing that the product is the same as what he had previously purchased and disliked. MASTROIANNI accuses OCASIO of purposely repackaging it to make it look like a different batch of fentanyl.

317.    As part of the investigation, investigators reviewed data from the JASSOR TELEPHONE and determined that Toni RISUCCI was working as the OCASIO DTO drug runner on the night of October 25, 2024 into the early morning hours of October 26, 2024. This is reflected in text messages found on the JASSOR TELEPHONE between the TARGET TELEPHONE and the RISUCCI TELEPHONE. A portion of the text message exchange, in relative part, is detailed below:

> TARGET TELEPHONE (1:16 AM): Vera Rd Brisotl Ct Silver Volkswagen 6 footballs and 0.3 of the F
>
> RISUCCI TELEPHONE (1:42 AM): I'm on Vera
>
> TARGET TELEPHONE (1:45 AM): He's there
>
> RISUCCI TELEPHONE (1:47 AM): He $1 short

318.    Based on my training an experience, in the preceding conversation, OCASIO is directing RISUCCI to travel to Vera Rd. in Bristol, CT where she will serve the occupant of a silver Volkswagen, who investigators know to be MASTROIANNI, six alprazolam pills and 0.3 grams of fentanyl. The deal is confirmed when RISUCCI advises OCASIO that MASTROIANNI was $1 short.

319.    Investigators have concluded, from the prior conversations, that MASTROIANNI purchased six alprazolam pills and 0.3 grams of fentanyl from the OCASIO DTO at about 1:47 AM on October 26, 2024.  About five hours later, MASTROIANNI would meet with C.M. to conduct a drug deal, and shortly after C.M and M.O. used the drugs purchased from MASTROIANNI, each overdosed.  While C.M. was revived, M.O. was pronounced deceased as a result.

320.    On or about May 20, 2025, investigators responded to the BPD to review evidence seized as part of the investigation into the overdose death of M.O. and the non-fatal overdose of C.M.  There, investigators located a food tray covered in a white powder substance. Investigators were aware, from the preliminary investigation conducted by BPD officers, and from later statements of C.M., that this food tray was used to hold the white powder substance C.M. had purchased from MASTROIANNI during the early morning hours of October 26, 2024. Investigators safely packaged a portion of the white powder substance in a plastic bag and processed it as a DEA drug evidence exhibit.  The white powder substance would later be sent to the DEA Northeast Laboratory, where it was subjected to testing, which concluded the primary substance was N-Phenyl-N-[1-(2-phenylethyl) -4-piperidinyl]propanamide (Fentanyl).  The white powder also contained amounts of cocaine and acetaminophen.

321.    As described above, investigators would later seize the MASTROIANNI TELEPHONE during his May 15, 2025, arrest, and subsequently perform a forensic extraction and analysis on the MASTROIANNI TELEPHONE pursuant to a warrant authorized by the Court.  During an analysis of data extracted from the MASATROIANNI TELEPHONE, investigators reviewed a timeline which showed all usage events for the MASTROIANNI TELEPHONE on or about October 25, 2024 and on or about October 26, 2024.  These including

calls, text messages, emails, device notifications, and other usage events logged by the phone, leading investigators to conclude that the data extraction for those dates was full and complete. However, investigators noted that any records of contact with C.M., such as the calls reflected in the toll records and the text messages described by C.M. are strangely absent from the phone data. Investigators expanded their search to look for any records of contacts between C.M. and the MASTROIANNI TELEPHONE during any time or date, and found a single contact; an outgoing Facetime call placed from the MASTROIANNI TELEPHONE to the C.M. TELEPHONE on or about September 10, 2024. Investigators noted that the C.M. TELEPHONE was not saved in the address book or contacts listing of the MASTROIANNI TELEPHONE. Investigators concluded that it was likely that MASTROIANNI had intended to delete all records of contact with C.M. from the MASTROIANNI TELEPHONE.

322. Investigators expanded their search of the MASTROIANNI TELEPHONE to the complete "timeline" of usage events, in order to provide further context to MASTROIANNI's activities from the night of October 25, 2024 through the morning of October 26, 2024. Investigators determined that MASTROIANNI was involved in a number of drug transactions aside from those conducted with the OCASIO DTO/RISUCCI, and M.O. and C.M. An approximate timeline of relevant events is as follows:

October 25, 2024, 2:34 PM:  MASTROIANNI purchases approximately a "half a ball" of cocaine and a "stack" of fentanyl from a drug dealer using the alias "Rip" for about $270. The drug deal is completed in the vicinity of Jerome Ave. in Bristol, CT. The term "stack" used here means ten "bundles" of fentanyl, packaged in wax paper folds. "Rip" agrees to provide MASTROIANNI with further cocaine later in the day.

October 25, 2025, 9:33 PM: MASTROIANNI completes a drug deal for unspecified amounts of fentanyl and cocaine with a telephone contact identified as "Dana." The drugs sold to "Dana" are those purchased from "Rip," as MASTROIANNI makes references in his conversation with "Dana" to waiting for a drug resupply while concurrently texting with "Rip" to acquire the cocaine and fentanyl. At about 8:01 PM, MASTROIANNI texts "Dana" that he "got the bs, waiting on the white." I know this to mean that MASTROAINNI has the bundles of fentanyl to sell, but is waiting on the rest of the cocaine, as explained above. Eventually MASTROIANNI texts "Dana" that he has all of the product, and the two meet in the parking lot of the Polish Club in Bristol, CT to complete the transaction.

October 26, 2024, 1:47 AM: MASTROIANNI purchases 6 Xanax pills and 0.3 grams of loose packaged fentanyl from the OCASIO DTO/RISUCCI, as described above.

October 26, 2024, 3:35 AM: Beginning during the morning of October 25, 2024, MASTROIANNI begins a lengthy text message conversation with a contact "Brandon Jones" in which "Brandon Jones" is attempting to purchase Xanax pills, which he refers to as "footballs" from MASTROIANNI. MASTROIANNI eventually acquires six "footballs" from the OCASIO DTO/RISUCCI, as described in detail above, texting "Brandon Jones" "I got you 6" at about 2:00 AM, minutes after completing the drug deal on Vera Rd. MASTROIANNI directs "Brandon Jones" to come to 367 Park St., Bristol, CT where they will complete the deal. At approximately 3:26 AM, "Brandon Jones"

texts "pulling up now."  At approximately 3:35 AM, MASTROAINNI texts "get home

safe," indicating that the drug deal was complete.

October 26, 2024, 5:09 AM:  MASTROIANNI conducts a second drug deal at 367 Park

St., Bristol, CT with a customer named "Brandon Lopez."  After a short text message

exchange, "Brandon Lopez" is directed to pay via Venmo and to come around the back.

The drug deal appears to occur without incident.  No drug types or quantities are

specified as this time.

October 26, 2024, Approximately 7:05 – 7:15 AM:  MASTROIANNI conducts drug deal

with C.M and M.O as described above

323.    On October 26, 2024, beginning at about 7:06 AM, likely while the drug deal

with C.M./M.O. is ongoing,  MASTROIANNI and "Brandon Lopez" have a lengthy text

message exchange regarding MASTROIANNI potentially having served "Brandon Lopez" with

the wrong bag of drugs.  The conversation occurs as follows:

MASTROIANNI TELEPHONE (7:06 AM):  I have you wrong bag

MASTROIANNI TELEPHONE: Have

MASTROIANNI TELEPHONE: Gave

MASTROIANNI TELEPHONE: Wya

"Brandon Lopez": Got you already be safe

MASTROIANNI TELEPHONE:I gave u wrong bag

MASTROIANNI TELEPHONE: Don't do none

MASTROIANNI TELEPHONE: Wya

"Brandon Lopez": I can't make it back shit looks same as before maybe less

MASTROIANNI TELEPHONE: It's not

MASTROIANNI TELEPHONE: And I'm coming to you

"Brandon Lopez": I can weigh and send pic broski

MASTROIANNI TELEPHONE: Bro I'm telling you

MASTROIANNI TELEPHONE: Don't touch it please

"Brandon Lopez": Is it different stuff

"Brandon Lopez": I haven't

MASTROIANNI TELEPHONE: No [racial slur] I gave u wrong bag

MASTROIANNI TELEPHONE: Dead ass

MASTROIANNI TELEPHONE: I just gave you a gram that's for someone else

MASTROIANNI TELEPHONE: I have your 40

"Brandon Lopez": ight man

MASTROIANNI TELEPHONE: I'll give u extra

MASTROIANNI TELEPHONE: Go to Sam's

"Brandon Lopez": I'm by Valero route 6 bro

"Brandon Lopez": I can't fr

MASTROIANNI TELEPHONE: Stay

"Brandon Lopez": I can weigh and pay the difference deadass

"Brandon Lopez": I'm not there

MASTROIANNI TELEPHONE: So where are you

"Brandon Lopez": I'm driving down Louisiana

"Brandon Lopez": Bro deadass there is no way this is a g I swear on everything I will weigh it up and send the difference

MASTROIANNI TELEPHONE: I wouldn't lie to you

MASTROIANNI TELEPHONE: Stay where you're at

"Brandon Lopez": Bro ngl really cant do this rn let me just send the difference

MASTROIANNI TELEPHONE: I need that

MASTROIANNI TELEPHONE: For someone else

MASTROIANNI TELEPHONE: I have your 40

MASTROIANNI TELEPHONE: send me 60

MASTROIANNI TELEPHONE: And you are coming off

MASTROIANNI TELEPHONE: I would never do you wrong

MASTROIANNI TELEPHONE: Brandon id never lie to you there's a whole rock in that bag

MASTROIANNI TELEPHONE: Bro I'm so sorry

MASTROIANNI TELEPHONE: I'm lying

MASTROIANNI TELEPHONE (7:17 AM): I am so sorry


324.    Based on training and experience, I understand that in the preceding conversation, MASTROIANNI initially believes that he served "Brandon Lopez" with the incorrect bag of drugs.  After a lengthy back-and-forth, MASTROAINNI realizes that he is mistaken, and apologized to "Brandon Lopez."

325.    Certain aspects of the previous conversation, when viewed in light of all facts known to investigators pertaining to MASTROIANNI's drug dealing activities on October 25, 2024 – October 26, 2024, become particularly relevant:

a.    Investigators are aware that MASTROAINNI purchased 0.3 grams of fentanyl, packaged loose from the OCASIO DTO/RISUCCI.  This most likely would have been packaged in a knotted "corner tear" style plastic bag, as opposed to typical street level fentanyl packaging which consists of wax paper folds - like those MASTROIANNI previously purchased from "Rip" and later sold to "Dana."

b.    Investigators are aware that the "wrong bag" conversation with "Brandon Lopez" occurred concurrently to when MASTROAINNI conducted the drug deal with M.O and C.M; that deal was supposed to be for approximately $40 worth of cocaine (about 0.4 grams)

c.    Investigators are aware that the deal with "Brandon Lopez" was also supposed to be for $40.  Though not specified, based on context it is likely for about 0.4 grams of cocaine.  MASTROIANNI, in the midst of the "wrong bag" conversation, texts "Brandon Lopez" stating "I have your 40."

d.    MASTROIANNI appears to believe that he gave "Brandon Lopez" a larger bag of cocaine, texting "Brandon id never lie to you there's a whole rock in that bag" and indicating that he needs to serve another customer; in this case, that customer is likely M.O. and C. M.

e.    MASTROIANNI eventually comes to believe that he was wrong, and in-fact served "Brandon Lopez" with the correct bag.  MASTROIANNI most likely would have come to this determination at the point that he located the drugs to be

sold to C.M. and M.O., which according to C.M. was a white powder packaged in a knotted plastic bag.

f.   Laboratory testing on the white powder found at the C.M. and M.O. overdose scene later confirmed the primary substance to be fentanyl, with lessor amounts of cocaine and acetaminophen.

326.   Investigators thus believe that in apparent confusion created as MASTROIANNI attempted to serve C.M and M.O. and believed he had sold "Brandon Lopez" the wrong bag, combined with the fact that MASTROIANNI possessed both fentanyl and cocaine in small knotted bags, that MASTROIANNI sold fentanyl to C.M. and M.O. instead of cocaine.

327.   On or about August 18, 2025 I submitted an Affidavit and Application for a search warrant to the Court seeking authorization to compel AT&T Mobility to disclose certain records and information it held related to the MASTROIANNI TELEPHONE.  Specifically, investigators sought HSLI and other historical precision location information, including per-call measurement data and timing advance records.  On the same date, the Honorable Maria E. Garcia authorized the warrant.

328.   On or about August 21, 2025 I served the warrant on the AT&T Mobility GLDC electronically.  On or about September 6, 2025 AT&T Mobility produced materials requested with the warrant.

329.   Investigators subsequently analyzed a portion of the records deemed pertinent to the October 26, 2024 overdose death of M.O. and non-fatal overdose of C.M., and noted that the MASTROIANNI TELEPHONE was present in locations associated with multiple drug transactions at times relevant to the investigation, as further described below.

330.    At approximately 1:45 AM, text messages exchanged between the MASTROIANNI TELEPHONE and the JASSOR TELEPHONE indicate that MASTROIANNI was traveling towards Vera Rd., Bristol to meet with an OCASIO DTO drug runner.  HSLI data (Mobility with cell location) shows that at that time, the MASTROIANNI TELEPHONE was connected to a cell tower located at coordinates of 41.695619, -72.911270; a location which corresponds to a physical address of approximately 43 Boardman St., Bristol, CT.  From the area of 43 Boardman St. to Vera Rd. is a trip of approximately 1 mile, taking about 3 minutes by car.

331.    Investigators also noted timing advance records, which showed that at approximately 7:16 AM – likely just around the time that MASTROIANNI had completed the drug deal with C.M. at 162 High St., Bristol, CT - the MASTROIANNI TELEPHONE device location was at approximate coordinates of 41.67192600, -72.93192800; this location corresponds to a physical address within the Huntington Woods Apartment Complex in Bristol, CT and approximately 435 meters from 162 High St.

332.    Investigators concluded that HSLI records related to the MASTROIANNI TELEPHONE support witness statements and cellular device information that indicated that on the night of October 26, 2024, MASTROIANNI first traveled to the area of Vera Rd., Bristol, CT to purchase fentanyl and Xanax from an OCASIO DTO drug runner, before traveling to 162 High St., Bristol, CT to complete a drug sale to C.M. for what was purported to be cocaine.

*Overdose Death of J.K. on January 2, 2025*

333.    During the review of the JASSOR TELEPHONE extraction, investigators learned of a frequent drug customer of the OCASIO DTO later identified as J.K.  Text message conversations between the JASSOR TELEPHONE, TARGET TELEPHONE, and the J.K. TELEPHONE began on or about August 5, 2024 and continue until approximately December 31,

2024. The substance of the conversation is primarily the negotiation of drug transactions in a customer / dealer relationship. Throughout the duration of the text message thread, J.K. frequently orders fentanyl and Xanax from TARGET TELEPHONE. On most occasions, J.K. specifies that she wants a particular type or mixture of fentanyl which she refers to as "purple bags," or "purple." Many of the transactions are similar to the ones detailed below:

August 10, 2024 at approximately 10:09 PM:

JASSOR TELEPHONE: Order

J.K. TELEPHONE: 3bars

JASSOR TELEPHONE: Okay

J.K. TELEPHONE: Eta?

J.K. TELEPHONE: Make it a bun instead

J.K. TELEPHONE: A purple one


December 22, 2024 at approximately 11:10 PM:

J.K. TELEPHONE: I need 2buns and 2 bars

TARGET TELEPHONE: No bars on him

J.K. TELEPHONE: 1.5 and a dime

TARGET TELEPHONE: Need address

TARGET TELEPHONE: You about to be hit

J.K. TELEPHONE: 226 Newton Street


December 25, 2024 at approximately 10:58 AM:

J.K. TELEPHONE: I need 8 buns and 8 bars can u do 200?

TARGET TELEPHONE: yeah

J.K. TELEPHONE: Eta?

TARGET TELEPHONE: On way


334.    On or about January 2, 2025, at approximately 8:20 PM, Berlin Police
Department responded to 226 Newton Street on a report of an unresponsive 26-year-old female,
later identified as J.K. The following investigation found that J.K. showed obvious signs of death
and did not appear to have died just prior to police arrival. The last time J.K. had been seen or
heard from was on January 1, 2025, likely sometime in the afternoon.

335.    Berlin Police noted that immediately next to J.K. there was a noticeable amount
of empty/used wax paper baggies which are commonly used to store heroin/fentanyl, several
pieces of burnt tin foil, lighters, glass smoking pipes, an empty pill bottle, and other drug
paraphernalia. Upon further review of J.K.'s immediate surroundings police also located a plastic
storage container which consisted of nine 8.5"x11" drawers, which appeared to all be filled with
empty heroin/fentanyl baggies. Lastly, police located a quart-sized Ziplock bag of a green
powdery/crystalline-like substance which presumptively tested positive for fentanyl, though lab
testing has not confirmed this.

336.    A review of the photographs taken by Berlin Police of the scene showed that a
large number of wax paper folds were found in J.K.'s room. The ones located in close proximity
to J.K. were a mixture of purple and white wax folds.  From the scene images it appears that the
majority of wax folds located within J.K.'s room are also purple folds, however also of note were
white bags stamped with Sonic the Hedgehog, the same wax paper folds seized from JASSOR. It
should be noted that purple and white folds are consistent with the two most common

options/mixtures of fentanyl available from the OCASIO DTO during the time surrounding J.K.'s overdose.

337.    The OCME determined that J.K.'s cause of death was acute fentanyl intoxication, and the manner of death was accidental.

338.    Investigators reviewed the text message conversations between the J.K. TELEPHONE, TARGET TELEPHONE and the JASSOR TELEPHONE leading up until her overdose. The messages are as follows:

December 30, 2024

TARGET TELEPHONE (1:29 PM): Hey

J.K. TELEPHONE (1:34 PM): Yo

TARGET TELEPHONE (1:48 PM): What's the full order

J.K. TELEPHONE (1:50 PM): 3 bars and if possible can u front a b or 2

J.K. TELEPHONE (4:02 PM): Yo

TARGET TELEPHONE (6:44 PM): I can't front

J.K. TELEPHONE (6:44 PM): Ok wya

J.K. TELEPHONE (7:15 PM): I have enough for the bars

TARGET TELEPHONE (10:55 PM): Yo

J.K. TELEPHONE (10:56 PM): Yo

J.K. TELEPHONE (11:41 PM): What's up

December 31, 2024

TARGET TELEPHONE (12:43 AM): Just bars

J.K. TELEPHONE (12:43 AM): ok wya

J.K. TELEPHONE (12:50 AM): I can't even put a half on credit?

TARGET TELEPHONE (12:50 AM): Not of purple nah

J.K. TELEPHONE (12:52 AM): ok well where r u then

339.    Additionally, investigators conducted a toll analysis of J.K TELEPHONE, and noted approximately five calls which occurred on December 31, 2024, with the last occurring at approximately 2:10 AM.

340.    Investigators conducted further review of the JASSOR TELEPHONE pertaining to the J.K. overdose death, and found a relevant text message conversation with a male who investigators later identified as Brian NARDELLI which occurred on or about January 13, 2025:

NARDELLI TELEPHONE (7:32 PM): Yo where you been at my guy u ight

TARGET TELEPHONE: been good

TARGET TELEPHONE: You don't come through

NARDELLI TELEPHONE: I'm a mess bro my mom passed away and couple days later [J.K.] so I'm a wreck right now

341.    Investigators noted that NARDELLI alerts OCASIO to J.K.'s death as if it was already known to OCASIO, and should come as no surprise.  Less than one hour later, at about 8:20 PM, TARGET TELEPHONE calls the NARDELLI TELEPHONE, and the two speak for just over 4 minutes.  The content of that conversation remains unknown.  After the call, the text message conversation continues briefly, with NARDELLI continuing to express grief.  The next day, on or about January 14, 2025, the NARDELLI TELEPHONE attempts to call the TARGET TELEPHONE twice, at about 11:04 AM and 11:09 AM.  Neither call was answered by OCASIO, and in between the call attempted the test message conversation continues:

NARDELLI TELEPHONE (11:06 AM): Call me

TARGET TELEPHONE: I don't want to talk to you about that makes me uncomfortable

NARDELLI TELEPHONE:  Are you going

NARDELLI TELEPHONE:  I wanted to see if you are going I'll bring u

NARDELLI TELEPHONE: If you want

NARDELLI TELEPHONE:  Up to u

TARGET TELEPHONE: Huh?

342.    Investigators later learned the J.K.'s funeral service occurred on January 14, 2025 at 1:00 PM.  Investigators believe in the previous conversation, NARDELLI is attempting to discuss J.K.'s death and funeral service with OCASIO, who replies "I don't want to talk to you about that makes me uncomfortable."

*35 Jasmine Street Overdose Deaths, September 2024 through May 2025*

343.    On or about May 12, 2025, the Bristol Police Department (BPD) responded to multiple overdose deaths that occurred at 35 Jasmine St., Bristol, CT during two separate incidents – one occurring in the morning and another in the evening.

344.    At approximately 9:55 AM, investigators from the BPD responded to an emergency call at 35 Jasmine St. reporting a sudden death.  Upon arrival, responding officers located a deceased 61-year-old male, whose identity is known to me, hereinafter referred to as "K.G," standing upright at the kitchen sink.  Investigators interviewed Donna MESSENGER and a male whose identity is known to me, hereinafter referred to as "D.L." who reported that K.G. was a known opiate user who had last been seen alive around 5:30 AM.

345.    The Office of the Chief State's Medical Examiner (OCME) took custody of the body of K.G. and later performed an autopsy, which was completed on or about May 13, 2025.

On or about June 5, 2025, Associate Medical Examiner Shana Straub, M.D. certified the results of the autopsy, classifying the cause of death as acute intoxication by the combined effects of cocaine and fentanyl and the manner of death to be accidental.

346.    Later in the day, at approximately 9:40 PM, investigators from BPD again responded to an emergency call reporting an unconscious 65-year-old male at 35 Jasmine St. Upon arrival, responding officers located D.L. who was unconscious on the couch. Responding officers attempted live saving measures, but were ultimately unsuccessful, as D.L was pronounced deceased at approximately 10:29 PM. Investigators identified a number of individuals who were present at the scene, including James WARKOSKI, Maria GORNEAULT, Robert PHELPS, Donna MESSENGER, and Lisa PERRON. Collectively, they stated that D.L. was last seen alive between approximately 7:30 and 8:00 PM, but at some point, it was noticed that D.L. was not breathing.

347.    The Office of the Chief State's Medical Examiner (OCME) took custody of the body of D.L. and later performed an autopsy, which was completed on or about May 13, 2025. On or about June 5, 2025, Associate Medical Examiner Shana Straub, M.D. certified the results of the autopsy, classifying the cause of death as acute fentanyl intoxication and the manner of death to be accidental. Contributory factors included recent cocaine use, diabetic ketoacidosis, and atherosclerotic cardiovascular disease.

348.    Investigators are aware that 35 Jasmine St. is a drug-involved nuisance property, known to BPD officers as residence for transient individuals involved in opiate use. Multiple residents and associates of 35 Jasmine St. are in contact with members of the OCASIO DTO for the purposes of acquiring drugs, including WOFFORD, D.L., and WARKOSKI. Additionally, WARKOSKI has acted as a drug-runner on behalf of the OCASIO DTO, a fact investigators

uncovered during his April 15, 2025 arrest in Portland, CT and his subsequent statements to police. Investigators are aware, via a review of the WARKOSKI TELEPHONE, that WARKOSKI oftentimes acquired drugs from the OCASIO DTO on behalf of D.L. Within WARKOSKI's conversations with TARGET TELEPHONE 2, a number of references are made to a specific individual I know to be D.L. Some of the messages in which WARKOSKI mentions D.L. are noted below:

February 17, 2025 at approximately 12:56 PM

WARKOSKI TELEPHONE: Half and maybe a bun too. D.L. is coming with me so it's gonna take a couple minutes to get him in the truck

March 5, 2025 at approximately 2:48 PM

WARKOSKI TELEPHONE: D.L. might want buns if you have good ones

March 22, 2025 at approximately 1:11 AM

WARKOSKI: D.L. in the hospital again, money tight

April 12, 2025 at approximately 7:56 PM

WARKOSKI TELEPHONE: Going in the house to see what D.L.'s doing

April 13, 2025 at approximately 1:57 AM

WARKOSKI TELEPHONE I got rid of the last bun to D.L.

349.    Phone conversations between the WARKOSKI TELEPHONE and the D.L. TELEPHONE were also noted within the WARKOSKI TELEPHONE extraction. Within those messages, investigators observed narcotics related conversation. D.L. appears to rely on WARKOSKI to facilitate purchasing drugs for both of them to use.  Some examples are as follows:

March 1, 2025 at approximately 1:09 AM

D.L. TELEPHONE: Are people giving you problems??? All OK?? What's taking so long?? (Emoji symbols) D.L. (Emoji symbols) I'm so ready to die for drugs!!!

WARKOSKI TELEPHONE: Problems

WARKOSKI TELEPHONE: I'm gonna bring something back

350.    On or about May 15, 2025, and again on or about August 7, 2025 investigators responded to 35 Jasmine St. to attempt to gather further information related to the overdose deaths of K.G. and D.L.  On the first date, investigators spoke primarily with MESSENGER, GORNEAULT, and WOFFORD.  They provided cursory information to investigators pertaining to those present at each of the overdose death scenes, phone numbers of involved parties, and other basic information.  Investigators noted that WOFFORD appeared nervous and circumspect, offering minimal information and avoiding eye contact.  Specifically, during questioning about who was the source of the drugs that killed K.G. and D.L., WOFFORD intently watched as MESSENGER and GORNEAULT answered, as if he was concerned about what they might say. WOFFORD began to sway slightly, before mumbling, "oh my God," under his breath and then hanging his head down as he sat.  At the time, investigators did not know WOFFORD to be a suspect, so his nervous behavior seemed peculiar.

351.    On or about August 7, 2025, investigators returned to 35 Jasmine St. to conduct a follow-up interview.  Again, investigators spoke with MESSENGER and GORNEAULT.  Investigators attempted to rehash the earlier interview.  This time, with WOFFORD not present, MESSENGER and GORNEAULT agreed that the male who had been sitting on the steps during the last interview, who they called "Bicycle Jim," had also stopped by 35 Jasmine St. during the timeframe surrounding the overdose deaths.  They described "Bicycle Jim" as a "dope guy," who was a friend of D.L.'s, and described him as driving a burgundy-colored small SUV similar to a Murano.  They later added that "Bicycle Jim" lived on Louisiana Avenue near the end of Missal Street in Bristol, at a house with a bunch of "tools and junk," in the driveway.  Investigators know that WOFFORD lives at 276 Louisiana Ave., which sits directly at the end of Missal St., has a driveway full of tools and scrap metal, and at the time drove a burgundy Toyota SUV.  Furthermore, WOFFORD was present for the first interview, as described.  Investigators thus concluded that "Bicycle Jim," and WOFFORD are the same person.

352.    MESSENGER and GORNEAULT stated that when "Bicycle Jim" would come by, he would stop in to see D.L. and then leave shortly thereafter.  Eventually, MESSENGER admitted that "Bicycle Jim" was the one who brought the drugs to the house, and described them as "purple bags."  MESSENGER and GORNEAULT went on to explain that "Bicycle Jim" often used D.L.'s money to purchase drugs for D.L., who would in turn pay "Bicycle Jim" for his assistance with drugs for "Bicycle Jim's" own use.  MESSENGER estimated that "Bicycle Jim" showed up with the "purple bags" between 6:00 - 6:30 PM, a time during which GORNEAULT believed she was at the grocery store.  Based on statements from MESSENGER and GORNEAULT, it was unclear whether "Bicycle Jim" was at 35 Jasmine St. on May 11, 2025, May 12, 2025, or both.

353.    Investigators are familiar with the "purple bags" and know them to be a signature of the OCASIO DTO, which generally offers white bags containing fentanyl as well as purple bags containing fentanyl.  Customers often specify a preference for one style over the other, with the purple bags seemingly a "stronger," dose.  During reviews of multiple cellular devices subjected to court authorized searches during the course of the investigation, there are numerous occasions in which OCASIO discusses different mixtures or types of fentanyl with customers, often referencing purple bags to designate a particular type

354.    As part of the investigation into the double-fatal overdoses at 35 Jasmine St., investigators concluded that the 9-1-1 call made to the BPD on the evening of May 12, 2025 related to the death of D.L. came from D.L.'s own cellular phone, the D.L. TELEPHONE. GORNEAULT stated that she used the D.L. TELEPHONE to call 9-1-1 and then put it down nearby.  Investigators on the scene that night attempted to locate the D.L. TELEPHONE, believing that it may contain pertinent evidence, but the phone seemed to have mysteriously vanished.  At the direction of police officers, GORNEAULT attempted to call the D.L. TELEPHONE to cause it to ring, in order for investigators to locate it, but was unsuccessful. BPD Dispatchers also tried to call the D.L. TELEPHONE, but reported the phone went directly to voicemail without ringing, indicating that it had no service or had been powered off.  On scene, GORNEAULT expressed to BPD that she believed WARKOSKI may have taken the D.L. TELEPHONE, and accusation she and MESSENGER later reaffirmed to investigators.  As of the date of this affidavit, investigators have been unable to locate the D.L. TELEPHONE.

355.    On or about October 18, 2025 at approximately 7:45 AM, I ran into MESSENGER by happenstance in Bristol, CT.  I took the opportunity to again interview her in regards to the overdose deaths of K.G and D.L. which occurred at 35 Jasmine St.  As with the

previous interviews, MESSENGER's recollection appeared to again improve, and she provided

new details which are significant. A summary of MESSENGER's October 18, 2025 statement is

as follows:

> That she believes that WARKOSKI and PERRON are the ones who took D.L.'s phone
> from the scene on the day of his death. That on May 11, 2025 – the night before the
> double overdose deaths - WARKOSKI left the house and went to the Nutmeg State
> Federal Credit Union ATM on Stafford Avenue, where he withdrew money using D.L.'s
> ATM card. That WARKOSKI was only gone a short time, returning at around 7:00 PM
> with crack-cocaine and purple bags of fentanyl. That WARKOSKI and D.L. began to
> smoke the crack-cocaine. That after smoking crack-cocaine, D.L. would always
> transition to using fentanyl, and would nod off, at which point WARKOSKI would take
> the rest of D.L.'s crack-cocaine and retreat to his room in the shed in the back yard. That
> the following morning, when K.G. was found dead, that WARKOSKI told her that he had
> seen K.G. dead at about 11:30 PM the night before. That she checked K.G.'s pockets
> that morning to see if he still had money she had given him for a phone bill, and K.G. had
> nothing. That she realized that WARKOSKI had "rolled him," meaning that
> WARKOSKI had stolen money and possible an ATM card from K.G.'s pockets after he
> was deceased. That after K.G.'s body was removed by the OCME, WARKOSKI had
> disappeared for hours. That WARKOSKI had then come back, and "he had shit." That
> WARKOSKI "got busted" working for a guy named "Jimmy," and that he might have
> gone to "Jimmy" to get the drugs her returned to 35 Jasmine St. with on May 12, 2025.

356.     Based on my training and experience, and knowledge of this investigation, I am aware that the "Jimmy" MESSENGER is referring to is OCASIO; it was OCASIO that WARKOSKI was running for on the night of April 15, 2025 when WARKOSKI was arrested by CSP during the surveillance operation conducted by investigators.  Based on MESSENGER's statement, it appears that on May 11, 2025 at around 7:00 PM, and again on May 12, 2025 between the deaths of K.G. and D.L. that WARKOSKI left the residence to purchase drugs, which he carried with him back to 35 Jasmine St., including the purple bags of fentanyl that investigators know to be sold by the OCASIO DTO, and it is likely that these are the fentanyl bags that ultimately led to the overdose deaths of K.G. and D.L.

357.     At this time, both WOFFORD and WARKOSKI, in addition to OCASIO, appear to be viable suspects in the investigation into the deaths of K.G. and D.L.

*Overdose Death of N.O.*

358.     Over the course of the investigation into the May 12, 2025 overdose deaths at 35 Jasmine St., investigators became aware of another death associated with 35 Jasmine St. This death occurred prior to the deaths of K.G. and D.L. back in September 2024, though investigators only learned of it recently, as described below.

359.     On or about September 25, 2024, members of the BPD responded to an emergency call from D.L., who requested an ambulance respond to 35 Jasmine St., Bristol, CT. D.L. stated that his girlfriend was having difficulty breathing and might be septic.  BPD officers responded, and a 52-year-old female whose identity is known to me, hereinafter referred to as "N.O.,"[22] was later transported to Bristol Hospital.

---

[22] Investigators are aware that N.O. is the biological mother of M.O., the overdose victim who died on or about October 26, 2024.

360.     N.O. was treated at Bristol Hospital but died during the course of treatment.[23]

361.     The Office of the Chief State's Medical Examiner (OCME) took custody of the body of N.O. and later performed an autopsy, which was completed on or about September 26, 2024. On or about October 15, 2024, Associate Medical Examiner Frank Evangelista, M.D. certified the results of the autopsy, classifying the cause of death as acute intoxication by cocaine, xylazine, and fentanyl and the manner of death to be accidental.

362.     Due to the circumstances in which the call for medical assistance was received, BPD investigators were unaware that N.O. had died by overdose, and no preliminary investigation into the death was completed. The facts and circumstances of N.O.'s death remained unknown to investigators until approximately September 2025, when investigators located a seemingly incriminating text message on the JASSOR TELEPHONE exchanged between the WOFFORD TELEPHONE and the TARGET TELEPHONE that occurred on or about September 26, 2024. The WOFFORD TELEPHONE begins to reach out to the TARGET TELEPHONE at around 8:30 AM, sending a series of messages asking for the TARGET TELEPHONE to call him, inquiring if OCASIO would be coming by, and then becoming frustrated after receiving minimal responses from the TARGET TELEPHONE. Then, on or about September 26, 2024 at about 9:20 PM, the WOFFORD TELEPHONE and the TARGET TELEPHONE have the following exchange:

WOFFORD TELEPHONE (9:20 PM): Just to let you know [N.O.] DIED. Dave's girl.

TARGET TELEPHONE (9:42 PM) How the fuck?

WOFFORD TELEPHONE (9:42 PM) What

WOFFORD TELEPHONE (9:43 PM) She had staff infection

---

[23] The exact details of the treatment that N.O. received at Bristol Hospital is not currently known to investigators.

363.    Investigators, curious as to why WOFFORD would inform OCASIO, his drug supplier, of the death of N.O. became suspicious that N.O.'s death may have been by overdose, and WOFFORD's attempt to classify it as a "Staff (sic) infection" may have been in an effort to avoid sending incriminating information via text message.  Further inquiries were made, including obtaining information from both Bristol Hospital EMS and the OCME, at which point investigators became aware of the circumstances surrounding N.O.'s death.

364.    Investigators, acting with information obtained during the prior investigation into the double overdoses that occurred at 35 Jasmine St. on or about May 12, 2025, conducted a review of the JASSOR TELEPHONE records seeking evidence related to N. O.'s overdose death.

365.    Investigators are aware that WOFFORD is a frequent associate of D.L. and others who reside at 35 Jasmine St., Bristol, CT, and is known to receive drug deliveries at 35 Jasmine St. and/or bring previously purchased drugs to 35 Jasmine St. for D.L.  A such, investigators conducted a review of WOFFORD's text messages that occurred on or about September 25, 2025, the date of N.O.'s death by overdose, and located a text message conversation that occurred between the WOFFORD TELEPHONE and the TARGET TELEPHONE, which is summarized as follows:

WOFFORD TELEPHONE (1:47 PM): U around bro

TARGET TELEPHONE (2:41 PM): Need order

WOFFORD TELEPHONE (2:43 PM): 7 bs

TARGET TELEPHONE (2:51 PM): Can you meet me

WOFFORD TELEPHONE (2:56 PM): No

TARGET TELEPHONE (2:56 PM): You need to meet me

WOFFORD TELEPHONE (2:59 PM): I can't bro

WOFFORD TELEPHONE (2:59 PM): Call me asap please

366.    Investigators next turned to telephone toll records to see if the above-referenced call that WOFFORD requested did in fact occur.  Investigators located an outgoing voice call from the WOFFORD TELEPHONE to the TARGET TELEPHONE that occurred at 2:59 PM, with a listed duration of zero seconds.  Investigators concluded that this call was not answered. Immediately following, investigators located an outgoing voice call from the TARGET TELEPHONE to the WOFFORD TELEPHONE that occurred at 3:00 PM, with a listed duration of 2 minutes and 1 second.

367.    A review of both telephone toll records and the JASSOR TELEPHONE data revealed no further contact between the two for the remainder of the day.  I am aware, through my training, experience, and knowledge of this investigation that WOFFORD, like nearly all of the OCASIO DTO's customers, is accustomed to lengthy wait times to be served as well as periods in which OCASIO does not respond to calls and texts.  In the overwhelming majority of these instances, the customer will continue to call and/or text the OCASIO DTO, oftentimes dozens of times, up until the point where they are finally served their drug order, at which point all contact ceases until the next time the customer wishes to place an order.  Due to the fact that after the completion of the two-minute phone call, WOFFORD did not contact the TARGET TELEPHONE until the following day, I believed that during that conversation OCASIO and WOFFORD arranged for WOFFORD to be served the order for seven bundles of fentanyl, specified in the earlier text as "7 bs."

## VII.    LOCATIONS TO BE SEARCHED

368.    Throughout the investigation, investigators have determined that members of the OCASIO DTO utilize multiple premises in furtherance of their illegal drug trafficking.  Among those premises are TARGET LOCATION 1 and TARGET LOCATION 2, which investigators now seek authorization to search.

369.    TARGET LOCATION 1 is a single-family home with attached garage, with green siding and light trim, located at 2 Yellow-Orange Circle, Middletown, CT.  The home was purchased by DIAMOND EXPRESS LOGISTICS LLC, a company owned by OCASIO, in approximately August of 2022.  Investigators are aware that TARGET LOCATION 1 is OCASIO's primary residence, and he stays overnight there on most occasions.  As will be further explained below, TARGET LOCATION 1 is also used in furtherance of the OCASIO DTO's drug trafficking activities in that illegal drugs drug proceeds are stored there, such as the July 31, 2024 incident in which OCASIO directed ROSADO-ORTIZ to travel to TARGET LOCATION 1 to pick up two boxes of fentanyl, one purple and one white.

370.    TARGET LOCATION 2 is multi-family duplex style structure, with tan siding, white trim, and black shutters.  TARGET LOCATION 2 is located at 37 Pioneer Circle, Manchester, CT.  The structure also holds the physical address of 35 Pioneer Circle, which investigators are not currently requesting to search.  The home was purchased by Jose ROSADO-ORTIZ in approximately June of 2022.  Investigators are aware that TARGET LOCATION 2 is ROSADO-ORTIZ's primary residence, and he stays overnight there on most occasions.  As will be further explained below, TARGET LOCATION 2 is also used as a stash location in furtherance of the OCASIO DTO's drug trafficking activities

*August 14, 2024 Seizure from T.S.*

371.    On or about August 14, 2024 at approximately 1:15 PM investigators established surveillance in the area of TARGET LOCATION 1 after having located a Dodge Ram bearing CT registration C300403 parked in the driveway.  Investigators were aware that the truck was an extended duration rental held by OCASIO.

372.    At approximately 3:22 PM, the Dodge departed the area, operated by a short, light-skinned Hispanic male who investigators recognized to be OCASIO.  Investigators maintained constant surveillance as OCASIO operated the Dodge to the area of New Britain, CT via CT Route 9 North, making no other stops along the way.

373.    At approximately 3:55 PM, OCASIO arrived in a small neighborhood in New Britain situated generally between Slater Rd., Corbin Ave. Clinton St., and Osgood Ave.  The neighborhood features roughly rectangular blocks, with parallel streets running both north and south, as well as east and west.  There, OCASIO began to employ what I recognized, from my training and experience, to be counter-surveillance techniques meant to thwart any law enforcement who may be following.  OCASIO began to square blocks, doubling back in the direction he came from before continuing.  The circuitous route of travel raised investigators' suspicions that OCASIO may be attempting to conduct a drug meet.

374.    At approximately 3:58 PM, OCASIO drove the Dodge down Mitchell St. heading westbound.  There he passed by a black Dodge Dakota bearing CT registration C158280 occupied by a white male with gray hair and a moustache, who was later identified by investigators as T.S.  Suddenly, OCASIO began to reverse, parking his silver Dodge next to the black Dakota.  Both trucks were facing westbound towards Slater.  The Dakota was parked on the wrong side of the road, and the passenger door of the Dakota was lined up with the driver's door of OCASIO's Dodge Ram.

375.    Investigators took up surveillance positions on Mitchell St. near the intersection with Slater Rd. and observed T.S. begin to reach out the passenger side window of the Dakota, as if he were seated in the passenger seat.  OCASIO was observed shifting around in the Dodge Ram, and then T.S. reached all the way into the Dodge Ram in a manner consistent with a hand-to-hand drug transaction.  T.S. leaned back into the Dakota, and the two appeared to continue to converse for a short time before OCASIO departed.

376.    Investigators attempted to follow OCASIO, but he again immediately began to perform counter-surveillance measures.  The surveillance on OCASIO was terminated to alleviate concerns that investigators would be identified as law enforcement.

377.    Investigators quickly reestablished surveillance on T.S., who had re-positioned the Dakota to the proper side of the road and then exited his vehicle.  T.S. appeared to be cautious of a New Britain Police Department marked police car that happened to drive by, and was observed folding a dark colored towel which he placed back inside the Dakota.

378.    At this point, investigators, clad in vests identifying them as law enforcement, approached T.S. to further investigate.  T.S. initially stated that he had met a friend in the silver Dodge named "Jim" and was currently waiting to do construction work on a residence in the area with another friend, coincidentally also named "Jim."  T.S. was unsure of which residence he was supposed to work at, but offered a hammer and tape measure as "proof" that his story was truthful.

379.    During this time, investigators observed in plain view on the driver's seat of the Dakota small, white flecks of a rock-like substance, that appeared to be crack-cocaine fragments.  In the cupholder area there were multiple "push rods" of the type that are commonly utilized by crack-cocaine users in conjunction with a crack-pipe to maneuver the filtering

medium around inside of the glass pipe. I collected one of the small flecks, which was field tested using a Sirchie brand Cocaine ID Swipe test kit. The small fleck turned bright blue, indicating a positive result for the presumptive presence of cocaine.

380.    Investigators conducted a search of the Dakota, during which a green, screw top keychain pill container containing a white rock-like chunk and a glass crack-cocaine pipe were located rolled up in the dark colored towel. A small digital scale that appeared to be broken was located in a driver's door pocket.

381.    The aforementioned items were all photographed. The crack-cocaine was seized, and later designated as an exhibit. The crack pipe and broken scale each had white residue on them, and having limited evidentiary value were safely disposed of.

382.    After the seizure, T.S. agreed to be interviewed by investigators. T.S. was informed that he was not under arrest. T.S. was then advised of his rights via a DEA-13 Form, which was read to him. T.S. then freely and voluntarily waived his rights, executing the DEA-13 form and agreeing to continue to speak to investigators.

383.    During the interview, T.S. provided a statement which is summarized as follows: That he had gone to Mitchell St. to meet a "light skinned Puerto Rican male who talks like a gangster" to purchase crack-cocaine and fentanyl. That he knows the male as "Jay" or "Jim." That the two use a ruse of "working construction" to explain their meet ups in case they are questioned by the police. That "Jim" is saved in his phone as "Jim2" and "JayN." That he had purchased the crack-cocaine from "Jim" before the police stopped him, and that "Jim" was supposed to come back to serve him fentanyl, which "Jim" did not have on hand during their initial meet up. That the phone call he received while stopped by the police was "Jim" calling back to arrange the meet up for the fentanyl sale. That he generally purchases from "Jim" every

2-3 days, and has bought crack-cocaine in various amounts and fentanyl for $20 a bundle packaged in purple, pink, white, green, or yellow wax folds.  That he has met "Jim" near the Stop and Shop on Pine St. in Bristol frequently.  That "Jim" frequently drives a silver Dodge Ram "Hemi" and a dark colored medium size SUV.  That today, he waited only 10 minutes for "Jim" to arrive, but sometimes waits 45 minutes or more.  That "Jim" also employs a series of "runners' who serve narcotics to customers on "Jim's" behalf.

*Arrest of Gregory LAFLAMME*

384.    During the early parts of the investigation, investigators conducted detailed analysis of toll records associated with cellular devices used by the OCASIO DTO; these phones included the TARGET TELEPHONE, and later, TARGET TELEPHONE 2 and TARGET TELEPHONE 3.  Using the toll records, investigators were able to identify other phone numbers with which the OCASIO DTO telephones were frequently in contact.  Among those was the phone number associated with the LAFLAMME TELEPHONE, which was a frequent caller on the TARGET TELEPHONE, and later with TARGET TELEPHONE 2 and TARGET TELEPHONE 3.  Investigators determined that the LAFLAMME TELEPHONE was subscribed to "Gregory Laflamme, 81 Cimmaron Rd., Middletown, CT 06457.  Investigators concluded that LAFLAMME was likely an associate of the OCASIO DTO.

385.    Upon conducting a review of the data extracted from the JASSOR TELEPHONE, investigators thus searched for content involving the LAFLAMME TELEPHONE, finding numerous text messages exchanged between the TARGET TELEPHONE and the LAFLAMME TELEPHONE, with the first appearing on or about July 23, 2024.  One such example appears in substance and part below:

September 23, 2024 (9:35 PM)

LAFLAMME TELEPHONE:  Hey bro need a half stack plz

TARGET TELEPHONE: You have 100

LAFLAMME TELEPHONE: I have 90... Shits tight right now bro. Can you work with me?

LAFLAMME TELEPHONE: ??

TARGET TELEPHONE: 5 min

LAFLAMME TELEPHONE:  Ok


386.     Based on my training and experience, in the preceding conversation, LAFLAMME orders fifty (50) individual bags of fentanyl ("half stack") from the OCASIO DTO.  The two negotiate price, settling on $90 after OCASIO first asks for $100, and then the two confirm a meet time.

387.     Another such conversation appears in substance and part below:

December 7, 2024 (8:15 PM)

LAFLAMME TELEPHONE:  Yo can you come thru for the half of loose?

LAFALMME TELEPHONE: ??

LAFLAMME TELEPHONE: Yoooi

TARGET TELEPHONE: Yeah

LAFLAMME TELEPHONE:  ok cool

LAFLAMME TELEPHONE: I'm in nb

LAFLAMME TELEPHONE:  How long

LAFLAMME TELEPHONE:  You on your way?

TARGET TELEPHONE: 45 min

TARGET TELEPHONE: yoo

LAFLAMME TELEPHONE:  What upp

LAFLAMME TELEPHONE: How much longer? I've been waiting. You were supposed to be here by now

LAFLAMME TELEPHONE: Yo wya

TARGET TELEPHONE:   They giving you the purple bundles

TARGET TELEPHONE: Go outside

LAFLAMME TELEPHONE:  Bro I asked for the usual loose

LAFLAMME TELEPHONE: Do you need me to come to you? You had all afternoon bro you said you had me

TARGET TELEPHONE: I was out with my kid all day

LAFLAMME TELEPHONE: That's fine then why not have your runner do.it like last time?

LAFLAMME TELEPHONE: Canni just come to you then? Make it easier

TARGET TELEPHONE: What you mean

LAFLAMME TELEPHONE:  Come to you to get the loose

TARGET TELEPHONE: They giving you the white stuff you like in bags but it has a little bit of strong stuff in it you'll like it trust me


388.    Based on my training and experience, in the preceding conversation LAFLAMME attempts to order the equivalent of a half stack, or fifty individual wax folds, of fentanyl packaged as loose powder.  OCASIO later specifies that the runner will sell LAFLAMME the normal purple bundles of fentanyl, and LAFLAMME protests.  LAFLAMME

asks to come pick up the loose fentanyl powder and OCASIO explains that the fentanyl being delivered to LAFLAMME is "the white stuff you like" that is cut with some "strong stuff," which based on my training and experience I believe to be Xylazine, a veterinary tranquilizer frequently used to cut fentanyl to increase its potency. Xylazine is not responsive to opiate antagonists such as Narcan, which is used to countereffect overdoses.

389.    In summary, during a review of communications found on the JASSOR TELEPHONE in which the LAFLAMME TELEPHONE was a part, investigators found significant evidence that LAFLAMME was a longtime customer of the OCASIO DTO. Investigators observed dozens of drug transactions that were arranged via the LAFLAMME TELEPHONE, each of which was similar in substance to those described above.

390.    On or about August 11, 2025, investigators conducted physical and electronic surveillance in the area of TARGET LOCATION 1.

391.    Investigators observed that at approximately 9:45 AM, a silver Honda Odyssey van bearing CT registration BJ53634 arrived and parked on the street in front of 2 Yellow-Orange Circle. A search of CT DMV records showed the Honda was registered to Marilyn LAFLAMME.

392.    As previously described, investigators were aware that Gregory LAFLAMME was a longtime customer of the OCASIO DTO. During the review of the JASSOR TELEPHONE, investigators also determined that LAFLAMME often drives a silver mini-van like the one parked outside of TARGET LOCATION 1.

393.    At approximately 6:59 PM, a male who appeared to be LAFLAMME, wearing jeans and a black hooded sweatshirt with the hood up, was observed standing at the rear of the Odyssey with a black backpack. It appeared that the male had walked from the direction of the

rear of TARGET LOCATION 1 where I am aware a second door to the residence is.[24]  A second

male who appeared to be OCASIO was observed standing in the driveway, wearing a white T-

shirt and white shorts.  OCASIO and LAFLAMME appeared to meet briefly in the driveway

after LAFLAMME closed the rear hatch of the Odyssey, after which the Odyssey departed the

scene.

394.    Investigators began to conduct mobile surveillance on the Odyssey as it departed

the neighborhood.  At this point, investigators contacted Ofc. Jared White, from the Middletown

Police Department to request that a motor vehicle stop be conducted on the Odyssey.

395.    Ofc. White began to follow the Odyssey in the area of Washington St. at Newfield

St., Middletown.  Ofc. White observed the Odyssey fail to maintain its lane by crossing over the

white fog line, and effected a motor vehicle stop.

396.    Ofc. White made contact with the operator, who was positively identified as

LAFLAMME at this time.  Ofc. White deployed his partner, K-9 "Sonny[25]" to conduct a free air

sniff of the vehicle.  K-9 "Sonny" alerted to the presence of the odor of narcotics within the

Odyssey.

397.    During a subsequent search of the Odyssey, investigators located approximately

sixteen (16) wax paper folds containing suspected fentanyl.  The wax folds were printed with an

image of the cartoon character "Sonic the Hedgehog."  A field test later yielded a presumptive

---

[24] Since installing the surveillance camera, investigators have experienced frequent technical issues with connectivity related to poor cellular service in the area.  This often causes the video to appear choppy, or to drop the video feed altogether for short periods of time.  In the instance described above, it is difficult to clearly ascertain exactly where the male emerged from due to the poor quality

[25] K-9 "Sonny" is a 7.5 year old German Shepherd who is trained and certified in narcotics detection by the Connecticut State Police K-9 Unit and Connecticut State Forensic Laboratory in accordance with NESPAC standards.  K-9 "Sonny" is trained to detect the following odors: Cocaine, Crack-Cocaine, Heroin and similar opiates, MDMA, and Methamphetamine.  Upon detecting one of more of the aforementioned odors, K-9 "Sonny" is trained to passively alert by sitting down.

positive result for the presence of fentanyl. Investigators also located the LAFLAMME

TELEPHONE, which was seized. Investigators then dialed the number investigators knew to be

LAFLAMME's (a number known to me ending in -1094) and observed that the LAFLAMME

TELEPHONE began to ring and display the incoming call. Investigators were thus able to

confirm that the telephone seized from LAFLAMME was in fact assigned call number ending in

-1094.

398.    During a roadside interview, LAFLAMME informed investigators that he was

coming from a friend's house on Yellow-Orange Cir., where he was doing "electrical work."

399.    LAFLAMME was arrested by the Middletown Police Department, and charged

with state narcotics violations.

*Sonic the Hedgehog Fentanyl Packaging*

400.    Investigators are familiar with the "Sonic the Hedgehog" branded wax paper folds

containing fentanyl, and know it to be one of the primary types of fentanyl offered for sale by the

OCASIO DTO. Investigators noted multiple instances where the "Sonic the Hedgehog" fentanyl

type was referenced during a review of the JASSOR TELEPHONE, including the following:

401.    During a conversation with Robert PINNETTE occurring on or about January 12,

2005 at 8:05 PM (UTC +0), PINNETTE references "Sonic the Hedgehog" fentanyl in a message

about drug inventory.


ROB TOM $35:  30 bars 50b sonic-22b white 26.3h 22s.


402.    Based on my training and experience, I believe that in the preceding message,

PINNETE totals up his drug inventory, referencing "30 bars" (30 Xanax pills); 50b sonic (50

"bundles" of fentanyl in "Sonic the Hedgehog" packaging totaling 500 individual wax folds); 22b white (22 bundles of fentanyl in plain white packaging totaling 220 individual wax folds); 26.3h (26.3 grams of crack-cocaine, specified here by the street slang "hard"; 22s (22 grams of cocaine, specified here by the street slang "soft".

403.     During a conversation with Kyle MASTROIANNI occurring on or about January 10, 2025 at 12:49 AM (UTC +0) MASTROIANNI references "Sonic the Hedgehog" fentanyl in a message about fentanyl quality:

MASTROIANNI TELEPHONE: Those sonics are good but pretty small anyone else say anything.

404.     Based on my training and experience, I believe that MASTROIOANNI is stating that the quality of fentanyl in the "Sonic the Hedgehog" bags is acceptable, but that each bag contains less than the usual weight of fentanyl.  I believe that street slang for this is that the fentanyl bags are "light" and know it to be a common tactic of drug dealers seeking to maximize profit; by intentionally shorting each bag a small amount, drug dealers end up with more individual bags they can offer for sale.

405.     During a conversation with Griffin DEPREY occurring on or about January 8, 2025 at 4:40 PM (UTC +0) DEPREY references "Sonic the Hedgehog" fentanyl in a message about drug inventory:

DEPREY TELEPHONE: I don't think I have 12 left to be honest.  I'll tell you in one second

DEPREY TELEPHONE: 8 Sonics

406.     Based on my training and experience, I believe that in the preceding message, DEPREY is responding to a possible order of 12 "bundles" of "Sonic the Hedgehog" by stating that he only has 8 bundles remaining.

407.     In addition, as referenced above, during the January 17, 2025 arrest of Ryan JASSOR in Bristol, CT, investigators seized approximately 418 wax paper folds containing fentanyl, each bearing an identical "Sonic the Hedgehog" graphic to those seized from LAFLAMME.

408.     On or about August 22, 2025, TFO I submitted an Affidavit in support of a search and seizure warrant to the U.S. District Court, District of Connecticut, seeking authorization to search the LAFLAMME TELEPHONE. On the same date, the Honorable S. Dave Vatti, U.S. Magistrate Judge for the District of Connecticut authorized the warrant.

409.     The LAFLAMME TELEPHONE was subsequently forensically examined and digital data was extracted from the phone. Investigators reviewed the data, to include text message conversations between the LAFLAMME TELEPHONE and TARGET TELEPHONE 3.

410.     Investigators observed that there were text messages between the LAFLAMME TELEPHONE and TARGET TELEPHONE 3 regarding LAFLAMME going to TARGET LOCATION 1 to do electrical work on August 11, 2025. Additionally, LAFLAMME requested an order of a half0stack, or five bundles of fentanyl from OCASIO. The messages are as follows:

August 10, 2025

12:43 PM: LAFLAMME TELEPHONE (12:43 PM): We still on for tomorrow at 9?

TARGET TELEPHONE 3: You for sure coming ?

LAFLAMME TELEPHONE: Yes if you need me too but I can't give you a quote until ew go over everything

TARGET TELEPHONE 3: It's making 4 outlets

LAFLAMME TELEPHONE: Ok. Well realistically looking at $400 in labor

LAFLAMME TELEPHONE: ??

TARGET TELEPHONE 3: Yes

LAFLAMME TELEPHONE: Ok

TARGET TELEPHONE 3: Yo


August 11, 2025

LAFLAMME TELEPHONE (3:46 AM): Yes?

LAFLAMME TELEPHONE: Yo can I get a half stack today too plz?

LAFLAMME TELEPHONE: And plz try to hook it up it was at least 2 bundles short

LAFLAMME TELEPHONE: Last one

LAFLAMME TELEPHONE: Are you going to be home?

TARGET TELEPHONE 3: Yov

TARGET TELEPHONE 3: Yo

TARGET TELEPHONE 3: It wasn't short bro

LAFLAMME TELEPHONE: Then why we do normal around but run out day early? Not to mention it looked way small than usual... So something happened

LAFLAMME TELEPHONE: Are you home?

LAFLAMME TELEPHONE: I'm at Dunkin but I don't wanna sit in you driveway for an hr or so

TARGET TELEPHONE 3: It's not that it was probably off by a tad but not 2 buns

TARGET TELEPHONE 3: Are you alone ?

LAFLAMME TELEPHONE: It was off by quite I bit bro. Why would I make this up I never complain

TARGET TELEPHONE: And yeah I'm here

LAFLAMME TELEPHONE: But yes I am alone

TARGET TELEPHONE: I believe you bro I got you

LAFLAMME TELEPHONE: Ok I'm just grabbing quick sandwich cause I didn't have bkfst be there soon

TARGET TELEPHONE 3: Okay

TARGET TELEPHONE 3: So you can check what we need and I'll give you the money you can run to Lowe's and grab itv

TARGET TELEPHONE 3: I'll be here won't leave cause have kid with me

LAFLAMME TELEPHONE: Ok sounds good

LAFLAMME TELEPHONE: I'm outside front door bro

LAFLAMME TELEPHONE: I'm out front at door

411.    There are no additional text messages between the LAFLAMME TELEPHONE and TARGET TELEPHONE 3 after LAFLAMME notified OCASIO that he was at the front door.  Based on my training and experience, since LAFLAMME and OCASIO were each observed at TARGET LOCATION 1 during the day, and LAFLAMME was later found to be in possession of wax folds containing fentanyl after departing TARGET LOCATION 1, consistent

with the order he placed as outlined in the text messaged, investigators believe the OCASIO holds quantities of fentanyl within TARGET LOCATION 1 that is readied for street level sales.

*Quran MUHHAMAD Drug Resupply at TARGET LOCATION 1*

412.    On or about August 13, 2025 at approximately 12:47 PM, investigators conducting electronic surveillance observed a white Lexus bearing CT Registration BS55966 park in the roadway in front of TARGET LOCATION 1. A light skinned black male with dark, long braided hair wearing a black t-shirt and blue shorts exited the driver's seat carrying a crossbody styled black bag. The male then opened the trunk of the vehicle, looked inside and walked back to the rear passenger's seat on the driver's side and retrieved a black duffel bag. Additionally, a short female exited the front passenger's seat. While the male and female were outside near the vehicle, OCASIO opened the front door of the residence wearing a white t-shirt and dark shorts and waited for the male and female at the door until they entered the residence.

413.    A CT DMV check of the white Lexus revealed the vehicle to be registered on a 2011 white Lexus Es 350 to Quran MUHAMMAD.  Investigators were aware through toll records that MUHAMMAD is in contact with the OCASIO TELEPHONE. Investigators also identified the male from the Lexus as MUHAMMAD, based on a comparison with his driver's license photograph.

414.    At approximately 1:54 PM, investigators observed MUHAMMAD and the unknown female standing outside the front door of the residence, talking at the door. MUHAMMAD appeared to be carrying the black duffel bag over his right shoulder, with his right arm resting on the top portion of the bag, as if it was weighted. MUHAMMAD and the female then walked to the Lexus and MUHAMMAD entered the driver's side rear passenger

seat. MUHAMMAD reached his body into the rear seat and appeared to be shoving the black duffel bag behind the passenger seat area. The Lexus then departed the area.

415.    As previous noted, MUHAMAMAD would later be arrested in Bristol, CT after being found with a black bag containing various illegal drugs.

416.    On or about August 18, 2025 investigators located a white Jeep Grand Cherokee bearing CT Registration BT12553, known to be operated by Jose ROSADO-ORTIZ, parked in front of TARGET LOCATION 2.  The Jeep was parked on the street directly in front of a black Mustang bearing CT Registration BP28262, also known to be previously operated by ROSADO-ORTIZ. A DMV check of the Mustang revealed it to be a misuse, registered on a 2019 black Lexus Es350 to ROSADO-ORTIZ. Investigators are aware that ROSADO-ORTIZ has also operated the Lexus.  Investigators established surveillance in the area of TARGET LOCATION 2 and maintained a visual on the residence and Jeep. At approximately 7:09 AM, investigators observed the front headlights of the Jeep flash on and heard the noise of the vehicle turning on, as if it was turned on from the remote starter. At approximately 7:16 AM, investigators observed Jose ROSADO-ORTIZ exit the front door of TARGET LOCATION 2.

417.    Investigators would later install a surveillance camera in the area which captured the outside of TARGET LOCATION 2.  Through periods of electronic surveillance, investigators determined that ROSADO-ORTIZ resided at TARGET LOCATION 2, and that OCASIO was a frequent visitor who held a key, and had access to the residence at any time of day or night, whether or not ROSADO-ORTIZ was home.  Investigators would later observe multiple instances where OCASIO DTO members would meet at TARGET LOCATION 2 to drop off or retrieve bags, consistent with the trafficking of drugs and drug proceeds.

418.    For example, on or about August 24, 2025 at approximately  1:36 PM, ROSADO-ORTIZ exited the front door of the residence wearing a black t-shirt and black shorts with a small bag and threw out the bag in a garbage bin located on the side of the residence. After going back and forth from the Jeep to the residence, ROSADO-ORTIZ exited the front door of TARGET LOCATION 2 and walked back to the rear passenger's side of the Jeep where he retrieved a large black duffel bag. ROSADO-ORTIZ carried the large duffel bag with contents in his left hand and walked inside the front door of TARGET LOCATION 2.  ROSADO-ORTIZ then exited the house without the bag and departed in the white Jeep.

419.    At approximately 1:45 PM, the Jeep returned and ROSADO-ORTIZ eventually entered TARGET LOCATION 2.  At approximately 1:50 PM, ROSADO-ORTIZ exited the front door of TARGET LOCATION 2 carrying a black and light-colored red backpack. ROSADO-ORTIZ placed the backpack in the rear passenger seat of the Jeep and departed in the Jeep. At approximately 1:53 PM, ROSADO-ORTIZ returned in the Jeep and parked it in the driveway. ROSADO-ORTIZ quickly entered the front door of TARGET LOCATION 2 and exited before departing in the Jeep again. At approximately 9:13 PM, ROSADO-ORTIZ returned in the Jeep. ROSADO-ORTIZ exited the Jeep and threw out a white bag in the garbage bin alongside the house. ROSADO-ORTIZ then walked to the front passenger's seat of the Jeep before entering the residence with nothing observable in his hands.

420.    On August 31, 2025 at approximately 12:59 PM, OCASIO was observed exiting the front door of TARGET LOCATION 1 wearing a gray sweatshirt, blue shorts, white socks, and black sandals carrying an orange backpack style bag. OCASIO walked down the driveway past the black GMC Sierra parked in the driveway and heading towards the intersection of Yellow Road. Investigators are aware that OCASIO parks his additional vehicles, including the

white Acura TLX bearing a misuse CT Registration AR89817, on a turn-around section of
Yellow Road. OCASIO proceeded outside of the camera's view.

421.    Investigators later reviewed LPR hits on the Acura after OCASIO left the
residence, which seemed to indicate that the Acura was making drug deliveries during the
midday time frame.

422.    At approximately 7:15 PM, ROSADO-ORTIZ exited the front door of TARGET
LOCATION 2 wearing a white t-shirt, brown shorts, and black shoes. ROSADO-ORTIZ
lingered on the front porch, as if he was waiting for someone, then proceeded to the front
passenger's seat of the white Jeep Grand Cherokee parked outside the residence on the street.
ROSADO-ORTIZ remained seated in the passenger's seat with the door open until a white Acura
TLX pulled up and parked in the vicinity.  ROSADO-ORTIZ then exited the passenger's seat,
walked around towards the driver's seat of the Jeep and gave the Acura a wave before entering
the driver's seat of the Jeep. Meanwhile, OCASIO exited the driver's seat of the Acura wearing a
gray sweatshirt, blue shorts, white socks, and black sandals. OCASIO reached into the rear seat
on the driver's side, then re-adjusted his pants and put his hands in his front sweatshirt pocket.
OCASIO then walked around to the rear passenger's seat of the Acura and retrieved an orange
bag, which appeared to be the same bag he left his residence with. ROSADO-ORTIZ then
opened the trunk of the Jeep and OCASIO met him at the trunk. ROSADO-ORTIZ and OCASIO
appeared to examine the orange bag, as if they were looking at items inside. OCASIO then shook
out a blanket or towel from the trunk of the Jeep and placed it in the rear passenger seat of the
Acura. ROSADO-ORTIZ and OCASIO then rummaged through the trunk of the Jeep, taking
items out and placing them on the ground. ROSADO-ORTIZ then brought approximately three
medium sized bags inside the residence. OCASIO continued to go back and forth between the

rear driver's seat of the Jeep and the trunk. ROSADO-ORTIZ also threw out several bags in the garbage bin placed along the side of TARGET LOCATION 2.

423.     At approximately 7:38 PM, ROSADO-ORTIZ and OCASIO entered the front door of TARGET LOCATION 2. OCASIO was carrying the same orange bag. At approximately 8:25 PM, ROSADO-ORTIZ and OCASIO exited the front door carrying a water heater and placed it on the curb line. Both re-entered the residence. At approximately 8:52 PM, ROSADO-ORTIZ exited the front door and retrieved a black duffel bag from the trunk of the Jeep. The duffel bag appeared to be weighted as ROSADO-ORTIZ carried the bag inside the residence. At approximately 10:07 PM, both parties exit the front door, ROSADO-ORTIZ discarded a bag into the garbage bin along the side of the house. Both parties re-entered the residence and exited shortly after. OCASIO then got into the driver's seat of the Acura and ROSADO-ORTIZ got into the front passenger's seat and the Acura departed the area.

424.     Investigators were later made aware that on or about September 1, 2025 approximately 01:26 AM, LT. Christopher Morrissey of the Manchester Police Department observed the Acura traveling northbound on Keeney Street in Manchester. LT. Morrissey observed the Acura to have no front plate, dark tinted windows, and a misused registration plate. Believing the Acura to be stolen, LT. Christopher Morrissey attempted a motor vehicle stop on the vehicle on Waddell Road by activating his police cruiser emergency lights. The Acura failed to yield and made a right turn on West Center St and fled at a high rate of speed. LT. Christopher Morrissey did not pursue the Acura, but observed the vehicle to be driving recklessly before it eventually entered I-384 westbound. Investigators believe that at the time, the Acura was traveling back to TARGET LOCATION 2 to drop off ROSADO-ORTIZ due to the residence being within about 300 meters of where the motor vehicle stop was attempted.

425.     A review of the pole camera at TARGET LOCATION 2 showed that on September 1, 2025, less than an hour later at approximately 02:17 AM, a dark SUV with a bright light affixed to the dashboard idled outside the residence. ROSADO-ORTIZ exited from the passenger's side of the vehicle and entered TARGET LOCATION 2. Investigators noted that the vehicle appeared to be a ride-share service such as "Uber."

426.     A review of the pole camera at TARGET LOCATION 1 showed that on September 1, 2025 at approximately 02:29 AM, the Acura backed into the driveway and OCASIO exited the driver's seat wearing the same outfit observed from before. OCASIO entered the front door of the residence with his phone illuminated in his right hand.

427.     On or about September 4, 2025 TFO Verillo at about 7:15 PM, the white Jeep Cherokee known to investigators to be regularly driven by ROSADO-ORTIZ arrived and parked in the street in front of TARGET LOCATION 2. A male wearing dark pants and a dark shirt, who appeared to be ROSADO-ORTIZ exited the Jeep and immediately popped the hood of a black Mustang, which was also parked in front of the residence, and also known to investigators to be driven by ROSADO-ORTIZ.

428.     After a short time, ROSADO-ORTIZ entered the driver's seat of the Mustang. At about 7:18 PM, ROSADO-ORTIZ departed in the Mustang. At about 7:23 PM, the Mustang returned, and ROSADO-ORTIZ exited. He again popped the hood of the Mustang and inspected the engine compartment. He then opened the trunk, and removed what appeared to be a black backpack or duffel bag with visible straps, which he carried inside TARGET LOCATION 2.

429.     At approximately 8:23 PM, a dark colored SUV arrived and parked in the middle of the road in front of the residence. A person exited the passenger side carrying a large white item, while the driver remained in the SUV. Additional descriptors of the person, item, or

vehicle were unable to be ascertained due to the dark.  The unknown person approached TARGET LOCATION 2, and was met at the door by a male who appeared to be ROSADO-ORTIZ.  The unknown person and ROSADO-ORTIZ entered the residence briefly.  Both then exit the house, with the unknown person entering the dark colored SUV and departing. ROSADO-ORTIZ unlocked the Jeep, and accessed the passenger side first, and then the driver's side, before returning to the residence.

430.    At approximately 8:30 PM, ROSADO-ORTIZ exited the front door of the residence, carrying what appeared to be a trash bag to the side of the house where the garbage can is kept.  He then wheeled the garbage can to the curb to prepare for trash collection.

*Trash Pull at TARGET LOCATION 2*

431.    On or about September 5, 2025 at approximately 9:30 AM, investigators conducted a trash pull operation at TARGET LOCATION 2. Upon approaching the residence, investigators observed that a trash bin had been placed at the curb of Pioneer Circle in front of TARGET LOCATION 2. The trash was placed along the roadside readied for trash collection.

432.    Investigators approached the bin and took its contents, transporting them to a secondary location where they were searched.  Investigators located items of evidentiary value within the trash, described as follows:

    a.  One (1) plastic "corner tear" style knotted bag, which was covered with other trash but contained a white residue

    b.  One (1) larger Ziploc style bag which contained white residue

    c.  One (1) plastic bag which contained white residue

    d.  One (1) Amazon shipping bag with label addressed to "Jose Ortiz, 37 Pioneer Circle, Manchester, CT, 06040-4720"

433.    These items were seized as evidence and later designated as exhibits.  Investigators utilized a Mistral Group cocaine ID swipe test kit to swab the three plastic bags, each yielding a presumptive positive result for the presence of cocaine. Investigators noted that the two smaller plastic bags, sometimes referred to as "corner tear" bags, are used for street level packaging for cocaine and a variety of other drugs.  The larger Ziploc style bag held significant residue, and investigators recognized that it could hold a quantity of cocaine suitable for redistribution.

434.    On or about Sept 7, 2025 at approximately 9:05 PM, a white Jeep Cherokee known to investigators to generally be driven by ROSADO-ORTIZ arrived and parked in front of TARGET LOCATION 2.  Two figures exited, and accessed the rear seat area as if collecting belongings.  The two individuals then approached the front entrance to TARGET LOCATION 2; the physical description of one was consistent with ROSADO-ORTIZ, and the second appeared to be an unknown female.  ROSADO-ORTIZ appeared to be carrying a black backpack.

435.    A few minutes later, the male believed to be ROSADO-ORTIZ exited the front door to TARGET LOCATION 2 and returned to the Jeep briefly, as if collecting an item he had left behind inside the Jeep.  He then returned inside the residence.

436.    At approximately 10:05 PM, investigators received an LPR alert indicating that a GMC Sierra bearing RI registration 1ZS345, known to investigators to be rented and driven by Joshua OCASIO, was read at the intersection of McKee St./Hartford Rd. in Manchester, CT.  The truck was pictured in the left turn lane.  Investigators are aware that after receiving an LPR alert at this intersection and lane position, OCASIO DTO vehicles often travel to TARGET LOCATION 2

437. At approximately 10:07 PM, the GMC did arrive in the area of TARGET LOCATION 2, and was observed backing into a neighbor's driveway. Investigators noted that a Jeep Wrangler appeared to be following the GMC, waiting in the road way just out of the camera's view, with only the headlights visible, as the GMC parked. Once the GMC parked, the Wrangler was observed driving by the residence and out of the camera's view. However, moments later, headlights again illuminated the right side of the camera view, leading investigators to conclude that the Wrangler or some other vehicle had parked near the GMC. Those headlights then shut off.

438. At approximately 10:10, a male figure consistent with OCASIO exited the driver's seat of the GMC, approached the passenger side as if to remove something, and then walked towards TARGET LOCATION 2. The dim lighting made it difficult to ascertain exactly what was carried, but it appeared to be a small light colored bag. OCASIO entered the residence without knocking or waiting.

439. Two minutes later, OCASIO exited the residence and walked back to the GMC, which he entered. After remaining stationary for a short time, the truck departs. Investigators noted that as OCASIO re-entered the GMC, illumination from the headlights of the vehicle parked off screen, believed to be the Wrangler, turned back on. As soon as the truck drove away, the Wrangler appeared on screen, following closely behind the GMC.

440. Investigators are aware, through training and experience, that drug traffickers will often utilize a "cover car' or "follow car" when transporting loads of illegal drugs. The purpose of this trail vehicle is to provide security and counter-surveillance for the "load vehicle" which is actually transporting the drugs, and in the event that law enforcement attempts to intervene, the trail vehicle will draw the attention of law enforcement and pull over, acting as a sacrificial layer

to allow the "load vehicle" to abscond. Since the Wrangler appeared to arrive and depart in tandem with the GMC, investigators concluded that the two vehicles had been traveling together. As such, investigators queried the specific LPR camera that had scanned the GMC at 10:05 PM, during that exact frame and located images of the GMC being followed by dark colored Jeep Wrangler that matched the one observed on the pole camera, and determined the registration to be MA 6GBP69. An inquiry with NLETS showed the Wrangler to be registered to EAN Holdings, LLC (Enterprise Rent-a-Car.)

441.    Investigators contacted the Enterprise Rent-a-Car law enforcement assistance line, and learned that the Wrangler had been rented by Lionel PACHECO, a long time OCASIO DTO member.

442.    On or about September 9, 2025 at approximately 4:04 PM, a white Jeep Grand Cherokee, known to investigators to be utilized by ROSADO-ORTIZ, parked outside of TARGET LOCATION 2. At approximately 4:20 PM, ROSADO-ORTIZ, wearing a black sweatshirt and dark pants, exited the driver's seat of the Jeep, retrieved a small black item from the Jeep, and entered the front door of TARGET LOCATION 2.

443.    At approximately 4:33 PM, a black GMC Sierra pickup truck, known to investigators to be utilized by OCASIO, parked in the driveway TARGET LOCATION 2. OCASIO, wearing a black sweatshirt, light colored shorts, and white socks, exited the driver's seat of the GMC and let himself into the front door of TARGET LOCATION 2. Investigators observed that OCASIO was not carrying anything at the time. At approximately 4:35 PM, OCASIO exited the front door to TARGET LOCATION 2 with a black bag slung over his right shoulder. The bag appeared to be weighted with contents as OCASIO walked with it by his side. ROSADO-ORTIZ also exited the front door of TARGET LOCATION 2 and appeared to lock

the front door from the outside. OCASIO proceeded towards the GMC and opened the rear driver's side door and appeared to place the bag in the back seat. OCASIO then entered the driver's seat and ROSADO-ORTIZ entered the passenger's side. The GMC then departed.

444.     At approximately 9:07 PM, the black GMC Sierra returned to TARGET LOCATION 2 and backed into the driveway. OCASIO and ROSADO-ORTIZ exited from the truck and walked towards the front door. ROSADO-ORTIZ unlocked the front door, while holding a light-colored bag. OCASIO entered the front door and ROSADO-ORTIZ walked towards the garbage bins on the side of the residence and appeared to have thrown the bag out. ROSADO-ORTIZ then entered the front door. At approximately 9:34 PM, OCASIO and ROSADO-ORTIZ exited the front door and stood on the porch, appearing to engage in conversation. They gave each other a handshake and OCASIO walked to the GMC. OCASIO departed in the GMC, while ROSADO-ORTIZ walked to the Jeep and entered it as if to retrieve something from it. ROSADO-ORTIZ then re-entered the front door of the residence.

445.     Investigators also conducted a review of electronic surveillance at TARGET LOCATION 1 on September 9, 2025. Investigators observed OCASIO exit the front door of the residence at approximately 3:52 PM, wearing a black sweatshirt, light colored shorts, and white socks. OCASIO departed in the black GMC Sierra parked in the driveway.

446.     At approximately 11:49 PM, investigators observed OCASIO walking in the driveway of TARGET LOCATION 1, carrying an orange bag in his right hand. There were no vehicles parked in the driveway, and it appeared as though OCASIO had walked up from the bottom of the street. Investigators are aware that OCASIO often parks vehicles on Yellow Road near the intersection of Yellow Orange Circle. OCASIO walked to the front door of TARGET LOCATION 1 and entered the front door.

447.    On or about September 15, 2025 at about 6:32 PM, OCASIO and a white/Hispanic male believed to be ROSADO-ORTIZ exited the front door of TARGET LOCATION 1.  OCASIO was wearing a blue sweatshirt, dark pants and white shoes and ROSADO-ORTIZ was wearing a black t-shirt and dark colored pants. OCASIO and ROSADO-ORTIZ walk down the street towards Yellow Rd., where OCASIO parks additional vehicles. OCASIO can be seen carrying a black bag and an orange backpack both slung over his right shoulder. The male believed to be ROSADO-ORTIZ has a black bag on his back.

448.    At approximately 10:44 PM investigators received information from license plate readers near TARGET LOCATION 2 that OCASIO's black GMC (RI 1ZS345), the Jeep Wrangler rental believed to be utilized by PACHECO (MA 6GBP69), and the white Jeep known by investigators to be utilized by ROSADO-ORTIZ (CT BT12553), were travelling in a caravan towards TARGET LOCATION 2.

449.    At approximately 10:46 PM, the black GMC pickup and the white Jeep Cherokee arrived at TARGET LOCATION 2 and parked.  After parking ROSADO-ORTIZ exited the driver's position of the Jeep and walked over to the passenger's side of the GMC. ROSADO-ORTIZ then walks away from the GMC and investigators are unable to determine if he is carrying something away from the truck. ROSADO-ORTIZ then enters the front door of TARGET LOCATION 2.  A short time later, ROSADO-ORTIZ exited the front door of TARGET LOCATION 2 and walked back to the passenger's side of the GMC while carrying a light-colored bag in his left hand. ROSADO-ORTIZ then appeared to open the front passenger's side door of the GMC as if placing something inside. ROSADO-ORTIZ is then observed walking away from the GMC back to the front door of TARGET LOCATION 2 without the bag. At that same approximate time, the black GMC and the Jeep Wrangler consistent with the one

believed to be operated by Lionel PACHECO depart the area and ROSADO-ORTIZ entered TARGET LOCATION 2 through the front door.

450.    A review of surveillance footage from TARGET LOCATION 2 showed that about thirty minutes later, at approximately 12:18 AM on September 16, 2025 a male believed to be OCASIO walks up from the beginning of Yellow Orange Circle and enters the home of TARGET LOCATION 2. The male believed to be OCASIO was wearing a light sweatshirt, and is seen carrying the light colored bag.

451.    On or about September 20, 2025 at approximately 11:33 AM OCASIO's white Acura arrived at TARGET LOCATION 1 and parked within the driveway. OCASIO then exited the driver's position of the Acura. OCASIO was observed wearing a dark blue or black sweatshirt, dark grey pants, and white sandals. OCASIO then retrieved an orange bag from the passenger's seat of the Acura. OCASIO then walked around the back of TARGET LOCATION 1 before returning to the Acura and retrieving a large weighted black duffle bag from the rear seat of the vehicle. OCASIO then walked to and entered the front door of TARGET LOCATION 1 with both bags.

452.    At approximately 2:21 PM the black GMC pickup truck rented by OCASIO arrives at TARGET LOCATION 1. After the truck's arrival, a white or Hispanic male exited the driver's position of the truck. The male was observed wearing a dark colored shirt, light grey sweatpants, and had an orange bag slung across his body. The male was also observed carrying what appeared to be a grey bag in his left hand. The male then walked to the front door of TARGET LOCATION 1 with both bags, where he waited before appearing to be let in. The observed male did not appear to be any of the currently identified members of the OCASIO DTO, but is believed to be a runner utilizing the GMC pickup.

453.    On or about September 22, 2025at approximately 8:17 AM, investigators observed Joshua OCASIO, wearing a gray sweatshirt and dark gray sweatpants, exit the front door of TARGET LOCATION 1 with an orange bag. OCASIO assisted his child into the white Acura TLX parked in the driveway and then left in the Acura with the orange bag. At approximately 12:51 PM the white Acura TLX returned and backed into the driveway. At the same time, the black GMC Sierra also backed into the driveway. OCASIO exited from the driver's seat of the Acura. A Hispanic male, with dark hair and a dark goatee, wearing a black sweatshirt, black sweatpants and carrying a black crossbody bag, exited the driver's seat of the GMC. Investigators believed the Hispanic male to match the description of Lionel PACHECO. OCASIO reached in and out of the GMC and the Acura and then proceeded inside the front door of TARGET LOCATION 1 with an orange bag similar to one he left the residence with earlier in the day. A short time later, OCASIO exited the front door of TARGET LOCATION 1 with the orange bag and entered the front passenger's seat of the GMC. PACHECO entered the driver's seat of the GMC and departed the driveway.

*Attempted Stop of OCASIO DTO Vehicle*

454.    On or about September 24, 2025 at approximately 7:39 AM, Joshua OCASIO exited the front door of TARGET LOCATION 1 wearing a light gray sweatshirt, dark gray sweatpants, and carrying an orange bag over his right shoulder. OCASIO entered the driver's seat of the black GMC Sierra parked in the driveway with the orange bag and departed the area.

455.    At approximately 10:45 AM, investigators initiated surveillance in the area of Louisiana Avenue, Bristol, CT. 276 Louisiana Avenue is an address known by investigators to be the residence of WOFFORD. WOFFORD is a known drug customer of the OCASIO DTO

and his address is a location frequented by members of the OCASIO DTO to complete drug sales.

456.     At approximately 10:50 AM, investigators observed WOFFORD sitting in a chair in the driveway of 276 Louisiana Avenue.  At approximately 12:10 PM, investigators observed the black GMC pickup truck bearing Rhode Island registration 1ZS345, known to be utilized by members of the OCASIO DTO, travelling on Brook Street towards Louisiana Avenue and observed that the operator appeared to be a white/Hispanic male with a beard, and that the male was holding a phone near his mouth and appeared to be talking.

457.     Several minutes later at approximately 12:12 PM, investigators observed the GMC arrive and park within the driveway of 276 Louisiana Avenue. Investigators then observed WOFFORD walking towards the area of the side door to 276 Louisiana Avenue home after having been at the driver's side door of the GMC for a short period of time. Investigators believed the interaction to be a hand-to-hand drug transaction.

458.     At approximately 12:14 PM investigators observed the GMC leaving the driveway of 276 Louisiana Avenue and turn left onto Brook Street. Constant mobile surveillance was initiated on the GMC. While behind the GMC on Brook Street, investigators observed the operator of the GMC holding a phone next to their mouth as if talking on the phone.  The GMC was followed as it continued on Brook Street onto Mix Street. The GMC continued on Mix Street onto Maple Avenue before turning right onto Round Hill Road. The GMC then turned onto Burlington Avenue and continued onto Milford Street, Burlington, CT. Investigators then observed the GMC park in the driveway of 427 Milford Street at approximately 12:24 PM.

459.     At approximately 12:31 PM investigators observed a white female in a white/tan hooded sweatshirt and dark colored pants come from the area of 427 Milford Street and walk up

to the GMC's driver's window. The female quickly interacted with the operator of the GMC in a manner consistent with a hand-to-hand drug transaction before the female quickly walked away back towards the house. Approximately one minute later investigators observed the GMC leave the driveway and begin travelling on Milford Street towards Bristol. Constant mobile surveillance was then initiated on the GMC

460.    The GMC was followed as it continued onto Burlington Avenue in Bristol. The GMC turned right onto Peacedale Street and continued onto James P. Casey Road. The GMC then turned left onto Hill Street and then right onto Matthews Street.

461.    At the request of investigators, BPD Officer MJ Fisher, in a marked police vehicle, conducted a traffic stop on the GMC. The GMC initially pulled over for Officer Fisher but fled upon Officer Fisher's approach to the GMC's window. A visual on the GMC was lost in the area of Matthews Street and Clark Avenue.

462.    12. At approximately 12:43 PM investigators located the fleeing GMC traveling in the area of Main Street and North Riverside Avenue towards Plymouth CT, but no further attempts to stop it could be made.

463.    Based on the observations of the GMC operator by investigators, and the lack of counter-surveillance driving tactics employed, investigators do not believe that the operator of the GMC was OCASIO.  Instead, investigators believe that OCASIO handed off the GMC to a drug runner, and the operator was another member of the OCASIO DTO that could not be identified at that time.

*Continued Electronic Surveillance of TARGET LOCATION 1 & TARGET LOCATION 2*

464.    Based on training and experience, and the preceding investigation and observations, investigators had by now come to believe that the OCASIO DTO was utilizing

both TARGET LOCATION 1 and TARGET LOCATION 2 in furtherance of its drug trafficking activities. Investigators are aware that large scale drug distributors, such as the OCASIO DTO, generally purchase quantities of illegal narcotics, such as cocaine and fentanyl, in bulk quantities. These drugs are then processed and readied for street level sales. The processing of cocaine can include "cutting" - combining the cocaine with various diluents or adulterants – to increase volume and profit margin, as well as weighing and packaging. Additionally, quantities of cocaine are often cooked into crack-cocaine, which is also then readied for street level sales. Similarly, the processing of fentanyl can include "cutting" or "milling," a process in which fentanyl is combined with other substances such as xylazine to increase its potency or effect, and is then readied for street level sales by packaging individual dosage units into wax paper folds. To accomplish these tasks, drug traffickers generally use a variety of drug paraphernalia and packaging items, including cutting compounds, sifters, mixers, blenders, plastic bags, wax paper folds, scales, rubber gloves, spoons, straws, and other similar items. Oftentimes these items are carried together in what amounts to a mobile drug processing station, which can be carried between locations the drug trafficker uses to prepare, package, and stash narcotics inventory. Investigators believe that the frequent movement of large bags between TARGET LOCATION 1 and TARGET LOCATION 2 is consistent with the preparation and transport of the OCASIO DTO's narcotics inventory, and further believe the frequent meetings between OCASIO DTO associates at TARGET LOCATION 1 and TARGET LOCATION 2 are for the purpose of drug preparation and resupply.

465.    Investigators continued to conduct periodic electronic surveillance of TARGET LOCATION 1 and TARGET LOCATION 2, and continued to observe meetings between OCASIO associates. Additionally investigators continued to observe the movement of large

bags, likely containing bulk drugs and processing equipment, and smaller bags such as OCASIO's small orange bag or reusable shopping bags, likely containing drug inventory readied for sale.  Some examples appear below.

466.     On or about September 24, 2025 a approximately 4:19 PM, a white Honda Civic, known to investigators to be operated by Mallorie DEJESUS, parked in the driveway of TARGET LOCATION 1. DEJESUS exited the driver's seat of the vehicle and OCASIO exited the front passenger's seat carrying an orange bag. DEJESUS and their son entered the front door of TARGET LOCATION 1. OCASIO, while carrying the orange bag, walked to the rear of the residence and remained out of sight.

467.     At approximately 8:54 PM, two males walked up the driveway of TARGET LOCATION 1 from the direction of Yellow Road. One male was observed to be heavier set, wearing a white shirt and light pants and carrying a black crossbody style bag, similar to the one observed on Lionel PACHECO on or about September 22, 2025. The other male appeared to be wearing a dark sweatshirt and dark shorts. The two males entered the front door of TARGET LOCATION 1, but investigators were unable to determine if they were let in by someone from the inside or if they let themselves in.

468.     On or about October 2, 2025 at approximately 2:09 PM, an unknown gray SUV parked in front of TARGET LOCATION 1. At approximately 2:26 PM, OCASIO parked the black GMC Sierra in the driveway and exited the driver's seat wearing a light gray sweatshirt and darker gray sweatpants. OCASIO walked to the passenger side of the gray SUV and retrieved a white plastic bag. OCASIO proceeded towards the rear of TARGET LOCATION 1 out of the sight of the camera and the SUV backed down the street towards Yellow Road. At approximately 2:19 PM, a heavier set male wearing a black hat, black sweatshirt, with a white shirt sticking out

underneath, and light gray sweatpants, carrying a crossbody style bag across his back, walked up the driveway and towards the rear of TARGET LOCATION 1 out of sight.

469.     At approximately 7:17 PM, OCASIO, wearing a light gray sweatshirt, dark pants, and white shoes exited the front door carrying a large, black weighted duffel bag over his right shoulder. A male, wearing a white shirt and gray sweatpants carrying a black sweatshirt, believed to be the same male observed earlier in the day, also exited the front door. OCASIO walked towards the mailbox affixed to the side of the garage and checked inside. OCASIO then entered the GMC Sierra with the bag and the male walked down the driveway towards Yellow Road. The GMC Sierra departed a short time later.

470.     On or about October 3, 2025 at approximately 1:25 AM, the black GMC Sierra parked in front of TARGET LOCATION 2, with an unknown light-colored sedan following directly behind the truck. OCASIO exited the driver's seat of the GMC Sierra wearing a gray sweatshirt and opened the rear passenger's seat on the driver's side. OCASIO retrieved a large dark colored bag and walked to the front door of TARGET LOCATION 2. The bag appeared to be weighted as OCASIO carried it by his right side. OCASIO appeared to have unlocked the front door and let himself in. A short time later, OCASIO exited the front door without the bag. OCASIO walked towards the passenger's side of the unknown sedan. OCASIO then walked back towards the passenger's side of the GMC Sierra. OCASIO was then observed entering the front door of TARGET LOCATION 2 with a smaller sized black bag. OCASIO then exited the front door and appeared to have locked the door. OCASIO walked towards the GMC Sierra with his right hand in his sweatshirt pocket and nothing in his left hand. OCASIO entered the driver's seat of the GMC and departed. The unknown sedan followed directly behind the GMC.

471.    At approximately 2:00 AM, the black GMC Sierra pulled into the driveway at TARGET LOCATION 1 and OCASIO exited the driver's seat. OCASIO, wearing a gray sweatshirt and carrying a backpack, walked to the front door of the residence and went inside.

472.    On or about October 5 at approximately 8:42 PM, a black GMC pickup truck known to investigators to be driven by members of the OCASIO DTO, including OCASIO, arrived and parked in front of TARGET LOCATION 2.  A male who appeared to be OCASIO exited the GMC, wearing what appeared to be shorts and a hooded sweatshirt.  OCASIO hesitated at the doorway as if using a key to unlock the door and then entered the residence at approximately 8:44 PM.  Investigators noted that prior to his arrival, the house had been dark, and a white Jeep Grand Cherokee often driven by Jose ROSADO-ORTIZ was not present; investigators thus concluded that ROSADO-ORTIZ was unlikely to be home at the time.

473.    After approximately 4 minutes, OCASIO exited the residence carrying a large dark colored duffel style bag carried down by his right side.  Illumination from OCASIO's cell phone can be seen as he exited.  OCASIO placed the duffel bag in the passenger side of the GMC, entered the driver's seat, and departed by 8:49 PM.

474.    At approximately 10:22 PM, the white Jeep Grand Cherokee most often driven by ROSADO-ORTIZ arrived and parked in front of the residence.  The operator remained in the vehicle for some time, during which the operator could be seen moving around inside the vehicle.  At approximately 10:49, a male who appeared to be ROSADO-ORTIZ exited the Jeep and entered the front door to the residence carrying a white bag in his left hand.

475.    On or about October 6, at approximately 6:42 PM, a white Jeep known to investigators to be operated by ROSADO-ORTIZ arrived and parked in front of TARGET

LOCATION 2. At approximately 7:11 PM a male who appeared consistent with ROSADO-ORTIZ exited the Jeep and entered TARGET LOCATION 2.

476.     At approximately 8:50 PM, a black GMC pickup truck known to investigators to be driven by members of the OCASIO DTO, including OCASIO, arrived and parked in front of TARGET LOCATION 2. A male who appeared to be OCASIO exited the GMC, wearing what appeared to be shorts and a hooded sweatshirt. OCASIO retrieved what appeared to be a large dark colored bag from the passenger's side of the GMC. Illumination from OCASIO's cell phone can be seen as he exited the truck and walked between the truck and the home. OCASIO then walked up to the door of TARGET LOCATION 2 and knocked before being let in by a male who appeared to be ROSADO-ORTIZ at approximately 8:53 PM.

477.     At approximately 9:13 PM, OCASIO exited TARGET LOCATION 2. It appeared that OCASIO was not carrying anything upon exiting. OCASIO then walked to and entered the black GMC and then backed the truck into the driveway on the right side of TARGET LOCATION 2. OCASIO then exited the truck and walked back to and entered the front door of TARGET LOCATION 2 at approximately 9:15 PM.

478.     At approximately 10:18 PM, OCASIO exits the residence carrying two large black/dark colored bags, one in each hand. OCASIO appears to struggle maneuvering the bags and they appeared to be of substantial weight. OCASIO then walked the bags to the GMC and placed them in the front passenger's side of the truck. OCASIO then waited by the GMC and the male who appeared to be ROSADO-ORTIZ shuts off the lights in the residence and exits. OCASIO and ROSADO-ORTIZ then appeared to converse by the GMC briefly, before OCASIO entered the GMC and ROSADO-ORTIZ entered the white Jeep and vehicles leave the area in tandem at approximately 10:20 P.M.  On or about October 16, 2025 at approximately 8:26 PM a

black truck consistent with OCASIO's GMC parks along the curb in front of TARGET LOCATION 2. The GMC is followed by a white Jeep consistent with the one operated by ROSADO-ORTIZ, which parks behind the GMC further down the street. Several minutes later individuals who appeared to be ROSADO-ORTIZ and OCASIO exited their respective vehicles, and entered the front door of TARGET LOCATION 2.  OCASIO was carrying a large, weighted bag under his right arm.

479.    At approximately 8:48 PM OCASIO exited the residence and entered the driver's position of the GMC before leaving the area a short time later. It could not be determined if OCASIO was carrying anything on his exit from the residence.

480.    On or about October 18, at approximately 12:25 PM, OCASIO's black RAM TRX arrived at TARGET LOCATION 2 and parked within the driveway to the right of the residence. The TRX was followed by OCASIO's black GMC pickup which parked along the curb in front of TARGET LOCATION 2. A short time later OCASIO, dressed in a green sweatshirt and black pants exited the TRX and took a weighted black duffle bag out of the TRX. OCASIO then walked towards the front of the home. At that same approximate time, an unknown white/Hispanic male exited the GMC wearing a gray sweatpants and sweatshirt, carrying an orange cross body bag. OCASIO then placed the black duffle on the ground near the GMC and moved the trash cans for the residence to the back of the home. OCASIO then came back and retrieved the duffle bag and walked with the unknown male into TARGET LOCATION 2 through the front door.

481.    On two occasions, at approximately 12:48 PM and 12:57 PM, the unknown male exited the residence and retrieved what appeared to be weighted red reusable style shopping bags from the GMC, before taking the bags inside of TARGET LOCATION 2.

482.    At approximately 1:02 PM the unknown male exited the residence carrying a red reusable bag that appeared to be fuller and bulkier than when previously observed. OCASIO also exited the residence at that same approximate time and walked to and entered the TRX.  The unknown male walked to the GMC, placed the red bag on the seat, and then entered the truck. A short time later, the TRX departed the area followed by the GMC.

483.    At approximately 4:15 PM OCASIO's black GMC arrived and parked in front of TARGET LOCATION 2. The unknown white/Hispanic male in grey sweatpants and shirt with the orange cross body bag exited the GMC and then appeared to let himself into the residence. At approximately 4:20 PM, the male exited the residence carrying a box. The male then shut and appeared to lock the door to the house before picking up the box and carrying it to the GMC. The male placed the box into the GMC and then entered the driver's position and departs the area.

484.    On or about October 28, 2025 at approximately 7:47 AM, OCASIO exited the front door of TARGET LOCATION 1.  OCASIO's white Acura sedan, and Chevy Tahoe rented from Enterprise Rent-a-Car by OCASIO were parked in the driveway.  OCASIO started both vehicles to warm them up, and removed a large black duffle bag from the Tahoe, which he carried over his shoulder to the Acura.  OCASIO placed the large black duffle bag in the Acura, before returning into TARGET LOCATION 1.

485.    A few minutes later, OCASIO, DEJESUS, and a child exited the front door of TARGET LOCATION 1.  DEJESUS carried another duffle bag, which she placed in the trunk of the Tahoe before entering the driver's seat.  OCASIO carried the orange satchel bag that is familiar to investigators, which he placed on roof of the Acura.  OCASIO helped the child into the Acura, and then placed the orange satchel bag on the Acura's front passenger seat.  OCASIO then returned inside TARGET LOCATION 1 momentarily, before again emerging carrying what

appeared to be a small blue box, which was also placed on the passenger seat of the Acura.

OCASIO entered the Acura's driver's seat. Both the Acura and Tahoe then departed.

## VIII.  GENERAL INFORMATION ABOUT DRUG TRAFFICKING

486.    During my tenure as a law enforcement officer, I have investigated and participated in operations which involved, in part, drug trafficking violations, and the flow of the illegal proceeds obtained from drug trafficking and related offenses. Search warrants relating to these investigations have covered, among other locations, residences, vehicles, businesses, stash locations and distribution locations used by drug traffickers and their coconspirators.

487.    Materials searched for and recovered in these locations have included, among other evidence, the following: controlled substances; drug paraphernalia, such as scales, processing materials and packaging materials; books and records reflecting drug sales, the transfer or transportation of drugs and amounts of monies owed for drugs, and the names, addresses and telephone numbers of coconspirators; sales receipts and other records reflecting the expenditure of monies that are proceeds from unlawful drug distribution; currency and money wrappers; cryptocurrency, cryptocurrency wallets or their constitutive parts, whether in electronic or physical format, to include "recovery seeds" or "root keys" which may be used to regenerate a wallet; records of bank transactions made to conceal and launder drug trafficking proceeds; cellular telephones; computers; and various valuable assets such as real property and automobiles that were purchased with the proceeds of unlawful drug trafficking. These items obtained during the executions of said search warrants have constituted evidence of drug violations, the acquisitions of assets with drug trafficking proceeds, and the use of the assets to facilitate drug trafficking violations.

488.    Based on my training, experience and participation in this and other drug trafficking investigations, I know that:

a.      Drug traffickers often place assets in names other than their own, including in the names of businesses and corporate entities as nominee title holders, to avoid detection of these assets by law enforcement.

b.      Drug traffickers often use multiple cellular telephones to facilitate drug deals and from information gathered during this investigation are aware that OCASIO and others use multiple cellular phones to facilitate the OCASIO DTO's drug trafficking.

c.      Drug traffickers must maintain and have quick access to large amounts of United States currency, foreign currency, cryptocurrency, or other liquid assets to maintain and finance their ongoing drug business; these materials, as well as records, generally described below, are often kept and maintained within premises controlled or used by the drug traffickers within safes or lock boxes.

d.      Drug traffickers maintain in their residences computerized or written books, records, receipts, diaries, ledgers, calendars, personal telephone/address books, airline tickets, airline schedules and airline receipts, cashier's checks, money orders, telephones with memory capabilities, and other papers relating to the transportation, ordering, sale and distribution, of controlled substances and the outstanding debts and collections from controlled substances that have been distributed; these materials are often maintained within the electronic memory of personal computers, iPads or other computerized tablets, external hard drives, memory cards, and thumb drives kept and maintained at premises under the control of the drug traffickers.

e.      Drug traffickers commonly provide narcotics on consignment sale to their customers, who subsequently pay for the drugs after reselling the drugs. Therefore, the above-mentioned books, computerized records, receipts, notes, ledgers, etc., will be secured by the drug traffickers within their residences for their ready access to them for the

purpose of determining drug debts and collecting monies derived from the sale of drugs.

f.     Drug traffickers commonly conceal contraband, proceeds of drug transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone numbers of drug associates within their residences, for ready access and to conceal them from law enforcement agencies.

g.     Drug traffickers commonly maintain records reflecting names, nicknames, addresses, and telephone numbers of both their current and past drug associates.

h.     Drug traffickers who are aware of an ongoing criminal investigation will often destroy an existing format of records reflecting their drug transactions. However, it is common for drug traffickers, particularly traffickers who provide or receive drugs on a consignment basis, to create another type of drug record to assist the trafficker in the collection of drug debts.

i.     Drug traffickers commonly use their homes to store records and/or receipts reflecting the collection of drug debts and the distribution of controlled substances, as well as records and receipts reflecting the expenditure of drug proceeds for personal and business assets.

j.     Drug traffickers will commonly conceal within their residences or within the curtilage of their residences, quantities of narcotics, large amounts of currency, firearms, financial instruments, jewelry, electronic equipment, motor vehicles and other items of value and proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, and spending large sums of money derived from drug trafficking.

k.     Drug traffickers will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services such as safe deposit

boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate and business fronts.

l.      Persons involved in drug trafficking who are aware of a criminal Investigation into their financial drug activities, will conceal, liquidate, and transfer easily movable drug derived assets in order to prevent law enforcement agencies from seizing and forfeiting their assets.

m.      Drug traffickers often have photographs, digital electronic data, or video movies of themselves, their co-conspirators and the property and assets purchased with drug proceeds. These photographs and video movies are normally in the drug traffickers' possession or residence.

n.      The State of Connecticut is generally viewed as a consumer state in regards to narcotic activity. However, it is common for drug traffickers to travel to major distribution centers to purchase their narcotics for distribution. It is known that after purchasing these narcotics, drug traffickers will transport these narcotics or cause them to be transported to those areas in which they will be distributed to their customers. It is known that drug traffickers' methods include, but are not limited to: commercial airlines, private motor vehicles, tractor trailer units, public transportation, and motor vehicles with concealed compartments, and government and contract mail carriers. It is known that the residences of drug traffickers will often contain records of drug related travel or shipping. These records may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel, or shipping labels, receipts, boxes, tracking numbers, or envelopes.

o.      Based on my training and experience, drug traffickers commonly have firearms and other weapons in their possession, in their cars, on their person, at their

residence, including, but not limited to handguns, rifles, shotguns, automatic weapons, and knives. These firearms and weapons are most often kept to protect and secure drug trafficker's property.

p.      Based on my training, experience, and participation in this and other drug trafficking investigations, I know that it is generally a common practice for drug traffickers to store their drug inventory and drug related paraphernalia in their residences, cars or those of trusted associates. This paraphernalia frequently includes scales, funnels, sifters, grinders, plastic bags, heat sealing devices, and dilatants.

q.      Based on my training and experience, drug dealers often create secret locations, commonly called "traps," in their automobiles, residences, or other premises under their control. Often, drug dealers will use these hidden locations to store narcotics, weapons, money and other items and documents related to their drug trade.

r.      Based on my training, experience and participation in this and other drug trafficking investigations, I know that drug traffickers often possess, maintain and control other items related to their drug trafficking activities in their cars, homes, garages and out-buildings, and in safes or lock boxes maintained at such locations.

489.    In addition, there is probable cause to believe that TARGET LOCATIONS 1 – 2 contain substantial evidence of the target crimes, including documents, records, items or other evidence regarding, among other things, the following: financial transactions relating to obtaining, transferring, secreting or spending of sums of money made from engaging in narcotics trafficking activities; contraband; quantities of narcotics and controlled substances; scales, cutting agents, dilatants, and drug packaging materials; addresses or telephone numbers in books, papers, cellular telephones, or electronic organizers, and their electronically stored contents, which reflect names, addresses, telephone numbers of and text messages to or from their associates and/or clients in

narcotics trafficking activity; photographs and digital recordings of participants and associates in narcotics trafficking activity and of property acquired as a consequence of narcotics trafficking activities; safes and other secure storage containers and their contents; identification documents and keys evidencing a possessory interest in premises, vehicles, and storage containers; their possession, ownership, and/or use of cellular telephones; their possession, ownership, and use of motor vehicles; travel to locations to meet sources of supply and/or other narcotics trafficking associates; U.S. currency or cryptocurrency used to purchase and/or pay for wholesale quantities of illegally obtained fentanyl, cocaine, Xanax, Adderall, counterfeit pills, and other controlled substances; U.S. currency or cryptocurrency derived from the sale of narcotics; unexplained wealth arising from their narcotics trafficking activities; receipts, transactions records, and other documents relating to the transfer of money to their sources of supply and/or other coconspirators; and records relating to the rent and use of storage locker units, safety deposit boxes, or other property used to facilitate their illegal activities.

## IX.    <u>CONCLUSION</u>

490.    On the basis of the foregoing information, there is probable cause to believe, and I do believe, that the individuals listed in paragraph 7, who together comprise the OCASIO DTO, have committed violations of 21 U.S.C. §§ 841(a)(1) and 846 as outlined herein.

491.    Based upon the foregoing, there is probable cause to believe, and I do believe, that a search of TARGET LOCATION 1 and TARGET LOCATION 2, which are more fully described in Attachments A-1 through A-2, for the things described in Attachment B, respectively, will provide evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846.  I therefore respectfully request that the proposed search warrants be issued.

492.    Because this is an application that pertains to an ongoing criminal investigation, and because disclosure of the information contained herein as well as disclosure of the warrants

and complaints being requested herein may compromise the investigation and increase the risk of harm for the law enforcement officers responsible for conducting the arrests and searches, I request that the warrants, applications, complaints and this affidavit be ordered sealed by the Court, for a period of 30 days, or until further order of the Court.

SCOTT VERILLO (Affiliate)
Digitally signed by SCOTT VERILLO (Affiliate)
Date: 2025.12.01 14:09:37 -05'00'

Scott Verillo
Task Force Officer
Drug Enforcement Administration

The truth of the foregoing affidavit has been attested to me by DEA Task Force Officer Scott Verillo over the telephone on this 1st day of December, 2025 at Hartford, Connecticut.

Robert A. Richardson
Digitally signed by Robert A. Richardson
Date: 2025.12.01 14:36:32 -05'00'

HON. ROBERT A. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A-1**

*Premises to be Searched (Target Location 1)*

TARGET LOCATION 1 is a single-family home with attached garage, with green siding and light trim, located at 2 Yellow-Orange Circle, Middletown, CT.  The residence may be accessed via white door on the west side of the residence, or by a door on the east side of the residence adjacent to a deck, in addition to the aforementioned attached garage.

The scope of the search is to encompass the entirety of **TARGET LOCATION 1**, including but not limited to the basement, the attic, backrooms, bathrooms, desks, drawers, file cabinets, safes, boxes, briefcases, hidden and/or "trap" locations within the premise, garages, sheds, enclosed trailers, receptacles, or any other storage containers or facilities whether inside or outside.



**ATTACHMENT A-2**

*Premises to be Searched (Target Location 2)*

TARGET LOCATION 2 is multi-family duplex style structure, with tan siding, white trim, and black shutters. TARGET LOCATION 2 is located at 37 Pioneer Circle, Manchester, CT. The structure also holds the physical address of 35 Pioneer Circle, which investigators are not currently requesting to search. The words "thirty seven" are written in script on an overhang that covers the front door.

The scope of the search is to encompass the entirety of **TARGET LOCATION 2**, including but not limited to the basement, the attic, backrooms, bathrooms, desks, drawers, file cabinets, safes, boxes, briefcases, hidden and/or "trap" locations within the premise, garages, sheds, enclosed trailers, receptacles, or any other storage containers or facilities whether inside or outside.



## ATTACHMENT B

The following property, records, and information that constitute evidence, fruits, and/or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances), and 21 U.S.C. § 846 (conspiracy to possess with intent to distribute controlled substances) (the "TARGET OFFENSES"), including, but not limited to:

1.      Narcotics, and other controlled substances;

2.      Firearms and ammunition;

3.      United States Currency;

4.      .Drug paraphernalia, including but not limited to, syringes, vials, distribution bags, scales, baggies, envelopes, needles, sifters, rubber gloves;

5.      Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

6.      Any information related to sources of drugs or drug customers (including names, addresses, phone numbers, or any other identifying information);

7.      All bank records, checks, credit card bills, account information, and other financial records;

8.      Money orders, receipts for money orders, and other documents evincing payment;

9.      Boxes and other shipping documents related to the transport and delivery of controlled substances, including but not limited to packaging materials, shipping boxes, and delivery records;

10.      Cellular devices and records, including phone logs, notes, ledger, lists, logs, notebooks, tallies, receipts, correspondence, text messages, electronic mail, chat logs, and other communications or documents, related to the sale of controlled substances, including but not limited to the following particular devices;

      a.   TARGET TELEPHONE

      b.   TARGET TELEPHONE 2

      c.   TARGET TELEPHONE 3

      d.   OCASIO TELEPHONE

      e.   ROSADO-ORTIZ TELEPHONE;

11.    Video recordings made by any and all surveillance cameras;

12.    Communications and evidence of communications by and between and among OCASIO DTO members as well as the individuals to whom he sells controlled substances;

13.    Records and information related to the identity of any potential co-conspirators;

14.    Documents and items concerning the location and access of any storage facility, including any keys, code, pass cards, access device, or passwords.

15.    Any and all cryptocurrency, to include the following:

      a.   any and all representations of cryptocurrency public keys or addresses, whether in electronic or physical format;

      b.   any and all representations of cryptocurrency private keys, whether in electronic or physical format;

      c.   any and all representations of cryptocurrency wallets or their constitutive parts, whether in electronic or physical format, to include "recovery seeds" or "root keys" which may be used to regenerate a wallet.

The United States is authorized to seize any and all cryptocurrency by transferring the full account balance in each wallet to a public cryptocurrency address controlled by the United States. The United States is further authorized to copy any wallet files and restore them onto computers controlled by the United States. By restoring the wallets on its own computers, the United States will continue to collect cryptocurrency transferred into the defendant's wallets as a result of transactions that were not yet completed at the time that the defendant's devices were seized.